Sealed

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: **17 - 24624**

FILED by _MM_ D.C.

DEC 20 2017

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. OF FLA. – MIAMI

CIV-COOKE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT H. SHAPIRO, | ) |
| WOODBRIDGE GROUP OF COMPANIES, LLC, | ) |
| d/b/a WOODBRIDGE WEALTH, | ) |
| RS PROTECTION TRUST, | ) |
| WMF MANAGEMENT, LLC, | ) |
| WOODBRIDGE STRUCTURED FUNDING, LLC, | ) |
| WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC, | ) UNDER SEAL |
| WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC, | ) |
| WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC, | ) |
| WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC, | ) |
| WOODBRIDGE MORTGAGE INVESTMENT FUND 4, LLC, | ) |
| WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 1, LLC, | ) |
| WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 2, LLC, | ) |
| 144 WOODBRIDGE-AFFILIATED PROPERTY LIMITED | ) |
| LIABILITY COMPANIES, | ) |
| 131 WOODBRIDGE-AFFILIATED HOLDING LIMITED | ) |
| LIABILITY COMPANIES, | ) |
| | ) |
| Defendants, and | ) |
| | ) |
| JERI SHAPIRO, | ) |
| WOODBRIDGE REALTY OF COLORADO, LLC | ) |
| d/b/a WOODBRIDGE REALTY UNLIMITED, | ) |
| WOODBRIDGE LUXURY HOMES OF CALIFORNIA, INC., | ) |
| d/b/a MERCER VINE, INC., | ) |
| RIVERDALE FUNDING, LLC, | ) |
| SCHWARTZ MEDIA BUYING COMPANY, LLC, | ) |
| WFS HOLDING CO., LLC | ) |
| | ) |
| Relief Defendants. | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* EMERGENCY MOTION FOR ASSET FREEZE AND OTHER RELIEF

# **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................ 1

II.    OVERVIEW OF THE FRAUD ...................................................................... 1

III.   DEFENDANTS AND RELIEF DEFENDANTS ........................................... 2

       A.    Defendants ........................................................................................... 2

IV.    VENUE ............................................................................................................ 6

V.     FACTS ............................................................................................................. 7

       A.    Shapiro and Woodbridge ..................................................................... 7

       B.    Investment Products ............................................................................. 8

             1.    Fund Offerings ............................................................................ 8

             2.    First Position Commercial Mortgages ........................................ 9

       C.    Aggressive Marketing Tactics and Their Reward .............................. 11

       D.    Anatomy of the Fraud ........................................................................ 15

             1.    Woodbridge's Purported Investment Products Were a Sham.... 15

             2.    The Defendants Operated a Ponzi Scheme ............................... 18

                   a.    Insufficient Revenue Generated ..................................... 18

                   b.    Comingling of Funds ...................................................... 19

                   c.    Shapiro Misappropriated Investor Funds ....................... 20

VI.    BANKRUPTCY ............................................................................................ 21

VII.   LEGAL ARGUMENT ................................................................................... 24

       A.    The Court Should Exercise its Equitable Powers and Order An Asset Freeze ..... 24

       B.    The Defendants  Violated the Federal Securities Laws....................... 25

             1.    Woodbridge's FPCMs and Fund Offerings are Securities ....... 25

                   a.    The FPCM Promissory Notes are Securities Under Reves ......... 25

                         (1)    The *Reves* Test ................................................... 25

(2)    FPCMs Are Securities Under the Family Resemblance Test ............................................. 26

b.    The Fund Offering Units Are Securities ....................................... 29

c.    The FPCM Promissory Notes and Fund Offering Units Are Investment Contracts ................................................. 29

2.    Violations of Section 5 of the Securities Act (Against Shapiro, Woodbridge, WMF, WSF, Funds 1 – 4 and Bridge Loan Funds 1 & 2) ......................................................... 30

3.    Violations of the Anti-Fraud Provisions ..................................... 32

a.    Misstatement Liability:  Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder (Against Shapiro, Woodbridge, WSF, Funds 1-4, and Bridge Loan Funds 1 & 2) ......................................... 32

b.    Scheme Liability:  Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder (Against all Defendants) ........................................... 34

c.    Control Person Liability for Corporate Defendants' Exchange Act Anti-Fraud Violations (Against RS Trust and Shapiro) ............... 36

4.    Broker-Dealer Registration Violations for Sales of FPCMs and Fund Offerings (Against Woodbridge and WSF and Against Shapiro for Aiding and Abetting) ....................................................... 38

C.    Disgorgement is an Appropriate Remedy ............................................ 40

D.    A Total Asset Freeze is Appropriate ................................................. 40

E.    Sworn Accounting .......................................................... 41

F.    An Order Prohibiting Destruction of Records ....................................... 41

VIII.    CONCLUSION ................................................................. 42

## TABLE OF AUTHORITIES

**CASES**

*Aaron v. SEC*, 446 U.S. 680 (1980) .................................................................... 32

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) ..................................................... 32

*Brown v. Enstar Group, Inc.*, 84 F.3d 393 (11th Cir. 1996) ............................. 36

*CFTC v. Levy*, 541 F.3d 1102 (11th Cir. 2005) ................................................. 24

*Deal v. Asset Mgmt. Grp.* 1992 WL 212482 (N.D. Ill. Aug. 28, 1992) .......... 27

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276 (11th Cir. 2007) .......... 25, 27

*Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310 (11th Cir. 2014) ......................... 32

*FTC v. IAB Marketing Associates, LP*, 746 F.3d 1228 (11th Cir. 2014) .......... 24

*FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307 (S.D. Fla. 2013) .......... 25

*FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) .......... 24

*G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945 (5th Cir. Feb. 1981) .......... 36

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) .......... 32, 33

*Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715 (11th Cir. 2008) ............... 36

*Levi Strauss & Co. v. Sunrise Int'l Trading Co.*, 51 F.3d 982 (11th Cir. 1995) .......... 24

*Mass. Fin. Serv., Inc. v. Sec. Inv. Prot. Corp.*, 411 F. Supp. 411 (D. Mass. 1976) .......... 38

*McNabb v. SEC*, 298 F.3d 1126 (9th Cir. 2002) ................................................ 26, 28

*Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808 (2d Cir. 1994) ........................ 26, 27, 28

*Quinn and Co., Inc. v. SEC*, 452 F.2d 943 (10th Cir. 1971) ............................. 31

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ..................................................... 25, 26, 27, 28

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ..................................................... 39

*SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167 (D.D.C. 1998) .......... 35

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) .......... 33, 39

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) .................................................. 31

*SEC v. Carriba Air Inc.*, 681 F.2d 1318 (11th Cir. 1982) ................................. 32

*SEC v. CMKM Diamonds, Inc.*, 729 F. 3d 1248 (9th Cir. 2013) .................................................. 31

*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ...................................................... 35

*SEC v. Coplan*, 13-62127-CIV, 2014 WL 695393 (S.D. Fla. Feb. 24, 2014) ...................... 33, 38

*SEC v. ETS Payphone, Inc.*, 300 F.3d 1281 (11th Cir. 2004)................................................ 30, 40

*SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) .............................................. 24, 30

*SEC v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir. 1981) ......................................... 25

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001) .......................................... 25

*SEC v. Holschuh*, 694 F. 2d 130 (7th Cir. 1982) ...................................................................... 31

*SEC v. Lauer*, 445 F. Supp. 2d 1362 (S.D. Fla. 2006)............................................................... 25

*SEC v. Lauer*, 478 Fed. Appx. 550 (11th Cir. 2012)................................................................. 24

*SEC v. Levin*, 849 F.3d 995 (11th Cir. 2017)............................................................................ 40

*SEC v. Lybrand*, 2000 WL 913894  (S.D.N.Y. July 6, 2000)..................................................... 41

*SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007)................................................ 32

*SEC v. Monterosso*, 756 F.3d 1326 (11th Cir. 2014)................................................................ 40

*SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233 (11th Cir. 2012)......................................... 34

*SEC v. Morris*, 2012 WL 6822346 (E.D. Mo. Sept. 21, 2012).................................................. 29

*SEC v. Murphy*, 626 F. 2d 633 (9th Cir. 1980) ........................................................................ 31

*SEC v. Mut. Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) ...................................................... 26

*SEC v. Ralston Purina Co.*, 346 U.S. 199 (1953) ..................................................................... 31

*SEC v. Randy*, 38 F. Supp. 2d 657 (N.D. Ill. 1999) .................................................................. 31

*SEC v. Shiner*, 268 F. Supp. 2d 1333 (S.D. Fla. 2003)............................................................. 41

*SEC v. Smart*, 678 F.3d.850 (10th Cir. 2012)........................................................................... 33

*SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240 (N.D.N.Y. 2014)............................................... 37

*SEC v. Sullivan*, 68 F. Supp. 3d 1367 (D. Colo. 2014).............................................................. 35

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013)................................................................... 27

*SEC v. Torchia*, 183 F. Supp. 3d 1291 (N.D. Ga. 2016) ........................................................... 36

*SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195 (11th Cir. 1999) .......................................... 29

*SEC v. United Monetary Servs.*, Inc., 1990 WL 91812 (S.D. Fla. May 18, 1990) ...................... 38

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ......................................................................... 29

*SEC v. Wallenbrock*, 313 F.3d 532 (9th Cir. 2002) ................................................................. 27

*SEC v. Zanford,* 535 U.S. 813 (2002) ...................................................................................... 34

*Stoiber v. SEC*, 161 F.3d 745 (D.C. Cir. 1998) ....................................................................... 28

*United States v. Oncology Assoc.,* 198 F.3d 489 (4th Cir.1999) ......................................... 24, 26

*Wright v. Downs*, 1992 WL 168104 (6th Cir. July 17, 1992) ................................................... 27

*ZPR Inv. Mgmt. Inc. v. SEC,* 861 F.3d 1239 (11th Cir. 2017) ................................................. 32

## I.   **INTRODUCTION**

From July 2012 through December 4, 2017, Woodbridge Group of Companies, LLC, d/b/a Woodbridge Wealth ("Woodbridge"), a private company not registered with the Commission, its affiliated companies and its owner and manager, Robert H. Shapiro ("Shapiro"), orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from over 8,400 nationwide investors.  For the protection of investors, to prevent further dissipation of investor funds, and to preserve assets that could be used to pay disgorgement, Plaintiff Securities and Exchange Commission ("Commission") has filed an *Ex Parte* Motion to Freeze Assets and Other Relief, and hereby submits in support the following Memorandum of Law.  In its Motion, the Commission seeks to freeze the assets of Defendants Shapiro, RS Protection Trust, ("RS Trust"), 13 Non-Bankruptcy Filer Woodbridge-affiliated Property Holding Limited Liability Companies ("Non-Filer Shapiro Property LLCs"), and 10 Non-Bankruptcy Filer Woodbridge-affiliated Holding Limited Liability Companies ("Non-Filer Shapiro Holding LLCs").[1]  The Commission also seeks an Order requiring Defendants Shapiro and RS Trust to provide a sworn accounting, and an Order prohibiting Defendants Shapiro and RS Trust from destroying records.  In support, the Commission states the following:

## II.   **OVERVIEW OF THE FRAUD**

Woodbridge, controlled by Shapiro, who was its founder and President, was purportedly in the business of real estate development and hard-money lending.  Woodbridge solicited investors nationwide to fund these objectives, promising virtually guaranteed profitable returns on investment.  Woodbridge told most investors that Woodbridge would use investor money to

---

[1]  The Non-Filer Shapiro Property LLCs and Non-Filer Shapiro Holding, LLCs are identified in Appendix A to the Complaint as well as in Ex. 42, Appendix A, to this Memorandum.

make hard-money, high interest loans to bona-fide third-party borrowers, with Woodbridge using the interest it would receive from those loans to pay returns to investors.  However, in reality there were few third-party borrowers—nearly all the loans Woodbridge made were to a non-revenue earning Shapiro-owned affiliate with no ability to make the interest payments on the loan.  As a result, Woodbridge's revenues were miniscule compared to the investor dividends and interest payments Woodbridge obligated itself to pay.  In sum, the only way Woodbridge was able to pay its investors their dividends and interest payments was through the constant infusion of new investor money. *(Ex. 1, Declaration of Soneet R. Kapila, CPA, CIRA, CFE, CFF).*

Inevitably, once Woodbridge could no longer bring in enough new investor money to pay returns to existing investors, it collapsed, culminating in a bankruptcy filing on December 4, 2017.  Although Woodbridge has stopped paying returns to investors, it continues to pay Shapiro $175,000 per month.

## III.   DEFENDANTS AND RELIEF DEFENDANTS

### A.   Defendants

1.   **SHAPIRO** is a resident of Sherman Oaks, California and also maintains a residence in Aspen, Colorado.  *(Ex. 20, ¶28).*  Shapiro is a Florida registered voter, and his voter information provides a Palm Beach County address.  *(Ex. 3).*  He is Woodbridge's owner, and President and during all relevant times maintained sole operational control over the company and its affiliated entities.  *(Exs. 20,¶¶14-16;22 at 243;25 at 322;28 at 408-09;31 at 501;34 at 583;37 at 666;40 at 754).*  Shapiro is not, and has never been, registered with the Commission, FINRA, or any state securities regulator.  *(Ex. 5).*  Shapiro personally solicited investors, including several high net-worth individuals, to invest in Woodbridge. *(Ex. 6; ¶¶23-24; Ex. 7 at 67-69).*  When

questioned under oath by the Commission during its investigation, Shapiro refused to answer any questions, asserting his rights under the Fifth Amendment to the Constitution. *(Ex. 8).*

2.     **WOODBRIDGE** is a Sherman Oaks, California-based financial company not registered with the Commission in any capacity with no publicly traded stock. *(Exs. 9;10).* Woodbridge was formed in December 2014. *(Ex. 10).* Since February 2016, Woodbridge has served as the main operating company of Shapiro's businesses with approximately 140 employees in offices in six states, including in Boca Raton, Florida. *(Exs. 11;13 at 70-81; 56 at 40, 92).* Woodbridge formerly operated as Woodbridge Structured Funding, LLC ("WSF") and was headquartered in Boca Raton, Florida. *(Exs. 14;15 at 14, 22-25).*

3.     **RS TRUST** is an irrevocable domestic asset protection trust settled under Nevada law under the control of Shapiro for the benefit of himself and his family. *(Exs. 16; 20, ¶14).* RS Trust is an umbrella asset trust holding all of Shapiro's business entities and personal assets, including, but not limited to, WMF Management, LLC ("WMF"), Woodbridge, the 144 Woodbridge-Affiliated Property Limited Liability Companies ("Shapiro Property LLCs") and the 131 Woodbridge-Affiliated Holding Limited Liability Companies ("Shapiro Holding LLCs"). RS Trust, as the beneficial owner of all of Shapiro's business entities, maintained operational control of each of the investment offerings through its ownership of Woodbridge, WSF, and WMF. *(Ex. 20, ¶14).*

4.     **WMF** is a Delaware Limited Liability Company formed on June 25, 2012. *(Ex. 17).* WMF, a privately owned entity, was controlled during all relevant times by Shapiro. *(Ex. 20,¶16).* WMF is a holding company for various Shapiro business entities including, but not limited to, Woodbridge Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1 and Bridge Loan Fund 2. *(Id.).*

5.      **WSF** is a Delaware Limited Liability Company formed on July 20, 2009.  *(Ex. 14).*  WSF was owned and controlled by Shapiro and during all relevant times.  *(Ex. 13 at 60-63).*  WSF is not, and has never been, registered with the Commission in any capacity and has no publicly traded stock.  *(Ex. 19).*  From 2012 through approximately 2015, WSF served as the operating company of Shapiro's business entities, including but not limited to, the securities offerings at issue, and maintained Shapiro's businesses' primary bank account.  *(Exs. 1, ¶¶ 15, 74, 78, fn.19; 15 at 14).*

6.      **WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC ("Fund 1")**, is a Delaware Limited Liability Company formed on June 25, 2012.  *(Ex. 21).*   At all relevant times, Shapiro was the President and CEO of Fund 1, which is wholly-owned by WMF.  *(Ex. 22 at 235, 239).*  On August 2, 2012, Fund 1 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506 of Regulation D of the Securities Act of 1933 ("Securities Act") seeking to raise $10 million from investors.  *(Ex. 23).*

7.      **WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC ("Fund 2")**, is a Delaware Limited Liability Company formed on December 6, 2013.  *(Ex. 24).*  At all relevant times, Shapiro was the President and CEO of Fund 2, which is wholly-owned by WMF.  *(Ex. 25 at 306, 322).*  On January 8, 2014, Fund 2 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $25 million from investors.  *(Ex. 26).*

8.      **WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC ("Fund 3")**, is a Delaware Limited Liability Company formed on September 9, 2014.  *(Ex. 27).*   At all relevant times, Shapiro was President and CEO of Fund 3 which is wholly-owned by WMF. *(Ex. 28 at 408-09).*  On September 19, 2014, Fund 3 filed with the Commission a Form D notice of exempt

offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $50 million from investors. *(Ex. 29).*

9.      **WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC, ("Fund 3A")** is a Delaware Limited Liability Company formed on July 28, 2015. *(Ex. 30).*   At all relevant times, Shapiro was the President and CEO of Fund 3A which is wholly-owned by WMF. *(Ex. 31 at 499, 501).*  On October 30, 2015, Fund 3A filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $100 million from investors.  *(Ex. 32).*

10.      **WOODBRIDGE MORTGAGE INVESTMENT FUND 4, LLC, ("Fund 4")** is a Delaware Limited Liability Company formed on June 3, 2015.  *(Ex. 33).*  At all relevant times, Shapiro was the President and CEO of Fund 4 which is wholly-owned by WMF. *(Ex. 34 at 580, 583).*  On November 21, 2016, Fund 4 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(b) of Regulation D of the Securities Act seeking to raise $100 million from investors. *(Ex. 35).*

11.      **WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 1, LLC, ("Bridge Loan Fund 1")** is a Delaware Limited Liability Company formed on May 7, 2015. *(Ex. 36).*  At all relevant times, Shapiro was the President and CEO of Bridge Loan Fund 1 which is wholly-owned by WMF.  *(Ex. 37 at 664, 666).*   On June 17, 2015, Bridge Loan Fund 1 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(c) of Regulation D of the Securities Act seeking to raise $50 million from investors. *(Ex. 38).*

12.      **WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 2, LLC, ("Bridge Loan Fund 2")** is a Delaware Limited Liability Company formed on July 28, 2015. *(Ex. 39).*  At all relevant times, Shapiro was the President and CEO of Bridge Loan Fund 2 which is wholly-

owned by WMF. *(Ex. 40 at 754)*.    On November 22, 2016, Bridge Loan Fund 2 filed with the Commission a Form D notice of exempt offering of securities pursuant to Rule 506(c) of Regulation D of the Securities Act seeking to raise $100 million from investors. *(Ex. 41)*.

13.    **SHAPIRO PROPERTY LLCS** are 144 Delaware and Colorado Limited Liability Companies owned, and at all relevant times controlled by Shapiro and/or Jeri Shapiro (through RS Trust) which own real estate purchased with investor funds underlying the securities at issue. *(Exs. 1,¶¶18.g; 19,20, ¶¶19-20;42, ¶¶3-6, Appendix A)*.

14.    **SHAPIRO HOLDING LLCS** are 131 Delaware and Colorado Limited Liability Companies owned, and at all relevant times controlled by Shapiro (through RS Trust) holding ownership of the Shapiro Property LLCs. *(Exs. 1, ¶¶18.g,19,20;20, ¶¶19-20;42, ¶3-6, Appendix A)*.

## IV.    <u>VENUE</u>

This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida for several reasons.  Woodbridge maintains an office in Boca Raton. *(Ex. 56 at 40)*.  As of September 30, 2017, Woodbridge raised at least $114 million from approximately 700 investors residing in this district. *(Ex. 1, ¶85)*.  Woodbridge also paid over $12 million in transaction-based commissions to 20 salespersons located in the Southern District of Florida. *(Ex. 1, ¶¶18.k, 107)*.  Prior to 2016, Woodbridge operated as WSF, and was headquartered in Boca Raton, Florida. *(Exs. 14; 15 at 22)*.

## V.   FACTS

### A.   Shapiro and Woodbridge

Since its inception, Shapiro was Woodbridge's President, and maintained sole operational control over Woodbridge and its affiliates. *(Exs.12 at 58;16;20,¶¶13-16;22 at 243 ;25 at 322;28 at 408-09;31 at 501;34 at 583;37 at 666;40 at 754).* There was no board of directors or any other executives with decision-making authority and at all relevant times, Shapiro maintained absolute control over the company's day-to-day operations. *(Exs. 7 at 24-25; 43 at 23-24; 44 at 84,169-70).* Woodbridge was the principal operating company of Shapiro's businesses and employed over 140 people in offices in six states. *(Exs 11;13 at 70-81; 34 at 581; 56 at 40, 92).* Shapiro identified the properties underlying the investments, approved every real estate purchase, selected the amount and type of investments sold, determined sales agents' commissions and calculated the company's potential profits. *(Ex. 45 at 42, 46;).* Shapiro had sole signature authority over all of Woodbridge's bank accounts. *(Exs. 1,¶61, Exhibit D; 12 at 58,96-97; 48 at 77).*

Despite being an over $1 billion dollar company, Shapiro hand-signed every investor interest check and every sales agent commission check. *(Exs.1,¶61; 12 at 130,154).* Shapiro was provided with daily notifications of the company's income and expenses and a monthly report showing the company's revenue and interest payments to investors. *(Ex. 48 at 22-25; Ex. 44 at 168).* Shapiro was notified whenever an investor chose to withdraw their funds from Woodbridge. *(Exs. 49;50).* Shapiro also personally solicited "bridge loans" from wealthy individuals to cover gaps in the company's funding. *(Ex. 7 at 67,69).*

### B.     Investment Products

Woodbridge sold investors two primary products, a five-year private placement security ("Fund Offerings" and "Fund Investors") and a twelve to eighteen month promissory note security called First Position Commercial Mortgages ("FPCMs" and "FPCM Investors"), which were based on the purported revenues Woodbridge received from issuing one-year loans to supposed third-party commercial property owners ("Borrowers"). *(Exs. 1, ¶¶16;20,¶¶17-18; 22;25; 28; 31; 34; 37; 40; 51; 52, ¶¶5,6,9,11, Ex. A; Ex. 106, ¶6).*

### 1.     Fund Offerings

During the period from August 2012 through December 4, 2017, Woodbridge affiliate WMF conducted the Fund Offerings through Funds 1, 2, 3, 3A, and 4 ("Woodbridge Fund Entities") and Bridge Loan Funds 1 and 2, pursuant to purported exemptions under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors. *(Exs.  22;23;25;26;28;29;31;32;34;35;37;38;40;41).*[2]   Woodbridge admits it ultimately raised at least $226 million from nearly 1,583 Fund Investors. *(Ex. 20, ¶17).*

Woodbridge purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend."     *(Exs. 22;25;28;31;34;37;40; 52¶21, 106,¶22).*     At the end of the five-year term, Fund Investors would also be entitled to a distribution based on Woodbridge's profits. *(Id.)*  In the offering

---

[2]  Woodbridge Group of Companies, LLC Woodbridge Structured Funding, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, Woodbridge Commercial Bridge Loan Fund 2, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, and Woodbridge Mortgage Investment Fund 4, LLC, are herein collectively defined as "Woodbridge Entities."

memoranda for each of the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs. *(Id.)* The Fund Offerings, in effect, were investments into pooled FPCMs ("The Company plans to use the net proceeds from this offering to invest in *first mortgages*") (emphasis added). *(Exs. 22;25;28;34;37;40;53 at 33-34).* Woodbridge and Shapiro used Fund Investors' funds to purchase at least 193 residential and commercial properties located primarily in Los Angeles, California and Aspen, Colorado *(Ex. 20, ¶19;Ex. 45 at 16; Ex. 54; Ex. 55).*

## 2.    First Position Commercial Mortgages

For each of the properties purchased through the Fund Offerings, Woodbridge then issued FPCMs to pools of unrelated, private investors that each contributed at least $25,000. *(Exs. 6,¶8;51; 52,¶5;57; 61,¶15; 104,¶4).* Many of these pools contained 40 or more investors. *(Exs. 58-60).* Woodbridge told investors that it was making short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers ("Borrowers") at high rates of interest, approximately 11%-15%, secured by a mortgage on the property. *(Exs. 6, ¶8; 57; 61,¶5; 62; 63; 69,¶4; 105,¶3).* Woodbridge in-turn promised FPCM Investors 5% to 8% annual interest paid monthly with a return of their principal at the end of their note's term and assigned each investor a pro-rata portion of Woodbridge's first position lien interest in the underlying property. *(Exs. 52,¶7; 57; 62; 63; 69,¶4; 105,¶3).* Woodbridge explained to investors that Woodbridge would receive the spread between what the Borrowers paid Woodbridge, and what Woodbridge was paying the investors. *(Exs. 6,¶8; 61,¶5;64, 69,¶4).* Woodbridge represented on its website and in its sales materials that it provided loan-to-value ratios of approximately 60-70%, ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." *(Exs. 6,¶26; 51; 52,¶¶8, 24;*

*84,¶6, Ex. B; 105,¶5; 106,¶¶8,19).*   At the end of the one-year term, the Borrower was purportedly obligated to repay Woodbridge the principal amount of the loan and if it defaulted, Woodbridge could foreclose on the property to recover the amount owed.   *(Ex. 12 at 87-90; 84,¶9 Ex. D; 105,¶8;106,¶11).*

Investors often received a one-page description of the key terms of the FPCM, a list of FAQs and perfunctory examples of the collateral properties, including a graphic that summarized the FPCM as follows:



*(Exs. 52, ¶13, Ex. B; 57; 63, 66; 84,¶10; 106,¶19).*

As detailed below, the premise of this pitch—that there would be "property owner[s] mak[ing] payments to Woodbridge"—was false.  Virtually all the loans were to Woodbridge affiliates, who earned no revenue and made no payments.  *(Ex. 1, ¶¶90-94).*

The FPCM Investors played no role in selecting or analyzing the underlying properties and, unless requested, were not provided Woodbridge's purported due diligence on the property.  *Exs.6,¶8;  52;  61,¶¶10,14;  69,¶4;  84,¶¶8,9;  104,¶5;  105,¶5;  106,¶16).*  Shapiro instructed Woodbridge's Managing Director of Investments, ("Head of Sales"), to fund certain FPCM Investors' securities prior to any underlying property actually being purchased.  *(Exs. 67;68.)*[3] Many of the FPCM Investors were retired and approximately 2,600 investors used their Individual Retirement Accounts ("IRAs") to fund their investments.  *(Exs. 1, ¶102; 69,¶¶5,12).*  Recognizing this, the Head of Sales told Shapiro that "most people are placing their life savings and retirement funds into these investments." *(Ex. 70).*

### C.     Aggressive Marketing Tactics and Their Reward

Woodbridge maintained an internal team of approximately 30 sales agents, led by the Head of Sales, responsible for soliciting Fund Investors.  *(Ex. 71).* Shapiro provided frequent, often daily, requirements to the Head of Sales of the number ("we need to raise 45 million in the next 39 days,") *(Ex. 72)* and type ("I need $5 million in [Fund Investors] in the next 2 weeks") of securities that needed to be sold.  *(Ex. 73).* To ensure compliance with these demands, Shapiro would either threaten his employees with termination or promise bonuses.  *(Exs. 72;74-76).* Shapiro called for daily sales updates from the Head of Sales, who in turn requested additional amounts and types of securities to sell from Shapiro.  *(Exs. 7 at 28; 77;78).*

---

[3]  When questioned by the Commission during the course of its investigation, the Head of Sales refused to answer any questions, asserting his rights under the Fifth Amendment to the Constitution. *(Ex. 82).*

Woodbridge also relied on a nationwide network of hundreds of purportedly "independent" external sales agents to solicit prospective FPCM Investors. *(Ex. 12 at 127-28).* In reality, however, Woodbridge required these external sales agents to provide prospective FPCM Investors solely the information and sales materials that Woodbridge provided. *(Ex. 79 at 54-55; Ex. 80 at 23,51-56).* As such, the external sales agents solicited the general public through marketing materials created, and in many cases, paid for by Woodbridge that they disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters, internet websites, YouTube videos, and in-person gatherings. *(Exs. 6,¶2-3;57; 63; 66; 81; 84,¶¶2-3, 85; 106,¶¶2-5).*

Woodbridge did not require or evaluate whether the FPCM investors were "sophisticated," "accredited" or otherwise had any particular financial acumen. *(Exs. 69,¶3; 80 at 85).* Indeed, instructions from a company providing Woodbridge with leads on potential investors remarked that leads that are followed up within 20 minutes of generation are "where your sales team will find the majority of low hanging, easiest to harvest fruit." *(Ex. 83).*

In numerous marketing materials sent to FPCM investors Woodbridge described this investment as "low risk," "simpler," "safe" and "conservative" and that investor returns were generated by Borrowers' interest payments. *(Exs. 52,¶¶8,11-12, Ex A; 57; 61,¶5; 63; 66;84,¶¶3,5-10, Exs B-F; 85; 106,¶7)* ("Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first lien position documents") *(Ex. 51, p. 4, #9).* Woodbridge also posted these documents online and instructed external sales agents to direct their clients to the company's website to view them. *(Exs. 52,¶3; 86; 87 at 70-71; 88 at 17).* The company's consultant training manual included a sales script for its internal sales agents to follow when offering the FPCM to external sales

agents. *(Ex. 86 at 468).* The script reiterated the information contained in the sales packet and on the website. *(Id.).* To ensure its sales agents followed this script, Woodbridge maintained an internal telephone recording system monitored by quality assurance personnel ("QAP") who reported any inconsistencies to the Head of Sales. *(Ex. 89-91)*

As an example of a sales pitch, in August 2017, a Woodbridge salesperson pitched a husband and wife over the telephone for more than 45 minutes to invest and stated,

> It's a very good vehicle. *One of the – the greatest things about it is that we're lending and not purchasing the properties* and that we're lending at low loan to value ratios so there's enough equity in those properties to protect us against a market downturn or protect us from a property owner defaulting, so that if we do have to foreclose, there's enough equity there for us to be able to profit.

*(Ex. 92 at 29:19-30:1) (emphasis added).* The salesperson was attempting to convince this husband and wife to invest $500,000. *(Id. at 30:21-25).*

Woodbridge did not disclose or inform investors that several of their sales agents had been previously censured or barred by the SEC, FINRA or state securities regulators. *(Ex. 93,¶10, Ex. A).* Many of their sales agents were not registered by the SEC or FINRA *(Ex. 93, ¶9, Ex A).* Pertaining to external sales agents, Woodbridge compensated them at a 9% wholesale rate, and the agents in turn offered the FPCM to their investor clients at 5% to 8% annual interest—the sales agent received a commission equivalent to the difference. *(Ex. 1,¶19).* Woodbridge paid external sales agents at least $64.5 million in commissions through this arrangement. *(Id, ¶107).*

Shapiro demanded that the Head of Sales and his internal sales team continuously seek to move FPCM Investors into one of the Fund Offerings. *(Exs. 94;95;106,¶¶12,23,27).* Woodbridge's internal sales team solicited each FPCM Investor approximately 90 days after they invested to "move your loan from the First Position Mortgage . . . even if your term hasn't

expired yet—to our higher-return Mortgage Investment Fund." *(Ex. 96)*. Woodbridge threatened to terminate its relationship with external sales agents who would not permit Woodbridge to contact the sales agents' clients about moving from the FPCM to the Funds. *(Ex. 79 at 97)*. Aggressive solicitation was encouraged, as for example, on March 4, 2016, the Head of Sales celebrated with his sales team that "even without being able to fund due to lack of inventory we funded over 37 million in [FPCMs] and 6 million in [Fund Offerings]!!!!!!!  By far our biggest month to date!!!!!" and congratulated his sales team, stating "WE ARE WINNERS!!!!" *(Ex. 97)*. Woodbridge successfully convinced 90% of its FPCM Investors to re-enroll when terms became due, thus avoiding having to pay large returns of principal. *(Exs. 80 at 62-63; 98 at PDF 18)*.

Despite being barred from soliciting and selling FPCMs in numerous states, Woodbridge continued to do so at an alarming rate.   After cease and desist orders were entered in Massachusetts, Pennsylvania, Texas, and Arizona, Woodbridge nonetheless raised $3.2 million, $2.6 million, $2.3 million, and $900,000, respectively, from investors in those states. *(Ex. 1,¶¶ 103, 99-102)*. Woodbridge's internal sales agents falsely mischaracterized the dispositions of these regulatory actions to external sales agents, claiming Woodbridge "was exonerated of any wrongdoing or fraudulent activity." *(Exs. 52,¶26; 103)*. Moreover, on a sales pitch call in July 2017 (during the course of the Commission's ongoing investigation), a Woodbridge salesperson falsely told a financial planner, "The SEC looked into us. We passed with flying colors," touting that the product Woodbridge was offering had a "zero default rate in anything we've had to offer." *(Ex. 18 at 14:20-21 and at 2:24-3:2)*.

Shapiro hired a public relations firm to manipulate search engine results so that investors who looked up Woodbridge would not see the state regulatory orders filed against the company.

*(Exs. 107, 108).* Also, at Shapiro's specific instructions, Woodbridge made a series of negligible charitable donations with the sole purpose of generating a stream of positive press releases to push these regulatory actions off the front page of internet search results relating to the company. *(Exs. 109, 110).*

Indeed, prior to its bankruptcy filing, Woodbridge recently created two new private placement offerings, Fund 5 and Bridge Loan Fund 3, and its website promised "New Product Coming Soon!" *(Exs. 111-113 ).* Woodbridge was attempting to transition investors into a new product called a Co-Lending Opportunity ("CLO") *(Ex. 114).* The CLO mirrors the FPCM in every material respect save one—the CLO's term is for 9 months. *(Id.).* In email communications, Shapiro and the Head of Sales contended that this small change ensured that the CLO was not a security and that Woodbridge could circumvent the states' regulatory agencies. *(Exs. 115, 116, 117).* Instead of disclosing this product to state regulators and ensuring that the terms of the new offering allayed their legitimate concerns, Shapiro and the Head of Sales decided to "switch first then settle quietly [with Colorado and California]." *(Ex. 118).*

### D.   Anatomy of the Fraud

#### 1.   Woodbridge's Purported Investment Products Were a Sham

Despite Woodbridge representing that the claimed interest payments in the FPCM product emanated from bona-fide third party borrowers, almost all of the purported "Borrowers" were Woodbridge affiliates owned and controlled by RS Trust, namely, the Shapiro Property LLCs. *(Exs. 1,¶¶90-94;51F).* In practice, Shapiro directed Woodbridge to use the funds raised from the Fund Offerings to purchase residential real estate, create a self-owned Shapiro Property LLC to hold title to each property and then issued FPCMs to investors based on the value of the underlying property. *(Exs. 1,¶¶14, 16, 90-94; 20,¶19,20).*

Woodbridge further reassured investors, telling them not to worry about the borrower not making their loans payments because Woodbridge would continue to pay the investor their interest payments. For example, in a Frequently Asked Question brochure for the FPCM product, Woodbridge stated the following:

> Q: If the borrower does not make their payments to Woodbridge will I be informed?
>
> A: This question is actually irrelevant, because Woodbridge would continue to make monthly payments to you . . . and may or may not inform you of the underlying non-payment. *As long as Woodbridge continues to make regular payments to you, there would be no reason to be concerned.*
>
> *(Ex. 52,¶16, Ex B;106,¶18, Ex. A* (emphasis added).

Assertions such as these by Woodbridge led investors to believe their investments were safe no matter what how the "borrower" performed.  (Exs. 6, ¶¶22-24; 84,¶¶8-9,11; 105,¶7-8; 106,¶19-20).   To support the misrepresentations, Woodbridge and Shapiro provided FPCM investors with the promissory notes between the underlying Borrowers and the Fund Offerings. *(Ex. 6, ¶¶13,16,18,19,20 (Exs A, C, E, F, G);Ex. 52, ¶¶8, 17 (Ex. D); Ex. 61, ¶¶12-13, 16-17, 19-20, 22, 24; Ex. 84, ¶¶ 10, 17 (Ex. E); Ex. 104, ¶10 (Ex. A); Ex. 105, ¶¶10-12 (Exs. A-C); Ex. 106, ¶¶17, 25).* However, Woodbridge did not disclose that the "Borrowers" were in virtually all cases Shapiro Property LLCs that earned no revenue—did not even have bank accounts—and had no ability to make the interest payments Woodbridge needed to make payments to the FPCM Investors. *(Exs. 1, ¶¶18.h, 86-88; 12 at 104;; 52, ¶¶ 5, 12, 16; 79 at 26-30; 106, ¶¶17,18,19 (Ex. B); 120).* Hence, in reality, the claimed interest "payments to Woodbridge" demonstrated in Woodbridge's glossy "three circles" brochure, referenced above, did not exist.

Every effort was made to hide the fact that Woodbridge was on both sides of the transaction.  None of the publicly available documentation indicated that RS Trust was the sole

member of the Shapiro Property LLCs purportedly doing the borrowing as well as paying the Fund Offerings the high rate of interest needed to make the required monthly payments to Fund Investors and FPCM Investors. Indeed, as early as 2014, a high ranking Woodbridge employee under Shapiro's direction specifically instructed Woodbridge's Registered Agent to not include any member/manager information on the Certificates of Formation for certain LLCs. *(Ex. 121.)*[4] And when an investor asked Shapiro point blank for the name of the borrower his investment was being lent to, Shapiro responded that Woodbridge does not provide borrowers' names because it is "not the way to do business" and "we don't want people pestering them." *(Ex. 6, ¶¶23-24).*

In April 2017, when one potential financial planner being pitched by a Woodbridge salesperson pointed out his suspicion of this incestuous structure on a recorded sales pitch call, QAP alerted the Head of Sales stating that, "[External Sales Agent]" seems to know an awful lot about our business model...He also knows Bob [Shapiro] owns Sturmer Pippin,[5] stating Woodbridge is loaning money to ourselves." *(Ex. 122).*

Similarly, Fund Investors were told that their returns were generated by these "loans" as well as Woodbridge's property development. *(Exs.1,¶¶19-20;22;25;28;31;34;37;40; 52,¶¶6,24;*

---

[4] Given that the corporate filings were predominantly in Delaware, with extremely limited public information, the Commission was forced to subpoena over two-hundred individual LLCs controlled by Shapiro, and then was forced to file a subpoena enforcement action in district court to obtain these documents after the LLCs did not respond to those subpoenas. The Commission only recently received these formation documents pursuant to stipulated Court Order. *See SEC v. 235 Limited Liability Companies,* 17-mc-23986-HUCK/MCALILEY (S.D. Fla.). In addition, the Commission was forced to file a separate subpoena enforcement action against Woodbridge to obtain, amongst other items, the company emails of Shapiro and Woodbridge's Controller. *See SEC v. Woodbridge Group of Companies, LLC,* 17-mc-22665-ALTONAGA/GOODMAN (S.D. Fla.). The Commission was also forced to file a Motion for Contempt for Woodbridge's willful failure to comply with the Court's Order requiring production of those emails.

[5] Sturmer Pippin is the Holding LLC which owns the Owlwood estate in Beverly Hills, California, which Woodbridge bought for $90 million in 2016, financing 100% of the purchase price with investor money. *(Ex. 1,¶95).* Woodbridge touted Owlwood in its FPCM promotions. *(Ex. 98 at 6).*

*106,¶2)*. First, as with FPCM Investors, Woodbridge did not disclose to Fund Investors that the purported interest payments required by the promissory notes underlying the FPCMs were non-existent. *(Ex. 1, ¶¶18.h, 84-88,90-94)*. Second, Woodbridge failed to tell Fund Investors that the profits from its development of properties were wholly inadequate to generate the promised returns. *(Ex. 1, ¶86,Exhibits E,F)*. Although Woodbridge, through the Shapiro Property LLCs, purchased almost 200 properties in and around Aspen and Los Angeles for approximately $675 million, the company has generated nominal net proceeds. *(Exs. 1,¶¶86,Exhibits E,F;54;55)*. Many of the properties Woodbridge purchased remain as vacant lots that have sat undeveloped for several years. *(Ex. 45 at 17, 62 (referencing Ex. 54))*.

### 2. The Defendants Operated a Ponzi Scheme
#### a. Insufficient Revenue Generated

During the relevant time period, Woodbridge raised approximately $1.22 billion from over 8,400 investors. *(Ex. 1,¶85)*. It paid back approximately $265 million in principal and $103 million in interest, resulting in a net liability of $961 million due to investors. *(Id.)*. However, Woodbridge's business activities were woefully inadequate to fund the interest payments made to investors. From July 11, 2012 through September 30, 2017, Woodbridge generated approximately $13.7 million in interest payments from unaffiliated third-party borrowers. *(Id.,¶86)*. There was no other meaningful source of operating cash flow to Woodbridge to fund the difference between the interest payments and the interest income. *(Id.)*

As early as the third quarter of 2012 (the first quarter in which there were funds received from investors), Woodbridge did not generate sufficient income to pay investor interest and dividend payments and operating expenses. Until the first quarter of 2013, Woodbridge utilized a cash balance carried over from the activities of WSF and funds received from other Shapiro

related entities to fund the cash flow deficits.[6]  *(Id.,¶87).*  Beginning in the second quarter of 2013, Woodbridge had continuing deficits in each quarter and the only source of funds available to fund the deficits was investor funds. *(Id.).*  This deficit grew to more than $250 million as of September 2017. *(Id.)*

As of April 28, 2017 out of $736 million in loans outstanding $718 million (98%) were due from Woodbridge Affiliated Entities. *(Id.,¶94).*  These "borrowers" were not making interest payments and the Woodbridge Fund Entities simply recorded interest income for book purposes only. *(Id.)* Woodbridge boasted a 90% rollover rate. *(Exs. 80 at 62-63;98 at PDF 18).* Had these investors redeemed their investments, Woodbridge would not have had sufficient immediate liquidity to pay off the notes without using funds raised from other investors. *(Ex. 1,¶100).*

### b.  Comingling of Funds

Woodbridge pooled FPCM Investors' and Fund Investors' funds into bank accounts associated with the Funds and then further commingled them into a single Woodbridge operating account under Shapiro's control ("Operating Account"). *(Ex. 1,¶18.g).*  Woodbridge and Shapiro used $368 million of new investor funds to pay interest and principal to existing investors. *(Ex. 1,¶¶18.b,85-86).*

And although each of the Woodbridge Entities maintained a separate bank account and general ledger, there were transfers totaling approximately $1.66 billion, exceeding 10,700 transactions between each of them, resulting in extensive commingling of investor funds. *(Ex. 1,¶89).*  In email conversations, Shapiro and the Head of Sales discussed how to manipulate its

---

[6] WSF was in the business of purchasing structured settlements, annuity and lottery payments, and raised money from investors to buy the annuity streams at a discount.  The investor would then purportedly receive the future payment stream *(Id. ¶15).*

records to show Woodbridge's supposed "profits" from certain property development. *(Ex. 65;123)* In fact, in its bankruptcy filing, Woodbridge admits that it has less than $12 million in its bank accounts while having investor liabilities approaching $1 billion. *(Ex. 20, ¶40).*

### c.   Shapiro Misappropriated Investor Funds

Woodbridge falsely told FPCM Investors and Fund Investors that it would invest their funds solely as promised. Instead, Shapiro misappropriated at least $21.2 million for his own personal benefit and to benefit his related entities or family members. *(Ex. 1,¶18.j).* For example, Shapiro charged at least approximately $9 million dollars on credit cards which were paid for nearly entirely by one or more Woodbridge entity. *(Ex. 1,¶105).* In fact, about 99% of the payments made toward those credit cards were derived from Woodbridge.

Shapiro charged personal items, including extravagant travel expenses, luxury brand items, and furnishings. For example, Shapiro used investor funds on at least the following:

- $200,000 at Four Seasons Hotels and Ritz Carlton Hotels.

- $34,000 on limousine services.

- $1.6 million on home furnishings.

- $1.4 million on luxury retail purchases like Louis Vuitton and Chanel.

- $600,000 on political contributions.

- $400,000 on jewelry purchases.

- $308,000 on wine.

*(Id.,¶¶105-106).*

In addition to the credit card charges, Shapiro spent additional investor funds as follows:

- $3.1 million for chartering private planes.

- $1.2 million in alimony to his ex-wife.

- $340,000 in luxury automobiles.

- $130,000 on country club fees.

*(Id.).*

Woodbridge and Shapiro also paid nearly $1 million to a rare coin and precious metal

firm, purportedly for client gifts. *(Id., ¶110.e.).*

## VI.   **BANKRUPTCY**

On December 4, 2017, Woodbridge and some (but not all) of its affiliates ("Debtors")

filed voluntary petitions ("Petitions") for relief under Chapter 11 of Title 11 of the United States

Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for

the District of Delaware, Case No. 17-12560 (KJC) (Bankr. D. Del.) (jointly administered).

*(Exs. 2;20).* Thus, the Debtors seek to reorganize a fraudulent operation into a going concern.

And several Woodbridge affiliates were not included in the bankruptcy.  RS Trust, the hydra of

the entirety of the fraud, where Shapiro was the trustee, and members of Shapiro's family were

the sole beneficiaries, was not included. *(Ex. 20,¶14 and ECF at 33).*

Effective December 1, 2017, Lawrence Perkins was appointed as the Chief Restructuring

Officer ("CRO") of WGC Independent Manager, LLC ("WGC Independent Manager"), which

after the filing of the bankruptcy became the sole manager of Woodbridge. *(Ex. 20,¶2).* The

sole manager of WGC Independent Manager is Beilinson Advisory Group, LLC, ("Independent

Manager"). *(Id.).*

However, despite this bankruptcy filing, Shapiro maintains control and ownership over

RS Trust and stands to gain a significant windfall over the sale of certain properties as well as a

salary of $175,000 per month for "consultation services."  Pre-Petitions, with the consent of the

CRO and the Independent Manager, Woodbridge entered into a consulting agreement with

Shapiro through Shapiro's controlled entity, WFS Holding Co., LLC, pursuant to a Transition Services Agreement which pays Shapiro an astonishing $175,000 *per month* for his services for a period of one-year, automatically renewed for another year, save certain circumstances, plus benefits of Woodbridge's health insurance and use of Woodbridge's office space, staff, and the like. *(Id., ¶27, ECF at 53, ¶¶1, 2).*[7] Per the Termination of Service provision, unless there is termination for "cause," as defined, Woodbridge must give Shapiro 30 days' prior notice of its intent to terminate Shapiro. In such event, Shapiro is entitled to six months' pay of his services, *i.e.* $1,050,000. *(Id., ECF at 54,¶6).* Strikingly, Shapiro's Pre-Petition fraudulent activities in running a Ponzi-scheme do not constitute "cause."

To further sweeten the deal for Shapiro, the CRO also allows Shapiro unfettered use of two multi-million dollar properties which were purchased with investor funds. *(Id., ¶28).*[8] The CRO also agreed to a "distribution arrangement" with Shapiro which serves to further harm investors. Under that arrangement upon the sale of real estate properties, after notes are repaid, Shapiro's trust will receive up to $500,000 of any excess proceeds "as an advance on any distributions." *(Id., at ¶37).* Furthermore, the bankruptcy specifically carves out at least 14 Non-Filer Shapiro Property LLCs and 13 Shapiro Holding LLCs whose properties were purchased using investor funds. *(Id., ¶23, and Ex. 124).* These properties are worth $34 million, and Shapiro, through RS Trust stands to benefit enormously from the sale of them. It is these Non-Filers that are subject to the asset freeze requested herein.

---

[7] Shapiro has already been paid $175,000, as the first payment was due upon execution of the Agreement. *(Id., ECF at 53, ¶2).*

[8] The Shapiro Property LLCs associated with these properties, Emerald Lake Investments, LLC and Carbondale Glen River, Mesa, LLC are included as defendants in the Commission's action. The Independent Manager concedes that Shapiro is paying below market rent for the California property. *(Ex. 20, ¶28, fn. 16).*

Moreover, investors are being blatantly misled by Woodbridge in its press releases following the bankruptcy. Even under its new "independent" management, Woodbridge presents investors with a rosy picture of this massive Ponzi operation. In a letter dated December 5, 2017, which refers investors to a website, Woodbridge describes the "steps Woodbridge is taking to strengthen its business for the future." (*Ex. 69, Exhibit A, pg. 7*). Woodbridge claims it initiated chapter 11 Bankruptcy "in an effort to recapitalize its debt and establish a stronger financial platform." *(Id.).* Later Woodbridge notes that it will continue "normal business operations while we develop a plan of reorganization to emerge from court protection as a stronger, more viable company." *(Id.)* There is never any mention of Woodbridge's complete lack of income or its Ponzi-style use of new investor money to pay obligations to earlier investors. Instead, Woodbridge cites to "unforeseen costs associated with ongoing litigation and regulatory compliance," attempting to blame regulators, rather than its own unlawful conduct and lack of income, as the source of its demise. (*Id.*)

Woodbridge soft-peddles its plan to avoid the FPCM Investors' security interests. The website asserts that Woodbridge's unpaid obligations to FPCM Investors "will be considered as general unsecured claims in the restructuring proceedings" without explaining that this means that Woodbridge is going to be suing investors to avoid their liens. (*Ex. 4).* To the contrary, Woodbridge tells investors to expect "various notices from the Bankruptcy Court," but that they should "not be alarmed by these notices," (*Id.,)* even though one such notice will be the summons in the adversary action seeking to avoid the investor's security interest.

# VII.   LEGAL ARGUMENT

## A.   The Court Should Exercise its Equitable Powers and Order An Asset Freeze

A district court may exercise its full range of equitable powers, including an asset freeze, to preserve sufficient funds for the payment of a disgorgement award. *FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1433-34 (11th Cir. 1984); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Co.,* 51 F.3d 982, 987 (11th Cir. 1995). Freezing assets is a well-accepted equitable remedy employed to "preserve the status quo" and is proper in actions arising under the federal securities laws. *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 734-35 (11th Cir. 2005), citing with approval, *United States v. Oncology Assoc.,* 198 F.3d 489, 494-99 (4th Cir. 1999); *Levi Strauss,* 51 F.3d at 987 (a request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze).

It is well recognized that an asset freeze is sometimes necessary to ensure a future disgorgement order will not be rendered meaningless. *SEC v. Lauer,* 478 Fed. Appx. 550, 554 (11th Cir. 2012) ("The district court may freeze assets in order to preserve funds while a party seeks an equitable remedy such as disgorgement."); *CFTC v. Levy,* 541 F.3d 1102, 1114 (11th Cir. 2005) ("[A] district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy.") *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir. 2005) ("[T]he asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement.").

The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required. "Exactitude is not a requirement . . . ." *ETS Payphones,* 408 F.3d at 735 (citation and quotation omitted); *FTC v. IAB Marketing Associates, LP,* 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for

dissipation of funds is even lighter. *FTC v. IAB Marketing Associates, LP,* 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze") (citing *ETS Payphones,* 408 F.3d at 734, and *SEC v. Lauer,* 445 F. Supp. 2d 1362, 1367-70 (S.D. Fla. 2006)); *SEC v. Gonzalez de Castilla,* 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("the SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . ."). Thus, there is no doubt the Court can enter an *ex parte* order freezing the assets of Shapiro, RS Trust and the Non-Filer Shapiro Property LLCs and Shapiro Holding LLCs and that it should.

    **B.**    **The Defendants 9 Violated the Federal Securities Laws**

        **1.**    **Woodbridge's FPCMs and Fund Offerings are Securities**

All of the Commission's claims require a determination that the interests Woodbridge sold to investors are securities under the Exchange Act and Securities Act, a finding easily made on the facts here.

        **a.**  **The FPCM Promissory Notes are Securities Under Reves**

           **(1)**    **The *Reves* Test**

A "note" is presumed to be a security under *Reves v. Ernst & Young,* 494 U.S. 56 (1990); *Fin. Sec. Assur., Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1284 (11th Cir. 2007).[10] This presumption can be rebutted if the note is an instrument the Court specifically said was not a

---

[9] While the Commission is only seeking an asset freeze against Non-Bankruptcy filers, the Commission notes that the an automatic stay under the Bankruptcy Code, 11 U.S.C. § 362(a) is inapplicable because of §362(b)(4)'s exception to the stay because the Commission is exercising its "police and regulatory powers." *See SEC v. First Financial Group of Texas,* 645 F.2d 429, 438 (5th Cir. 1981). Furthermore, the Commission believes it instructive to demonstrate the merits of its case as to all the defendants for purposes of its motion and thus will demonstrate all the defendants have violated the federal securities laws as alleged.

[10] Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), define "security" to include "any note."

security. *Reves*, 494 U.S. at 65; *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125 (9th Cir. 1991); *SEC v. Levin*, 2014 WL 118788357, *9 (S.D. Fla. Oct. 6, 2014).   According to the Court, Congress' purpose "was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Reves*, 494 U.S. at 61 (emphasis in original); *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 742 (11th Cir. 2005).   A note that is not among the list identified in *Reves* is a security unless it bears a "strong family resemblance" to the non-security notes identified in the opinion. *Reves*, 494 U.S. at 64-65; *Levin*, 2014 WL 11878357 at *9. *Reves* established a four-factor family resemblance test to determine whether a note is a security:  (1) the motivations of the buyer and seller; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the existence of an alternate regulatory regime. *See* id. at 66-67.  Failure to satisfy one of the *Reves* factors is not dispositive, as the test is considered as a whole. *See, e.g., McNabb v. SEC*, 298 F.3d 1126, 1132-33 (9th Cir. 2002).  If a note fails the family resemblance test, it is deemed a security and subject to federal securities regulation.

### (2)   FPCMs Are Securities Under the Family Resemblance Test

The first *Reves* factor examines the transaction "to assess the motivations that would prompt a reasonable seller and buyer to enter into it." *Reves*, 494 U.S. at 56.  The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security). *See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994) (holding that mortgage participations were securities under *Reves*).  The FPCM investors were unquestionably motivated by the high rate of return that Woodbridge offered.  Woodbridge induced investors to purchase promissory notes by offering rates of 5% to 8% annual interest

knowing that they were much higher than current rates earned by investors.[11]  Woodbridge's sales materials claim that the FPCM program offered "attractive financial opportunities" that generate "higher returns" for "individuals to achieve their financial objectives" and "tremendous income generation for the concerned boomer."  The *Reves* Court recognized that if the buyer is primarily interested in the profit the note is expected to generate, it is likely to be a security.  *See Reves*, 494 U.S. at 66.[12]

The second factor is whether there is "common trading for speculation or investment" which is satisfied when the notes are "offered and sold to a broad segment of the public." *Reves*, 494 U.S. at 68; *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1287 (11th Cir. 2007). The promissory notes here were sold to thousands of investors nationwide who invested hundreds of millions of dollars.  Such a widespread distribution to an extremely large number of holders is more typical of a securities offering than of a borrower/lender relationship.  *See SEC v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) (notes sold to over 1,000 investors in at least 25 states constituted broad segment of public); *Wright v. Downs*, 1992 WL 168104, *3 (6th Cir. July 17, 1992) (notes sold to 200 investors constituted broad segment); *see also Deal v. Asset Mgmt. Grp.* 1992 WL 212482, *4 (N.D. Ill. Aug. 28, 1992) (holding that just six unrelated investors constituted broad segment).  Woodbridge also placed no limitations on who could purchase the notes, offering them to any member of the public with the money to buy them.  *See SEC v. Thompson*, 732 F.3d 1151, 1165 (10th Cir. 2013) (noting that seller "sought to expand its

---

[11]  *See, e.g.* www.bankrate.com (noting that current one year money market rate averages 1.30%).

[12]  In addition, the raising of money "for the general use of a business enterprise or to finance substantial investments" is indicative of an investment motivation.  *See Reves*, 494 U.S. at 66; *Pollack*, 27 F.3d at 812-13. Apart from simply misappropriating funds for Shapiro's personal use and paying Woodbridge's operating expenses, Woodbridge's motivation in soliciting FPCM funds was to use them to purchase real estate for development and profit.

distribution to anyone interested who had $100,000 to invest . . . and made its instruments available to anyone willing to pay.").

The next factor to analyze is the "reasonable expectations of the investing public" and whether there is a valuable return on an investment, as well as the length and characteristics of the note. *See, e.g., Stoiber v. SEC*, 161 F.3d 745, 751 (D.C. Cir. 1998) ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments."). This analysis is quite similar to that required by the first *Reves* factor—the FPCMs were held by thousands of individual investors, were secured by commercial property, and carried a promised high rate of return. Woodbridge repeatedly advertised them as "lucrative," "safe" and "secure." These facts would lead a reasonable investor to believe that the FPCMs were investments and, in fact, investors viewed these as passive investments generating safe returns.

The final factor is whether there are any risk-reducing factors indicating that the notes are not in fact securities. *Reves*, 494 U.S. at 69. An alternative regulatory regime would need to be quite comprehensive, such as FDIC or ERISA regulations, to keep the notes from "escap[ing] federal regulation entirely." *Reves*, 494 U.S. at 69. In light of Woodbridge's claim in its bankruptcy filing that the FPCM Investors' security interests are avoidable because they were not properly perfected, the illusory nature of the investors' security makes it quite clear that any recuperation of investor assets will be based on the ability of the Commission to seek redress of investor harm. *See Pollack*, 27 F.3d 808 (holding state mortgage regulations inadequate); *McNabb*, 298 F.3d 1126 (holding that state property laws are "not the type of regulatory schemes contemplated by the [*Reves*] test"). No matter whether the FPCM promissory notes are weighed

against the four *Reves* factors individually or collectively, the notes are properly categorized as securities and thus subject to federal securities regulation.

### b.  The Fund Offering Units Are Securities

The investments sold by the Fund Offerings are securities.  The Funds considered the units as "securities", filing a Form D (Notice of Exempt Offering of Securities) with the Commission and describing the units in Offering Memorandums as interests in the Funds entitling investors to 8%-10% returns and 50% of cumulative profits.  The Offering Memorandums specifically highlighted that the Units were being offered pursuant to exemptions provided by Section 4(a)(2) of the Securities Act and Regulation D and Regulation S thereunder. The Funds' own characterization of these investments as subject to the federal securities laws is sufficient to characterize them as securities. "Where, as here, defendants characterize their offerings as securities under circumstances where investors have reason to believe this characterization, the investments at issue satisfy the definition of 'security.'" *SEC v. Morris*, 2012 WL 6822346, *8 (E.D. Mo. Sept. 21, 2012).

### c.  The FPCM Promissory Notes and Fund Offering Units Are Investment Contracts

Even under an analysis of the FPCM notes and the Fund Offering units as investment contracts, they would still meet the definition of a security.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts."  In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

Both the FPCM and Fund Investors clearly made an "investment of money." Thousands of people invested hundreds of millions of dollars in promissory notes based on the supposed payment of interest from hundreds of commercial property Borrowers. The FPCM Investors had no role in selecting or analyzing the underlying commercial properties. Here, the expected profitability of the investments, as well as the promise to pay returns, were derived solely from the efforts of Woodbridge. Once investors purchased the promissory notes, they had no control over how Woodbridge used their money. As such, the FPCMs offered by Woodbridge are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.[13] Similarly, the Fund Offerings involved units that were interests in pooled vehicles, and therefore, the Fund Offerings also qualify as investment contracts because investors were dependent on Woodbridge to manage the Funds' assets to provide the promised returns.

### 2.     Violations of Section 5 of the Securities Act (Against Shapiro, Woodbridge, WMF, WSF, Funds 1 – 4 and Bridge Loan Funds 1 & 2)

Absent an exemption from registration, Section 5(a) of the Securities Act makes it unlawful for any person to use any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security for which a registration statement is not in effect. Similarly, Section 5(c) makes it unlawful to offer for sale a security for which a registration statement has not been filed with the Commission. A prima facie case for a violation of Section 5 is established by showing that: (1) the defendant sold or offered to sell securities; (2) no registration statement covered the securities; and (3) the sale or offer was made through the use of interstate facilities or mails. *See SEC v. Randy*, 38 F. Supp. 2d 657, 667 (N.D. Ill.

---

[13] The Eleventh Circuit has determined that the proper precedent in that circuit is the broad vertical commonality test, requiring only a showing that the investors are dependent upon the expertise or efforts of the investment promoter. *SEC v. ETS Payphone, Inc.*, 300 F.3d 1281, 1284 (11th Cir. 2004), *re-aff'd by SEC v. ETS Payphones, Inc.* 408 F.3d 727, 732 (11th Cir. 2005). The FPCM and Fund Offerings satisfy this element.

1999).   Scienter is not required to establish a violation of Section 5.   *See SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256 (9th Cir. 2013); *SEC v. Holschuh*, 694 F.2d 130, 137 n. 10 (7th Cir. 1982).   The defendant need not have personally sold securities as long as "the defendant was a 'necessary participant' or 'substantial factor' in the sale." *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)   Once the Commission establishes a prima facie case for a violation, the defendant assumes the burden of proving that the securities offering qualified for an exemption from registration.   *See SEC v. Ralston Purina Co.*, 346 U.S. 199, 126 (1953).   The courts narrowly construe the exemptions from the registration provisions to provide full and fair disclosure and to prevent frauds. *See SEC v. Murphy*, 626 F. 2d 633, 641 (9th Cir. 1980); *Quinn and Co., Inc. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).

In this case, the Commission can establish a *prima facie* case against Shapiro, Woodbridge, WMF, WSF, and the Fund Offerings ("collectively Section 5 Violators") for violations of 5(a) and 5(c) of the Securities Act.   The Section 5 Violators offered and sold securities to the general public by email, telephone, the internet and other instruments of interstate commerce to at least 8,400 investors and their families throughout the United States. No registration statement was in effect or had been filed with the Commission in connection with the securities.   Additionally, the FPCM offerings and Fund Offerings were part of a single plan of financing by entities under common control, which formed part of the same investment scheme, and the investment proceeds were commingled among the issuers and also used for the same general purpose.   Due to the general solicitation, no exemptions from registration were available.   As a result, these Section 5 Violators violated Securities Act Sections 5(a) and 5(c) for failing to register these offerings with the Commission.

3.      **Violations of the Anti-Fraud Provisions**

a.  **Misstatement Liability:  Section 17(a)(2) of the Securities Act and
    Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
    (Against Shapiro, Woodbridge, WSF, Funds 1-4, and Bridge Loan
    Funds 1 & 2)**

Section 17(a)(2) of the Securities Act prohibits any person, in the offer or sale of a

security, from directly or indirectly obtaining money or property by means of an untrue

statement of a material fact or an omission to state a material fact necessary to make the

statements made, in light of the circumstances under which they were made, not misleading.  A

violation of Section 17(a)(2) can be shown by negligent conduct.  *See Aaron v. SEC*, 446 U.S.

680, 701-02 (1980).  Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibit the making of

(1) a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the

purchase or sale of a security.  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir.

2007).  A fact is material if there is a "substantial likelihood that a reasonable [investor] would

consider it important in deciding how to [invest]."  *Basic Inc.* v. *Levinson,* 485 U.S. 224, 231

(1988); *Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1321 (11th Cir. 2014).  The Eleventh

Circuit has concluded scienter may be established by a showing of knowing misconduct or

severe recklessness.  *ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017); *SEC v.

Carriba Air Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  For purposes of Rule 10b-5(b), the maker

of a statement is the person or entity with ultimate authority over the statement, including its

content and whether and how to communicate it.  *See Janus Capital Group, Inc. v. First

Derivative Traders*, 564 U.S. 135, 142 (2011).

Woodbridge (and its predecessor WSF) and Shapiro made misleading statements about

the purported use of proceeds and source of investor "returns" when in fact the Woodbridge

offerings were part of a large-scale Ponzi scheme.  Sales agent solicitations, Woodbridge's

website, and marketing materials sent to investors described the FPCM investments as "low risk," "simpler," "safe" and "conservative" and that investor returns were generated by third party Borrowers' 11%-15% interest payments ("Woodbridge funds the real estate loan and collects funds from the property owner.") The Fund Offering materials represented that funds would be used to finance real estate investments and acquisitions, not to enter into false promissory note agreements and use investor proceeds to fund interest and principal payments back to investors.[14]

The misrepresentations were clearly material. Instead of investing their funds as promised, Shapiro used investors' funds to pay the company's operating expenses, payroll and sales commissions. *See SEC v. Smart*, 678 F.3d. 850, 857 (10th Cir. 2012) (fact that money not being used as represented would be material to reasonable investor). Woodbridge and Shapiro created falsified promissory notes evidencing these fictitious loans that they provided to each of the FPCM Investors. *See SEC v. Coplan*, 13-62127-CIV, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014) (omissions of how revenue was generated was material because "a reasonable investor considering whether to invest would have wanted to know that [the investment manager] used investors' funds to pay earlier investors their purported returns.").

Woodbridge, WSF, Shapiro, Funds 1-4 and Bridge Loan Funds 1 and 2 all obtained millions of dollars of money or property by means of these misrepresentations and omissions. Shapiro, and thus these entities, acted with scienter. Shapiro knew, or was reckless in not

---

[14] Under *Janus*, with respect to Rule 10b-5(b), Shapiro is responsible for the statements of the entities selling the securities. Shapiro exercised absolute control over the operations of Woodbridge, WSF, Funds 1 - 4, Bridge Loan Funds 1 and 2, and was responsible for each of the company's misrepresentations and omissions. No information was disclosed to investors without Shapiro's approval, and Shapiro signed each of Woodbridge's Fund Offering memoranda. *Janus* does not apply to the Commission's claims under Section 17(a)(2) of the Securities Act. *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 796-98 (11th Cir. 2015).

knowing, that Woodbridge was using investor funds to make Ponzi-like payments.   As the person who misappropriated investor funds and orchestrated this scheme, it is axiomatic that Shapiro knew he was not investing the funds in accordance with the representations he and Woodbridge made to investors.[15]

### b. Scheme Liability:  Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder (Against all Defendants)

The Defendants knowingly engaged in a scheme to defraud investors.   Scheme liability under Sections 17(a)(1) and 17(a)(3) and Rule 10b-5(a) and (c) generally requires a showing that the defendant committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, with scienter (with respect to Section 17(a)(1) and Rules 10b-5(a) and (c)) or negligently (with respect to Section 17(a)(3)). *See SEC v. Morgan Keegan & Co., Inc.,* 678 F.3d 1233, 1244 (11th Cir. 2012).   As discussed above, Shapiro's scheme was extensive in duration (spanning over five years), the number of investors (approximately 8,400), amount raised (over $1.2 billion) as well as the various deceptive acts engaged in by the Defendants.   Shapiro, as the sole person in control of Woodbridge, not only made material misrepresentations and omissions to investors, but also signed falsified documents, controlled the company's bank accounts, made Ponzi-like payments to investors, paid sales commissions, and misappropriated investor funds for his own personal enjoyment.   *See SEC v. Zanford,* 535 U.S. 813, 821-22 (2002) (misappropriation of client's securities for personal use states a claims for scheme to defraud).

---

[15] Instead of disclosing material information about the dozens of state regulatory actions against Woodbridge, which would have been necessary to make the other statements they made about the offerings not misleading, Shapiro also instructed the Head of Sales to affirmatively withhold this material information from investors and to "only tell investors if they ask."   Woodbridge's sales agents falsely mischaracterized the dispositions of these regulatory actions to external sales agents claiming that the company "was exonerated of any wrongdoing or fraudulent activity" when no such determination was actually made.

At Shapiro's direction, Woodbridge transferred new investor funds to pay the purported "interest" owed to previous Fund and Bridge Loan Fund investors.  These interest payments created the illusion that Woodbridge was investing funds and generating returns as promised, allowing the company to continually induce additional investors. *See SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) (soliciting investors with promise of expected returns and instead inappropriately diverting investor funds sufficient for liability); *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1379 (D. Colo. 2014) (creating the false appearance that the funds would be used legitimately, when in reality they were entered into a Ponzi scheme, is sufficient for liability). Shapiro signed all checks to investors evidencing supposed "interest payments" from the Borrowers.  Shapiro also misappropriated at least $21 million in investor funds for his own personal use.  A reasonable investor would consider the misappropriation of funds to be significant. *See, e.g.*, *SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167, 177 (D.D.C. 1998) ("[N]o rational investor would knowingly invest in a project [where company] diverted substantial funds to the personal use of its promoter.").

The Shapiro Property LLCs and RS Trust also engaged in a scheme to defraud investors. Shapiro created a web of more than 200 companies (the Shapiro Property LLCs) and corresponding like-titled Holding LLCs in order to purchase properties he controlled, all financed 100% by investor funds from the FPCM and Fund Offerings.  While creating these LLCs to purchase properties is not, in and of itself, violative conduct, Shapiro engaged in deceptive acts and a fraudulent course of conduct in connection with investors' purchase and sale of securities by: 1) concealing Shapiro's control over, and ownership interest in, all of these entities that executed notes with the Fund Offerings (which Shapiro also controlled), in connection with the purchase and sale of securities by investors; and 2) on behalf of the Shapiro

Property LLCs, executing promissory notes for financing with absolutely no intention of making any required payments on the loans – contrary to the stated terms.  The fact that Shapiro never established bank accounts for the Shapiro Property LLCs provides more evidence of his scienter, which is attributable to the entities he controls.  *SEC v. Torchia,* 183 F. Supp. 3d 1291, 1321 (N.D. Ga. 2016).  WMF also participated in the scheme by managing the various Fund offerings, including commingling all investor proceeds into one operating account and paying returns to investors using investor proceeds.

### c.  Control Person Liability for Corporate Defendants' Exchange Act Anti-Fraud Violations (Against RS Trust and Shapiro)

Section 20(a) of the Exchange Act makes a person "who, directly or indirectly, controls any person liable under any provision of [the act] or of any rule or regulation thereunder ... liable jointly and severally with ... such controlled person."  15 U.S.C. § 78t(a).  To establish control person liability, the Commission must show that "the controlled person . . . violated the federal securities laws" and "the controlling person exercised control over the controlled person." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 722 (11th Cir. 2008).  Control is established if "(1) the defendant had the power to control the general affairs of the primary violator, and (2) the defendant had the power to control the specific corporate policy that resulted in the primary violation." *Id.* at 723; *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996).  The focus is thus on the "power" to control—"a controlling person need not commit an intentional violation of the Act to be liable under section 20(a)." *Laperriere*, 526 F.3d at 724.  Rather, it is the controlling person's burden to establish "that 'he did not act recklessly in inducing, either by his action or his inaction, the act or acts constituting the violation.'" *Id.* at 725 (quoting *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 960 (5th Cir. Feb. 1981)).

With respect to a violation of Section 10(b) and Rule 10b-5 of the Exchange Act by the controlled persons, the Commission relies on the discussion above.  Shapiro and RS Trust clearly "directly or indirectly" controlled the entities that violated Rule 10b-5.  It is undisputed that RS Trust is the sole owner, either directly or indirectly, of every entity affiliated with Woodbridge, and that Shapiro is RS Trust's trustee.  (*Ex. 20*, ¶14)  Shapiro thus had total power to control the affairs of the controlled entities.  *See SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 261 (N.D.N.Y. 2014) (control established when defendant founded the company, was CEO, sole board member, and largest beneficial shareholder), *aff'd on other grounds*, 652 F. App'x 35 (2d Cir. 2016).

In addition to his power to control through ownership, Shapiro exercised absolute control over the operations of the Corporate Defendants.  He controlled the financial accounts and accounting on behalf of these entities.  Shapiro signed note or subscription agreements with investors on behalf of the Fund Offerings for each Fund Offering and FPCM note, as well as all of the promissory note agreements between the Shapiro Property LLCs and the Fund Offerings.  Shapiro signed checks paying investors' interest payments using investor proceeds.  Moreover, Shapiro misappropriated more than $21 million of investor proceeds from the Fund Offerings.  RS Trust, as the beneficial owner of all of Shapiro's business entities, maintained operational control of each of the Fund Offerings through its ownership of Woodbridge, WSF and WMF.  As the CRO stated:  "Prior to December 1, 2017, each [Shapiro Holding LLC] and [Shapiro Property LLC] was managed by Mr. Shapiro . . . ."  *(Ex. 20,¶20)* ("Until December 1, 2017, [Shapiro] managed and controlled, directly or indirectly, each of the entities within the

Woodbridge Group Enterprise, and was also the sole Manager of most entities within the Woodbridge Group Enterprise.") (*Id.,* ¶24).[16]

### 4. Broker-Dealer Registration Violations for Sales of FPCMs and Fund Offerings (Against Woodbridge and WSF and Against Shapiro for Aiding and Abetting)

Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), makes it unlawful for a broker or dealer to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security unless such broker or dealer is registered with the Commission, or in the case of a natural person, is associated with a registered broker-dealer or is eligible for an exemption or safe harbor. It is not necessary to prove scienter to establish a violation of Section 15(a)(1). *See SEC v. United Monetary Servs.*, Inc., 1990 WL 91812, *8 (S.D. Fla. May 18, 1990). Section 3(a)(4)(A) of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the accounts of others." A person may be found to be acting as a broker if he participates with a "certain regularity of participation" in securities transactions "at key points in the chain of distribution." *SEC v. Coplan*, 2014 WL 695393, at *6 (S.D. Fla. Feb. 24, 2014) quoting *Mass. Fin. Serv., Inc. v. Sec. Inv. Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976).

Woodbridge (previously operating as WSF) acted as an unregistered broker by orchestrating this Ponzi scheme wherein it used false statements and omissions to solicit investor funds through the FPCMs and Fund Offerings. Woodbridge was the operating company responsible for the FPCM Offerings and Fund Offerings and controlled all of the misrepresentations and omissions to investors. Woodbridge determined which investors to

---

[16] As noted above, it is Shapiro and RS Trust's burden to show the absence of reckless conduct or inaction inducing the violation. In light of Shapiro's invocation of his Fifth Amendment privilege, this is currently a burden he will be unable to meet.

solicit, provided sales materials to investors espousing the high rates of returns and safety of these investments, and actively sought out these investors through cold-calling, advertisements and in-person presentations. Woodbridge received its own transaction-based compensation, for example, each Fund Offering memoranda provided that the company was reserving between 5% and 8% of the total amount raised for commissions to be paid to licensed broker/dealers

Shapiro aided and abetted Woodbridge's (and its predecessor entity WSF's) violations. To establish aiding and abetting liability, the Commission must prove: (1) a primary violation; (2) that the defendant knew or recklessly disregarded that his or her role was part of an overall activity that was improper; and (3) substantial assistance of the conduct that constitutes the violation. *See SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 800 (11th Cir. 2015); *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012). Shapiro hired and controlled an internal, unregistered sales force directed at aggressively soliciting Fund Investors to purchase Woodbridge securities and paid them transaction-based commissions. Shapiro also personally solicited certain investors. Shapiro also maintained a nationwide network of hundreds of external sales agents selling FPCMs to investors that he controlled by: 1) approving all sales materials; 2) purchasing advertising; 3) determining the type, total number and total dollar amount of investments; and 4) paying external sales agents transaction-based compensation.

Shapiro also controlled the issuance of Woodbridge securities to investors by signing Borrower "interest" payments, approving the issuance of each investors' securities and depositing investor funds into accounts only he controlled. Woodbridge, WSF and Shapiro have never registered or been associated with a registered broker-dealer. None can avail themselves of an exemption or safe harbor from the broker registration requirements.

### C.       Disgorgement is an Appropriate Remedy

"Disgorgement is an equitable remedy intended to prevent unjust enrichment." *SEC v. Monterosso,* 756 F.3d 1326, 1337 (11th Cir. 2014); *accord SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).   Woodbridge, through Shapiro, raised $1.2 billion from investors, and only returned a deminimis percentage of it in principal and interest.   Furthermore, Shapiro misappropriated $21 million for his own personal use.   "Reasonable approximation[s] of the defendant[s'] unlawfully acquired assets. . . shift[] [the burden] to the defendants to demonstrate the SEC's estimate is not reasonable." *Monterosso,* 756 F.3d at 1337; *Levin,* 849 F.3d at 1006. Therefore, the Commission has demonstrated a reasonable approximation of the disgorgement.

### D.       A Total Asset Freeze is Appropriate

As demonstrated throughout this memorandum, the Defendants, including Shapiro, RS Trust, and the Non-Filer Shapiro Property and Holding LLCs have violated the securities laws. The evidence set forth above shows the Commission is likely to succeed in disgorging the amounts the Defendants have misused and misappropriated.   Without the asset freeze, Shapiro, either individually or through RS Trust, is free to use as he chooses the funds he has acquired over the five years of his egregious fraud.   Furthermore, RS Trust is still privy to a significant windfall in the event of properties being sold, as it receives 50% of all sales beyond the satisfaction of the mortgages on the property in the Debtor LLC held properties, up to $500,000 per property, *(Ex. 20, ¶ 37,)* and is eligible to reap the benefits of the sale of $34,000,000 of property not in bankruptcy. *(Ex. 20,¶23;124).*    Investors are owed nearly $1 billion.   All ill-gotten gains must be recovered so as to make investors whole.   "[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze"); *ETS Payphones,* 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when

estimated disgorgement and value of frozen assets were comparable).    While Shapiro misappropriated $21 million, much of it already spent or not liquid, this obviously does not approach anywhere near the amount of potential disgorgement.  Furthermore, even the Debtors in the bankruptcy conceded that Woodbridge's operating account has only $12 million. *(Ex. 20,¶40)*.  Therefore a freeze over Shapiro, RS Trust and the Non-Filer Property LLCs and Holding LLCs is necessary to preserve the remaining funds, prevent dissipation of assets, and aid in the recovery of funds for defrauded investors.

### E.    <u>Sworn Accounting</u>

In its Complaint, the Commission seeks disgorgement orders against all of the Defendants, including Shapiro and RS Trust.  Sworn accountings by Shapiro and RS Trust are necessary to enable the Commission and the Court to more precisely determine the amounts the Defendants have raised and spent in perpetration of their fraud, and to better identify (1) the amount of Shapiro's and RS Trust's unjust enrichment; and (2) the assets available for disgorgement. *See SEC v. Lybrand*, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000).

### F.    <u>An Order Prohibiting Destruction of Records</u>

An Order against Shapiro and RS Trust prohibiting the destruction of records is appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available.  *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1345-46 (S.D. Fla. 2003). Consequently, we ask that the Court order Defendants Shapiro and RS Trust not to alter or destroy relevant documents.

## VIII.   <u>CONCLUSION</u>

The Defendants have perpetrated a massive fraud on thousands of investors nationwide. Yet, Shapiro and RS Trust and the Non-Filers still sit outside the reach of the bankruptcy, and stand to gain a significant windfall from the sale of properties and from an unconscionable salary for "consultation" services.   Moreover, Shapiro has already misappropriated more than $21 million for his own benefit, and without this freeze, there is nothing to stop him from continuing to loot investors of their money.   Therefore, the Commission respectfully requests the Court impose an asset freeze on Shapiro, RS Trust and the Non-Filers, and issue an Order requiring Shapiro and RS Trust to provide a sworn accounting and prohibit them from destroying records.

Dated: December 20, 2017

Respectfully submitted,

By:

Russell Koonin & Christine Nestor
Senior Trial Counsel
kooninR@sec.gov; nestorc@sec.gov
FL Bar No.: 474479; FL Bar No. 597211
Telephone: (305) 982-6385; (305) 982-6367

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154