Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
                    Plaintiff,        )  **17-24624**
                                      )
v.                                    )
                                      )  **CIV-COOKE**
ROBERT H. SHAPIRO,                    )
WOODBRIDGE GROUP OF COMPANIES, LLC,   )
d/b/a WOODBRIDGE WEALTH,              )
RS PROTECTION TRUST,                  )
WMF MANAGEMENT, LLC,                  )
WOODBRIDGE STRUCTURED FUNDING, LLC    )
WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC,  ) UNDER SEAL
WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC,  )
WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC,  )
WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC, )
WOODBRIDGE MORTGAGE INVESTMENT FUND 4, LLC,  )
WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 1, LLC, )
WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 2, LLC, )
144 WOODBRIDGE-AFFILIATED PROPERTY LIMITED  )
LIABILITY COMPANIES,                  )
131 WOODBRIDGE-AFFILIATED HOLDING LIMITED )
LIABILITY COMPANIES,                  )
                                      )
                    Defendants, and   )
                                      )
JERI SHAPIRO,                         )
WOODBRIDGE REALTY OF COLORADO, LLC    )
d/b/a WOODBRIDGE REALTY UNLIMITED,    )
WOODBRIDGE LUXURY HOMES OF CALIFORNIA, INC., )
d/b/a MERCER VINE, INC.,              )
RIVERDALE FUNDING, LLC,               )
SCHWARTZ MEDIA BUYING COMPANY, LLC,   )
WFS HOLDING CO., LLC                  )
                                      )
                    Relief Defendants.)
                                      )
_____)

**PLAINTIFF'S EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER AND
SUPPORTING MEMORANDUM OF LAW**

FILED by _____ D.C.
DEC 20 2017
STEVEN M. LARIMORE
CLERK U.S. DIST. CT
S. D. of FLA. – MIAMI

Plaintiff Securities and Exchange Commission moves for an Order appointing a Receiver over Defendants Woodbridge Group of Companies, LLC (d/b/a Woodbridge Wealth) ("Woodbridge"), RS Protection Trust ("RS Trust"), WMF Management, LLC ("WMF"), Woodbridge Structured Funding, LLC (previously Woodbridge Structured Funding of Florida, LLC) ("WSF"), Woodbridge Mortgage Investment Fund 1, LLC ("Fund 1"), Woodbridge Mortgage Investment Fund 2, LLC ("Fund 2"), Woodbridge Mortgage Investment Fund 3, LLC ("Fund 3"), Woodbridge Mortgage Investment Fund 3A, LLC ("Fund 3A"), Woodbridge Mortgage Investment Fund 4, LLC ("Fund 4"), Woodbridge Commercial Bridge Loan Fund 1, LLC ("Bridge Loan Fund 1"), Woodbridge Commercial Bridge Loan Fund 2, LLC ("Bridge Loan Fund 2"), 144 Woodbridge-affiliated Limited Liability Companies ("Shapiro Property LLCs"), and 131 Woodbridge-affiliated Holding Limited Liability Companies ("Shapiro Holding LLCs")[1] (collectively "Corporate Defendants") with full and exclusive power, duty, and authority to: administer and manage the business affairs, funds, assets, choses in action and any other property of the Corporate Defendants; marshal and safeguard all of the assets of the Corporate Defendants; and take whatever actions are necessary for the protection and maximization of those assets, including protecting aggrieved investors. The grounds for this Motion are fully set forth in the Memorandum of Law below. As additional support for this Motion, the Commission incorporates by reference its *Ex Parte* Motion for Asset Freeze and Other Relief ("*Ex Parte* Motion").

## I. INTRODUCTION

Robert Shapiro raised more than a billion dollars from investors through fraud. His scheme has collapsed: his companies have stopped paying investors; he has filed bankruptcy for

---

[1] The Shapiro Property LLCs and Shapiro Holding LLCs are identified in Appendix A to the Complaint.

many but not all of his network of hundreds of LLCs; and the bankruptcy filings make clear there will be substantial investor losses. Yet, somehow, Shapiro remains closely aligned with Woodbridge and its affiliates, the beneficiary of a $175,000 per month "consulting" contract under which he will provide "advice" and "support" concerning every aspect of Woodbridge's business. This contract and other benefits were bestowed upon Shapiro by the very people Shapiro selected to "restructure" Woodbridge.

This cannot stand. "It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of [the corporate defendant's] affairs . . . ." *SEC v. First Financial Group of Texas*, 645 F.2d 429, 438 (5th Cir. May 1981) (citation and quotation omitted). An independent receiver is therefore necessary. Such a receiver could, among other things, (a) cancel the corrupt bargains with Shapiro, (b) make a conflict-free determination whether bankruptcy proceedings or a district-court supervised receivership would be the best way to preserve assets and make appropriate distributions, and (c) ensure that, whichever method is employed, *all* of Shapiro's entities, not just those he hand selected, come under the control of either this Court or the bankruptcy court.

For these and the other reasons detailed below, the Court should appoint a Receiver over the Corporate Defendants.

## II. FACTS

### A. The Fraud

As set forth in greater detail in the Commission's *Ex Parte* Motion, the Corporate Defendants, along Shapiro, have orchestrated a massive Ponzi scheme, raising in excess of $1.22 billion from approximately 8,400 nationwide investors, at least 2,600 of which invested using their Individual Retirement Account funds.

Woodbridge sold investors two primary products: (i) a twelve to eighteen month promissory note ("FPCMs" and "FPCM Investors"), secured by Woodbridge's interest in loans it was supposedly making to third-party commercial property owners ("Borrowers"), and (ii) a five-year private placement security ("Fund Offerings" and "Fund Investors"). Both the FPCM Investors and the Fund Investors were promised monthly interest or dividend payments. The FPCM Investors were to be paid their principal at the end of the term of the note. The Fund Investors were to receive their principal and a pro-rata share of 50% of the profits at the end of their five-year term.

Woodbridge told both FPCM and Fund Investors that these third-party Borrowers were paying the company 11-15% annual interest for "hard money," short-term financing, thereby allowing Woodbridge to pay returns to investors. As an additional source of revenue, Woodbridge told Fund Investors that it would purchase properties to develop and sell for a profit. Woodbridge utilized both an internal sales team of approximately 30 employees and a network of hundreds of external sales agents to solicit investments from the general public by way of television, radio, and newspaper advertisements, aggressive cold calling campaigns, social media, websites, seminars, and in-person presentations.

In reality, Woodbridge's business model was a sham: there was no revenue from which it could pay investors, because only a tiny fraction of the Borrowers were bona-fide third-parties. In fact, the vast majority of the "Borrowers"—representing 98% of the outstanding loans—were the hundreds Shapiro Property LLCs, which earned no revenue (they did not even have bank accounts) and made virtually no actual cash interest payments to the Shapiro-controlled lender. Hence, for a period of approximately five years, despite issuing "loans" of $675 million at purportedly high rates of interest, Woodbridge collected only $13.7 million in interest payments.

To create an appearance of legitimacy, for each transaction Woodbridge and Shapiro would create a promissory note payable by a Borrower (a Shapiro LLC) to a lender (a different Shapiro LLC). Woodbridge would then provide a copy of the fraudulent promissory note to the FPCM Investor, lulling the investor into thinking he had received what he had paid for—a loan backed in part by the monies Woodbridge would be receiving from a paying Borrower.

Similarly, Fund Investors were told that their returns were generated by these "loans" as well as Woodbridge's property development. These statements were false and materially misleading. First, as with FPCM Investors, Fund Investors were not told that the Borrowers were not making any actual interest payments. Second, Woodbridge failed to tell Fund Investors that its profits from developing properties were wholly inadequate to generate the promised returns.

Because the "Borrowers" were actually non-revenue earning Shapiro Property LLCs, the only way for Woodbridge to pay returns to the FPCM and Fund Investors was by continuously raising money from new investors and convincing existing FPCM Investors to defer repayment of their principal by "rolling over" their investment into a new note at maturity. As a result, Woodbridge and Shapiro ended up using $368 million in new investor funds to pay interest and

principal to existing FPCM and Fund Investors. Woodbridge also used $172 million of investor money to pay its operating expenses, including wages and sales commissions. Shapiro also misappropriated at least $21 million for his own personal benefit, using the money to purchase extravagant luxury items (including more than $400,000 worth of jewelry and $300,000 worth of wine), charter private planes, make political contributions, and pay alimony.

Shapiro's house of cards finally collapsed on December 1, 2017, when Woodbridge stopped paying investor returns, and days later on December 4 filed for Chapter 11 bankruptcy protection along with many (but not all) of its affiliates. Bank account records show that Woodbridge owes investors at least $961 million in principal. Woodbridge's assets consist mostly of residential real estate, which it purchased for approximately $592 million.

## B. The Bankruptcy

On December 4, 2017, Woodbridge and some (but not all) of its affiliates ("Debtors") filed voluntary petitions ("Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware, Case No. 17-12560 (KJC) (Bankr. D. Del.) (jointly administered). *(Voluntary Petition for Non-Individuals Filing For Bankruptcy [DE 1] attached hereto as Exhibit A; Declaration of Lawrence R. Perkins in Support of the Debtor's Chapter 11 Petitions and Request for First Day Relief [DE 12] attached hereto as Exhibit B, ¶6).* Thus, the Debtors seek to reorganize a fraudulent operation into a going concern. And several Woodbridge affiliates were not included in the bankruptcy. Notably, as detailed in the *Ex Parte* Motion for Asset Freeze, numerous entities controlled by RS Protection Trust ("RS Trust"), the hydra of the entire fraud, where Shapiro is the trustee, and members of his family are the sole beneficiaries, were not included. *(Exh B, ¶14 and ECF at 33).*

### 1. Obviousness of the Ponzi-Scheme

Woodbridge's bankruptcy filings describe its "principal business" as "buying, improving, and selling high-end luxury homes," in essence admitting that investors were lied to when they were told that Woodbridge was in the business of making high-interest loans. *(Exh. B., ¶12)*. Woodbridge further acknowledges that Shapiro, through his trust, owns nearly 200 properties purchased with hundreds of millions of dollars of mortgages provided by investors. *(Id., ¶19)*. Yet their Bankruptcy budget shows virtually no mortgage interest income, *(Id., ECF at 157)*, and therefore the new management must understand that the only way Woodbridge had been able to pay returns to investors was through new investor funds and rollovers.

### 2. The Sweetheart Arrangement with Shapiro

On December 1, 2017, the business day preceding the bankruptcy filing, a number of actions were taken. First, Shapiro appointed Beilinson Advisory Group, LLC ("Manager") as the manager of WGC Independent Manager LLC, which became the sole manager of Woodbridge and most of its affiliated LLCs at a rate of $40,000 per month. *(Ex. B., ¶2; Ex C)* Manager, in turn, appointed Mr. Perkins to serve as WGC Independent Manager's Chief Restructuring Officer ("CRO"), at a rate of $575 an hour, and including staff with rates ranging from $575 per hour to $100 per hour. *(Ex. B, ¶ 35; Ex. D)*

Manager also entered into a series of agreements with Shapiro. First, Manager caused Woodbridge to entered into the Transition Services Agreement (the "Agreement"), a consulting agreement with a Shapiro-controlled entity pursuant to which Woodbridge pays Shapiro an astonishing $175,000 *per month* for his services for a period of one-year (renewable by the parties for additional one-year terms), plus company-paid health insurance and the use of office

7

space and equipment and staff support. *(Ex.B, ¶27, ECF at 53, ¶¶1, 2).*[2] Under the Agreement, unless there is termination for "cause," Woodbridge must give Shapiro 30 days' prior notice of its intent to terminate Shapiro and pay him six months' pay, i.e. $1,050,000, as liquidated damages. *(Id., ECF at 54, ¶6).* Incredibly, under the Agreement, Shapiro's pre-petition fraudulent conduct does *not* constitute "Cause" for termination. *(Id., ECF at 54, ¶6)*[3]

Mr. Shapiro's "consulting" duties leave him entangled with Woodbridge and the investors' money. Under the agreement, Shapiro is to provide "advice" and "support" on all aspects of the Woodbridge's business, including developing and selling its real estate portfolio, identifying new projects, raising capital, investigating the FPCM and Fund Investors' Claims against Woodbridge, and managing Woodbridge's staff and consultants. *(Id., ECF at 58).* Shapiro's duties also specifically delineate overseeing and managing relationships with Relief Defendants Mercer Vine Inc., and Riverdale Funding, LLC *(Id.)*, which, as alleged in the Complaint are wholly or partially owned by Shapiro and received illicit proceeds from Shapiro's fraud.

But a $175,000 monthly consulting contract was not enough for Shapiro. To further sweeten the deal, Manager and the CRO also allowed Shapiro unfettered use of two multi-million dollar homes, one in California and one in Colorado, that had been purchased with

---

[2] Shapiro has already been paid $175,000, as the first payment was due upon execution of the Agreement. *(Id, ECF at 53, ¶2).*

[3] Shapiro is the sole beneficiary of this million-dollar amnesty. With respect to other Woodbridge employees, new management is "reviewing the[ir] involvement . . . in prior fundraising." As part of this review, "the Debtors may place certain employees or contractors on administrative leave or take other appropriate actions pending an investigation of their involvement in this activity." *(Id., ¶ 60).* This disparate treatment between the man at the top and those further down the org chart is farcical.

investor funds. *(Id., ¶28)*. Shapiro supposedly pays rent on these properties, but the bankruptcy filings concede that rent for the California property is below market.[4] *(Id., ¶28)*.

The CRO also agreed to a "distribution arrangement" with Shapiro, which further harms investors. Under that arrangement, upon the sale of real estate properties, after notes are repaid, Shapiro will receive up to $500,000 of any excess proceeds "as an advance on any distributions". *(Id., at ¶37)*. This arrangement is not in the best interest of investors or the Bankruptcy estate. First, given Shapiro's fraud and Woodbridge's insolvency, the notion that the bankruptcy proceeding will result in distributions to Shapiro is fanciful, and Woodbridge should not be advancing funds against phantom future distributions. Second, given Shapiro's fraudulent conduct outlined in the *Ex Parte* Motion, he should not receive another penny at the expense of investors or the estate.

Woodbridge's arrangement with Shapiro was tainted from the outset. The various December 1, 2017 transactions were clearly part of a prearranged deal: if Manager wanted his $40,000 per month and the CRO wanted his $575 per hour, Shapiro was going to get his $175,000 per month, all at Woodbridge's expense. Now that the Agreement exists, Woodbridge is stuck—Shapiro's fraud does not constitute cause to terminate, and it will cost Woodbridge a million dollars to disentangle itself from Shapiro.

### 3. The Bankruptcy Allows Shapiro to Profit From His Misrepresentation to the FPCM Investors that they Were Secured

Through Woodbridge and its sales force, Shapiro repeatedly represented to FPCM Investors, including thousands who invested their retirement funds, that their notes were secured

---

[4] The Shapiro Property LLCs associated with these properties, Emerald Lake Investments, LLC and Carbondale Glen River, Mesa, LLC, are defendants in this action. The properties, in California and Colorado, carry debt, respectively, of over $6 million and $5 million, with Woodbridge agreeing to forebear from any foreclosure or other remedy during the pendency of the bankruptcy. [*Exh. B, ¶28, ECF at 60-91*]. As noted above, there is no disclosure as to whether the rent Shapiro purportedly pays is sufficient to service that debt.

9

by a first-lien on the property tied to their note. In fact, a frequent part of the sales pitch was that because of the collateral, the debtor did not need to be concerned with Woodbridge's financial condition. For example, this was included in a Frequently Asked Question brochure provided to investors:

> In a Frequently Asked Question brochure for the FPCM product, Woodbridge stated the following:
> Q: If the borrower does not make their payments to Woodbridge will I be informed?
>
> A: This question is actually irrelevant, because Woodbridge would continue to make monthly payments to you . . . and may or may not inform you of the underlying non-payment. *As long as Woodbridge continues to make regular payments to you, there would be no reason to be concerned.*

(*Exh. E*, emphasis added).

However, in the bankruptcy, the Debtors intend to avoid the FPCM Investors' liens because of their purported failure to properly perfect their security interests under the Uniform Commercial Code, thus turning them into unsecured creditors. *(Exh. B at fn. 9; Ex G at ¶¶8-13).* Avoiding the liens is the only way Woodbridge can continue to finance its operations, including the $2.1 million per year going to Shapiro. Thus, if things go according to Shapiro's plan, Shapiro will have defrauded the FPCM Investors into purchasing what they thought were secured notes, used the bankruptcy proceeding to "unsecure" these investors, and used that unsecured status to obtain the financing needed for him to receive the $2.1 million per year under the Agreement.[5]

### 4. Depletion of the Estate

Shapiro's choice of Chapter 11 reorganization—the only way for him to install his hand-picked Manager and work his plan to take $175,000 per month out of the company—is imposing

---

[5] The Commission is not at this time taking a position on the merits of the lien perfection issue. However, Shapiro should in no way benefit if does turn out that the FPCM Investors are just unsecured creditors.

10

significant costs on the Estate. One day after the bankruptcy filing, the bankruptcy court authorized Woodbridge to borrow $6 million in interim post-petition financing. *(Exh. F, pg 6)*. Woodbridge will be requesting another $19 million in interim financing at a hearing on December 21, 2017, *(Id.)* along with an additional $75 million in financing on a final basis (for a total of $100 million) at a hearing scheduled for January 10, 2018, *(Exh. G; Exh. H)*, all premised on the notion that Woodbridge is going to reorganize and emerge from bankruptcy as a going concern. *(Exh. B, ¶¶53-54)*. Woodbridge is securing these loans with liens on various assets currently securing the FPCM Investors' claims—taking a senior position to the noteholders' liens. *(Ex. G, ¶¶ 8-13, 22)* The Bankrupt Defendants have zero revenues and are operating (and will continue to operate) solely on these borrowed funds. *(Ex. B. at ECF 157)*.

In addition to the displacement of the FPCM Investors' collateral, the projected administrative costs, in addition to other budgeted items, are projected to cause a budget deficit of more than $28 million in the first six weeks of the bankruptcy. *(Id., ECF at 157 (Total Operating Disbursements through 1/19/18)*, and in just the first 13 weeks alone, there are a projected $4,617,000 in professional fees (legal counsel and CRO). *(Id., ECF at p .157)*.[6] The CRO's fees are $575 per hour, with additional staff ranging from $100 to $575 per hour. *(Exhibit D)*. The Independent Manager's fees are $40,000 per month. *(Exhibit C)*. Nine attorneys have already appeared in the bankruptcy case on Woodbridge's behalf. Shapiro's decision to proceed in this fashion potentially benefits him greatly and costs him nothing, but seems certain to impose great costs on investors and creditors.

---

[6] Notably, at the First Day Hearing, on December 5, 2017, nine lawyers appeared in person on behalf of the Debtors and five more appeared via telephone. (Exhibit I).

11

### 5. Shapiro Has Kept Significant Assets Outside the Bankruptcy

Shapiro selectively omitted from the bankruptcy filings approximately 30 Woodbridge-related entities that hold real estate assets worth at least $34 million. *(Ex. B, ¶23; Exh J).* Shapiro therefore potentially stands to gain from these assets as they remain outside the jurisdiction of any court.

### 6. Woodbridge's Continued Lack of Candor With Investors

Even under its new "independent" management, Woodbridge presents investors with a rosy picture of this massive Ponzi operation. In a letter dated December 5, 2017, which refers investors to a website, Woodbridge describes the "steps Woodbridge is taking to strengthen its business for the future." *(Exh. K, Exhibit A).* Woodbridge claims it initiated chapter 11 Bankruptcy "in an effort to recapitalize its debt and establish a stronger financial platform." *(Id.).* Later Woodbridge notes that it will continue "normal business operations while we develop a plan of reorganization to emerge from court protection as a stronger, more viable company." *(Id.)* Woodbridge blames its problems on to "unforeseen costs associated with ongoing litigation and regulatory compliance," attempting to blame regulators, rather than its own unlawful conduct and lack of income, as the source of its demise. *(Id.)* Indeed, Shapiro is singled out for exoneration, with the website's FAQ section stating:

> [Q:] Does Bob Shapiro stepping down mean he did something wrong?
>
> [A:] Bob initiated the management changes so that the Company could focus on restructuring. The management changes were implemented as part of the plan to secure the Company's future.

*(Exh. L, FAQs)*

Thus, new management is continuing to conceal from investors what the managers would have learned from even a cursory review of Woodbridge's accounts, namely, that for the past several

years Woodbridge had virtually no revenue and was paying returns to investors from funds obtained from new investors.

Finally, Woodbridge soft-peddles its plan to avoid the FPCM Investors' security interests. The website says in the FAQ section, that Woodbridge intends to resume interest payments to the noteholders, which is inconsistent with treating them as unsecured creditors. The website does mention that Woodbridge's unpaid obligations to FPCM Investors "will be considered as general unsecured claims in the restructuring proceedings" without explaining that this means that Woodbridge is going to be suing the noteholders to avoid their liens. (*Id.*). To the contrary, on the front page, Woodbridge tells investors to expect "various notices from the Bankruptcy Court," but that they should "not be alarmed by these notices," (*Id.*) even though one such notice would have been related to the motion to permit the financing that will displace their liens—and permit Shapiro to be paid—and another notice will be the summons in the adversary action seeking to avoid the investor's security interest.

### III. MEMORANDUM OF LAW

#### A. A Receiver is Needed to Preserve and Maximize the Value of Assets

The appointment of a Receiver is a well-established equitable remedy available to the Commission in civil enforcement proceedings for injunctive relief. *See e.g., SEC v. First Financial Group of Texas*, 645 F.2d 429, 438 (5th Cir. May 1981);[7] *SEC v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010); *see generally* Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a); and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. Appointing a Receiver is particularly appropriate in cases where a defendant, through its management, has defrauded members of the investing public. *First Financial*, 645 F.2d at 438.

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

13

In such cases, without the appointment of a Receiver to maintain the *status quo*, the assets will be subject to diversion and waste to the detriment of those who were induced to invest in the scheme. *Id.*; *see also SEC v. R.J. Allen & Associates, Inc.,* 336 F. Supp. 866, 891 (S.D. Fla. 1974).

### B. Appointing a Receiver Is Not Barred by the Automatic Stay

Generally, pursuant to Section 362(a) of the Bankruptcy Code, upon the filing of a Chapter 11 petition, an injunction is placed into effect which automatically stays, among other things, (i) the commencement or continuation of any judicial, administrative or other action or proceeding that was, or could have been, commenced before the filing of the Chapter 11, or (ii) any act to obtain possession of or exercise control over the property the debtors' estates. However, the stay is inapplicable here because of the exception for a governmental unit enforcing its police and regulatory powers. 11 U.S.C. § 362(b)(4).

As a preliminary issue, this Court has jurisdiction to determine whether the automatic stay applies to these proceedings and the Commission's Motion to Appoint a Receiver. *See SEC v. Wolfson,* 309 B.R. 612, 617 (D. Utah 2004) ("At the outset, the Court finds that it has jurisdiction to determine its own jurisdiction, as well as to decide whether the automatic stay is applicable to the instant litigation.") (citations omitted); *In re Dolen,* 265 B.R. 471, 476 (Bankr. M.D. Fla. 2001) ("[t]he district court has concurrent jurisdiction with the bankruptcy court to determine the extent to which the Section 362 automatic stay limits the actions of the Commission in its ability to pursue the pending district court action"); *In re Glass,* 240 B.R. 782, 787 (Bankr. M.D. Fla. 1999); *In re Baldwin-United Corp. Litig.,* 765 F. 2d 343, 347 (2d Cir. 1985).

Next, it is well settled that the automatic stay does not bar the Commission from commencing or continuing an action to enforce the Commission's police and regulatory powers. Section 362(b)(4) of the Bankruptcy Code provides:

> (b)     [t]he filing of a petition * * * does not operate as a stay -
>
> (4)     under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit * * * to enforce such governmental unit's * * * police or regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

11 U.S.C. § 362(b)(4). "A proceeding that seeks to curb certain behavior, such as defrauding investors, by imposing financial liability or seeking an injunction, is one that enforces the government's police or regulatory power and serves to protect public health and safety." *SEC v. Friedlander*, 2002 WL 1628832 (S.D.N.Y. 2002) (citations omitted).

The purpose of the Section 362(b)(4) exception "is to prevent a debtor from frustrating necessary governmental functions by seeking refuge in bankruptcy court," *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000), and to "to prevent the bankruptcy court from becoming the haven for wrongdoers." *Bilzerian v. SEC*, 146 B.R. 871, 873 (M.D. Fla. Bankr. 1992) (citations omitted).

Accordingly, the "police and regulatory power" stay exception allows the Court to appoint a receiver against the Corporate Defendants in bankruptcy. In *First Financial*, the Court held that the district court's appointment of a receiver was not stayed where "it [was] likely that, in the absence of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste." 645 F.2d at 437-38.[8] Although *First Financial* involved an involuntary

---

[8] *See also Wolfson*, 309 B.R. at 620 (automatic stay exception permits court to appoint a receiver); *SEC v. Behrens*, 2014 WL 3490001, *2-3 (D. Neb. July 11, 2014); *SEC v. Morriss*,

15

bankruptcy proceeding, the case for a receiver is even greater when the debtor files a voluntary proceeding. *See SEC v. Tyler*, No. CIV.A.3:02 CV 0282 P, 2002 WL 32538418, at *8 (N.D. Tex. Feb. 21, 2002) ("[B]ecause Defendants themselves filed for bankruptcy and are debtors-in-possession, there is even greater reason [than there was in *First Financial*] to appoint a receiver to ensure that no further diversion of Defendants' assets occurs." Thus, the Court clearly has the authority to appoint a Receiver here.

### C. A Receiver is Needed Despite the Pending Bankruptcy Proceeding

As noted above, approximately two weeks ago, Shapiro directed some, but not all, of the Corporate Defendants to file Chapter 11 bankruptcy petitions in the District of Delaware. In an effort to eliminate the appearance that the Debtors are no longer tainted by Shapiro's fraud or subject to his influence, the day-to-day management was transferred to the CRO on December 1, 2017—the Friday before the Monday bankruptcy filing. As part of the Petitions, the Debtors tout the "independence" of the new management team. This is a rather dubious given the benefits bestowed to Shapiro by his hand-picked management team and the benefits they bestowed in exchange.

Appointing a Receiver to manage the Debtors—along with the other Corporate Defendants not in bankruptcy—is appropriate and in the best interests of investors. *First*, appointing a truly independent Receiver over all Corporate Defendants will allow the Receiver to administer *all* of the Woodbridge-related assets in one centralized forum. The Receiver will need to decide whether to administer the assets in this Court (by moving to dismiss the bankruptcy case) or the bankruptcy court (by filing bankruptcy petitions for the remaining

---

2012 WL 2154903, *2 (E.D. Mo. June 13, 2012) (receiver appointed eight days after Defendants filed for bankruptcy); *SEC v. Towers Financial Corporation*, 205 B.R. 27 (S.D.N.Y. 1997) (SEC not stayed from continuing enforcement action against Chapter 7 debtor).

16

Corporate Defendants and deciding whether to seek to convert the proceeding to a Chapter 7 liquidation) as appropriate to maximize value. If, on the other hand, the Receiver were appointed over only the non-bankrupt entities, then the Corporate Defendants, and their assets, would be administered in two different courts by two different administrators. ***Second***, although Shapiro no longer directly manages the Debtors, he retains substantial influence and control. Shapiro, a perpetrator of a massive and serious fraud, remains intricately involved in the day-to-day operations of Woodbridge, is paid an exorbitant salary for his services, and retains a contractual right for breach and for excessive liquidated damages if he is terminated. The CRO and Independent Manager's decision to leave the orchestrator of this massive Ponzi scheme involved with Woodbridge's activities in any capacity, let alone one where he receives $175,000 per month, is shocking and incomprehensible. There is no reason these tasks could not be performed by a non-fraudster, for less money, and no reason to keep Shapiro anywhere near Woodbridge, let alone in a major role. No matter what forum the Receiver elects, Shapiro must be removed, and there is no chance the current management will do this.

In addition, Shapiro has instructed the independent management team to pursue a reorganization of the Woodbridge business that will allow him to resume full control over all of the Corporate Defendants upon emergence from Chapter 11 by the end of 2018. Indeed, after the filing of the bankruptcy, Woodbridge, under the direction of the CRO, represented to investors that Woodbridge would be continuing normal business operations, and blamed the Commission for its financial condition.

Hence, it is clear that the Corporate Defendants, including those currently in bankruptcy, will benefit from having one ***court-appointed*** fiduciary who can administer the assets of all

entities in one forum, free from Shapiro's influence and control and from the Shapiro management team's myopic and tainted view of Shapiro and Woodbridge.

Additionally, the bankruptcy management team hired by Shapiro has stated – from the outset – its intention to sue Woodbridge noteholders to avoid their liens and treat them as unsecured creditors in the bankruptcy. If the lien avoidance action has merit, a Receiver can ensure that the procedure is being employed to benefit the Estate and not as part of a plan to continue to enrich Shapiro.

Finally, there is the projected expense of the current bankruptcy. The Debtors are represented by two law firms, on an hourly basis, with high billing rates, and are also paying for the CRO, the CRO's supporting team, and the Independent Manager (plus Shapiro's $175,000 monthly fee). Yet another firm is representing the company in the Commission's investigation. The projection of these costs and others are astronomical. A Receiver, with the reasonable and severely discounted rates as detailed below, will be able to administer the Corporate Defendants more efficiently in whatever forum the Receiver were to select.

### IV. RECEIVER CANDIDATES

The Commission's staff has solicited expressions of interest from three potential Receivers it believes are well-suited to handle this matter, and attaches the credentials of these candidates as Exhibits M, N, and O to this motion. After considering these candidates, the Commission's staff believes that investors and other interested parties would best be served by appointing Jeffrey C. Schneider, Esq., whose credentials are attached as Exhibit M, to serve as Receiver over the Corporate Defendants.

Mr. Schneider, whose credentials are attached as Exhibit M, is a partner with the law firm of Levine, Kellogg, Lehman, Schneider & Grossman, LLP in Miami, Florida, and the co-

chair of its receivership group. His letter and resume indicate that during Mr. Schneider's 25-year career, he has previously served as a Receiver, and been lead counsel to Receivers, on multiple occasions. Mr. Schneider has been a Receiver on behalf of the Commission, Commodity Futures Trade Commission, Federal Trade Commission, and the Florida Office of the Attorney General. In addition, his firm has extensive experience and expertise in receiverships and bankruptcy. Because of the size and scope of the Receivership, which involves more than 10,000 investors and the winding down of a large real estate portfolio, a Receiver with Mr. Schneider's extensive experience is essential.

Moreover, Mr. Schneider is willing to significantly discount his and his firm's current hourly rates. He is willing to discount his normal hourly rate by more than half, from $575 an hour to a capped rate of $260 an hour. Additionally, the firm's partners normally charge from $450 to $600 an hour, but he will substantially reduce and cap those rates at $250 an hour. The firm's associates normally charge from $325 to $375 an hour and he will also significantly reduce and cap his associates' rates at $200 an hour; and his firm's paralegals will charge no more than $125 an hour. Not only will these considerable rate reductions substantially reduce the costs of the Receivership to defrauded investors, they are significantly lower rates than the other candidates offered.

Therefore, the Commission recommends Jeffrey Schneider, who has the capability and experience necessary for carrying out the tasks that will be required of the Receiver and has indicated a willingness to serve as Receiver. As the Commission indicated previously, it sought expressions of interest to serve from additional candidates who also are well-qualified to serve as receivers and, with their respective firms, have also agreed to significantly discount their fees. Accordingly, if the Court does not agree with the Commission's recommendation, the

Commission suggests the Court consider either of the two alternative candidates, Cori-Lopez Castro and Daniel Newman, whose credentials are attached as Exhibits N and O.

## CONCLUSION

All of the misrepresentations and omissions described in the Commission's Complaint and other papers filed in this action occurred under the auspices of Shapiro, Woodbridge and its affiliated entities. The victims in this case need a court-appointed independent fiduciary. A Receiver is necessary to take over the Corporate Defendants to prevent further dissipation of investor assets, locate and recover the assets of *all* the Corporate Defendants, not just those Shapiro selected for the bankruptcy case, and independently assess the cost-effectiveness of the bankruptcy proceeding *viz-a-viz* the best interests of the entities. For the foregoing reasons, the Commission requests that the Court grant its emergency request for the appointment of a Receiver over all the Corporate Defendants.

Dated: December 20, 2017

Respectfully submitted,

By: _____
Russell Koonin & Christine Nestor
Senior Trial Counsel
kooninr@sec.gov; nestorC@sec.gov
FL Bar No.: 474479; FL Bar No. 597211
Telephone: (305) 982-6385; (305) 982-6367

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154