# Woodbridge Entities

# Declaration of Soneet R. Kapila

## December 18, 2017





## Table of Contents

**Declaration of Soneet R. Kapila**

**Exhibits**

| | |
|---|---|
| **Resume of Soneet Kapila** | **A** |
| **Resume of Melissa Davis** | **B** |
| **Ponzi Fraud Cases** | **C** |
| **Bank Record Inventory** | **D** |
| **Credit Card Statement Record Inventory** | **D.1** |
| **QuickBooks Files Provided** | **E** |
| **Consolidated Bank Reconstruction** | **F** |
| **Summary of Bank Reconstructions** | **F.1** |
| **Bank Reconstruction Categories** | **F.2** |
| **Summary of Credit Card Activity** | **G** |
| **Credit Card Account Reconstruction Categories** | **G.1** |
| **Summary of Net Payments to Insiders** | **H** |



## Declaration of Soneet R. Kapila

Pursuant to 28 U.S.C § 1746, the undersigned states as follows:

I, Soneet R. Kapila, declare and state that the following facts are known to me personally and that I am competent to testify about them.

### I.        RETENTION

**1.**      I am over eighteen years of age and have personal knowledge of the matters set forth herein.

**2.**      I am the founding partner of KapilaMukamal, LLP ("KM"), a forensic consulting and insolvency advisory firm that was retained by the United States Securities and Exchange Commission ("SEC") to conduct a forensic accounting investigation in this matter.

**3.**      In conducting my investigation and analysis, I was assisted by other KM professionals with extensive experience in insolvency and forensic investigations working under my direct supervision.  Any references to "I", "my", "KM" or "Kapila" within the Declaration would incorporate my efforts with the assistance of my co-professionals working under my direct supervision.

### II.    QUALIFICATIONS

**4.**      I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF) conferred by the AICPA, and a Certified Insolvency and Restructuring Advisor (CIRA). The CIRA designation is conferred by the Association of Insolvency and Restructuring Advisors (AIRA), after a three-



part examination and a required 4,000 hours of prior qualified insolvency experience.

5.  I am a Fellow of the American College of Bankruptcy. This recognition is based on recommendations by peers in the insolvency industry at a national level, invitation by the American College of Bankruptcy and induction into this College.

6.  KM is a niche practice focusing on forensic investigative work, creditors' rights, bankruptcy, insolvency and fiduciary services.  Several of the core professionals of KM have similar certifications as identified in ¶4 above.

7.  I have served as a Federal Bankruptcy Trustee, Bankruptcy Examiner, Chief Restructuring Officer, SEC Corporate Monitor and Federal and State Court Receiver in numerous matters in the Southern and Middle Districts of Florida and the District of New Jersey.

8.  I have served as a Federal Bankruptcy Trustee on the panel of U.S. Bankruptcy Trustees in the Southern District of Florida from approximately 1992 to present. I have been appointed as a Chapter 11 Trustee, Chapter 7 Trustee, post confirmation Liquidating Trustee or other post confirmation fiduciary roles. In these roles I have investigated frauds, Ponzi schemes, distressed businesses and their failures, financial affairs of bankruptcy debtors, evaluated asset recoveries and claims against third parties. These roles routinely include tracing assets, assessing for possible fraud and successor businesses.  I have also investigated causes of action against management, professionals and under Chapter 5 of the Bankruptcy Code.  My duties have extended to evaluating, bringing and overseeing litigation



claims.   Such claims have included tort litigation against professionals and directors and officers.

9.   As a court appointed Examiner, I have reported to the Bankruptcy Courts on issues whose defined scope of the duties is in the Bankruptcy Court's mandate, investigating the conduct of businesses and management and making recommendations to the Bankruptcy Court.

10.   As a Federal Court approved Corporate Monitor appointed by the SEC, I have operated a public company international business and negotiated its sale to a foreign company, and I am overseeing the restructuring of a healthcare business of multiple entities in the senior living facilities industry.

11.   I have been qualified as an expert dozens of times in federal and state courts regarding Ponzi schemes, insolvency, fraudulent transfers, funds and asset tracing, lost profits, damages and other subject matters as well as a non-testifying expert in many other cases.   A true and correct copy of my Resume and Case Experience is attached hereto as ***Exhibit A***.   Also attached as ***Exhibit B*** is the Resume of Melissa Davis, a partner in KM with a similar concentration, who functioned as the lead partner assisting me with this investigation and analysis. ***Exhibit C*** is a selective summary of the credentials of KM relating to fraud investigation experience, including Ponzi schemes.

## III.   <u>RELEVANT ENTITIES</u>

12.   This Declaration is based upon my review, investigation and analysis of the available accounting and bank records for the period from July 11, 2012 to



September 30, 2017 ("Relevant Time Period") of the following entities (collectively

the "Woodbridge Entities"):

**Table 1 – List of Relevant Entities**

*Source: Bank Reconstruction and QuickBooks Files*

| Entity Name | Defined As |
|---|---|
| Woodbridge Group of Companies, LLC | "Group" |
| Woodbridge Structured Funding, LLC | "Structured" |
| Woodbridge Mortgage Investment Fund 1, LLC | "WMIF 1" |
| Woodbridge Mortgage Investment Fund 2, LLC | "WMIF 2" |
| Woodbridge Mortgage Investment Fund 3, LLC | "WMIF 3" |
| Woodbridge Commercial Bridge Loan Fund 1, LLC | "Bridge 1" |
| Woodbridge Commercial Bridge Loan Fund 2, LLC | "Bridge 2" |
| Woodbridge Mortgage Investment Fund 3a, LLC | "WMIF 3a" |
| Woodbridge Mortgage Investment Fund 4, LLC | "WMIF 4" |

13.     Collectively, Group and Structured are referred to herein as the "Woodbridge

Operating Entities".

14.     WMIF 1, WMIF 2, WMIF 3, WMIF 3a and WMIF 4 (collectively, the "Woodbridge

Fund Entities") were formed and managed by Robert Shapiro ("Shapiro")

purportedly for purposes of investing in first mortgages, mezzanine loans and other

real estate acquisitions using funds raised from investors located throughout the

country ("WMIF Investors").[1] The WMIF Investors included two types:

a.     Purportedly accredited investors that invested pursuant to the Confidential

Offering Memorandums described below ("Fund Investors").  The terms of

these loans were five years; and

---

[1] Offering Memorandums



b.   Short-term investors that loaned money on a short term basis, primarily one year, ("FPCM Investors") and in turn allegedly received a first position commercial mortgage as security for their investment.

15.   Structured is a Delaware limited liability company formed in July 2009 by Shapiro. In March 2013, Structured submitted an application to transact business in Florida. Structured has offices in Florida and California that purportedly specialize in purchasing structured settlements, annuity and lottery payments.[2]   Structured raises money from investors and uses the funds to buy the annuity payment stream at a discount.   The investor would then receive the future payment stream.

16.   Group is a Delaware Corporation formed in December 2014. It has several divisions that purportedly specialize in real estate, buying/selling notes, hard money lending and alternate financial space.   Its divisions include[3]:

a.   Woodbridge Realty Unlimited – a Colorado limited liability company formed in August 2014[4] as a boutique full service Colorado real estate firm.[5]

b.   Woodbridge Wealth – an entity located in California that offers investors a variety of investment options including: [6]

i.   First Position Commercial Mortgages ("FPCM") – investors are private lenders that give short term loans, primarily on a one-year basis, to Woodbridge Fund Entities in return for 5% annual interest payable

---

[2] https://www.woodbridgeinvestments.com/about-woodbridge/
[3] www.woodbridgecompanies.com
[4] Colorado Secretary of State
[5] https://www.woodbridgerealtyco.com/about
[6] https://www.woodbridgewealth.com/financial-products/



monthly.[7]  The loans are purportedly "backed" by a dedicated commercial real estate property.  FPCM purportedly works as follows:[8]

1. The investor lends money to the Woodbridge Fund Entities primarily for a one year period and will receive an annual 5% interest, payable monthly;

2. The Woodbridge Fund Entities pool money received from the short-term investors to make loans to commercial borrowers for a maximum of two years and up to only 70% of the value of the real estate.  The Woodbridge Fund Entities conduct all due diligence including title search and appraisal on the commercial properties and borrowers. When the Woodbridge Fund Entities make the loan, the short-term lenders receive a first lien position on the property and the Woodbridge Fund Entities receive a subordinated position to the short-term investors.

3. The Woodbridge Fund Entities fund the real estate property loan and receive payments from the real estate owner.

4. The property owner makes payments to the Woodbridge Fund Entities and the investor receives monthly interest payments based on a 5% annual interest rate and a first lien position as security.

---

[7] I noted that in certain instances the interest rate exceeded 5% and the loan terms was in excess of 12 months.
[8] https://www.woodbridgewealth.com/financial-products/first-position-commercial-mortgages/



ii. Commercial Bridge Loan Fund – offers investment in a security with a 6% annual preferred return payable monthly for one year. If the investor holds the investment for a period greater than one year and up to five years, it offers an additional 1% accrued incentive return if the investment is held for five years.

iii. Second Market Annuities – offers investment in a fixed annuity payment stream with a 5% annual return. The investment funds a variety of obligations at a discount, including lottery winnings, personal injury settlements and investments.

c. Riverdale Funding, LLC – a hard money lender that specializes in providing asset-based one to three-year interest only commercial loans to borrowers. Loans range from $250,000 to $5 million.

## IV. <u>SCOPE</u>

17. The SEC requested that I determine the following for the Relevant Time Period:

a. The amount of funds the Woodbridge Entities raised from WMIF Investors and the number of WMIF Investors;

b. The amount of funds the Woodbridge Entities paid to WMIF Investors for principal and interest payments to FPCM Investors and dividend payment to Fund Investors (the interest and dividends collectively "Returns");

c. The amount of funds remaining due to WMIF Investors;

d. The total amount of WMIF Investor funds that were derived from an IRA custodian and the number of such WMIF Investors;



e.  The amount of WMIF Investor funds derived from investors located in the Southern District of Florida and the number of such WMIF Investors;

f.  The amount of funds received from WMIF Investors residing in states where state governments issued orders precluding the sale of the Woodbridge Entities' FPCM investment vehicles and the number of such WMIF Investors;

g.  Whether or not WMIF Investors' funds were commingled;

h.  Whether or not the Woodbridge Entities' business activities were:

    i.  Dependent on continued infusion of outside investor money;

    ii.  The investor money was used for the stated purpose;

    iii.  The investor money was used to pay the returns promised to earlier investors;

    iv.  If the business enterprise generated sufficient profits to pay the promised returns to investors; and

    v.  If the business activities were consistent with the model promoted.

i.  Whether or not the Woodbridge Entities' accounting records reflect the correct amount of the income generated and assets as compared with the actual cash flow in the Woodbridge Entities' bank records;

j.  The amount of funds paid by the Woodbridge Entities to or for the benefit of Shapiro, his relatives or related entities; and

k.  The amount of funds paid by the Woodbridge Entities for commission payments, including the amount of commissions paid to sales agents located in the Southern District of Florida.



## V.   <u>SUMMARY OF FINDINGS</u>

18.   Kapila's findings are as follows:

a.   During the Relevant Time Period, the Woodbridge Entities raised approximately $1.2 billion from over 8,400 WMIF Investors nationwide. [¶85]

b.   During the Relevant Time Period, the Woodbridge Entities paid approximately $265 million of principal to WMIF Investors and $103 million in Returns to WMIF Investors. [¶85]

c.   As of September 30, 2017, the amount remaining due to WMIF Investors is approximately $961 million. [¶85]

d.   As of September 30, 2017, there were at least 2,600 WMIF Investors that invested approximately $394 million through IRA custodians. [¶102]

e.   As of September 30, 2017, there were approximately 700 WMIF Investors from the Southern District of Florida who invested approximately $114 million. [¶85]

f.   The Woodbridge Entities derived funds from FPCM Investors in states after government authorities for such states had issued cease and desist orders precluding the sale of the Woodbridge Entities' FPCM investment vehicles as follows [¶103]:

i.   $3.2 million from 11 WMIF Investors in Massachusetts.

ii.   $2.3 million from 25 WMIF Investors in Texas.

iii.   $900,000 from 13 WMIF Investors in Arizona.

iv.   $2.6 million from 31 WMIF Investors in Pennsylvania.



g.   WMIF Investor funds were commingled within the Woodbridge Operating Entities' bank accounts. [¶89]

h.   The Woodbridge Entities' business activities were [¶80]:

  i.   Dependent on continued infusion of outside investor money;

  ii.   The investor money was not used for the stated purpose;

  iii.   The investor money was used to pay the returns promised to earlier investors;

  iv.   The business enterprise did not generate sufficient profits to pay the promised returns to investors; and

  v.   The business activities were not consistent with the model that was promoted.

i.   The Woodbridge Entities' accounting records do not reflect the correct amount of income and assets that is consistent with the cash flow activity reflected in Woodbridge Entities' bank records, resulting in artificial representation of the income generated and assets available. [¶78]

j.   The Woodbridge Entities made net payments of $21.2 million to or for the benefit of Shapiro, his relatives or related entities. [¶104]

k.   The Woodbridge Entities paid $64.5 million in commission payments, of which over $12 million was paid to 20 sales agents located in the Southern District of Florida. [¶107]



## VI.    BACKGROUND

### Woodbridge Entities – Business Model

19.    The Woodbridge Entities' business model as represented by Shapiro was to borrow money from investors and to use that money to make real estate related loans to borrowers.  The difference between the monthly interest rate charged to the borrowers and the monthly rate paid to the investors would serve as an income source to the Woodbridge Fund Entities.  For example, if the Woodbridge Fund Entities borrowed funds from an investor at a rate of 5% but charged its borrowers 11%, the difference in the rate of 6% would be income available to the Woodbridge Fund Entities that could be used to pay expenses, including the operating expenses and sales agent commissions.

20.    Importantly, the monthly interest payments the Woodbridge Fund Entities received from the borrowers would be the source of funds to make the monthly Returns to the WMIF Investors.

### Woodbridge Entities – Financial Products

21.    WMIF Investor funds were deposited into each of the Woodbridge Fund Entities' bank accounts for the intended use in investing in first mortgages, mezzanine loans and real estate acquisitions and investments.  The WMIF Investors included Fund Investors and FPCM Investors.

11



**WMIF 1**[9]

22.     WMIF 1 is a Delaware limited liability company formed in June 2012 to invest in mortgages and other real estate ventures. WMIF 1's president and chief executive officer is Shapiro and its managing member is WMF Management, LLC ("WMF"). Shapiro is the managing member of WMF.

23.     In July 2012, WMIF 1 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 1's stated purpose was to offer accredited investors up to $10 million for 100 units of WMIF 1 for $100,000 each.

24.     Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 1.

25.     WMIF 1 was to use the proceeds of the offering to invest in first mortgages, mezzanine loans and other real estate acquisitions and investments that were to be "secured" and titled in the name of WMIF 1.

26.     The investors, referred to as "unit holders", were to be repaid as follows:

   a.     8% per annum based on capital contribution;

   b.     After five years, repayment of initial investment; and

   c.     After five years, 50% of the cumulative profits of the company earmarked for all unit holders.

---

[9] Woodbridge Mortgage Investment Fund 1, LLC Confidential Offering Memorandum.



27.   The July 2012 Offering Memorandum was amended in September 2012 increasing the 8% preferred dividend to a 10% preferred dividend and 2% additional accrued preferential dividend after 5 years[10].

**WMIF 2** [11]

28.   WMIF 2 is a Delaware limited liability company formed in December 2013 to invest in domestic and foreign first mortgages and other real estate ventures. WMIF 2's president and chief executive officer is Shapiro and its managing member is WMF.

29.   In January 2014, WMIF 2 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 2's stated purpose was to offer accredited investors up to $25 million for 250 units for $100,000 each.

30.   Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 2.

31.   WMIF 2 was to use the proceeds of the offering to invest in both domestic and foreign first mortgages, mezzanine loans and other real estate acquisitions and investments that were to be "secured" and titled in the name of WMIF 2.

32.   The investors, referred to as "unit holders" were to be repaid as follows:

a.      10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit;

---

[10] Amended Woodbridge Mortgage Investment Fund 1, LLC Confidential Offering Memorandum.
[11] Woodbridge Mortgage Investment Fund 2, LLC Confidential Offering Memorandum.

13



    b.      After five years, repayment of initial investment; and

    c.      After five years, investors share in 50% of the cumulative profits of the company earmarked for all unit holders.

### *WMIF 3* [12]

**33.**    WMIF 3 is a Delaware limited liability company formed in September 2014 to invest in domestic and foreign first mortgages and other real estate ventures.  WMIF 3's president and chief executive officer is Shapiro and its managing member is WMF.

**34.**    In October 2014, WMIF 3 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 3's stated purpose was to offer accredited investors up to $50 million for 500 units for $100,000 each.

**35.**    Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 3.

**36.**    WMIF 3 was to use the proceeds of the offering to invest in both domestic and foreign first mortgages, mezzanine loans and other real estate acquisitions and investments that were to be "secured" and titled in the name of WMIF 3.

**37.**    The investors, referred to as "unit holders" were to be repaid as follows:

    a.      10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit;

    b.      After five years, repayment of initial investment; and

---

[12] Woodbridge Mortgage Investment Fund 3, LLC Confidential Offering Memorandum.



c.   After five years, investors share in 50% of the cumulative profits of the company earmarked for all unit holders.

*Bridge 1* [13]

**38.** Bridge 1 is a Delaware limited liability company formed in May 2015 to provide senior position loans to various Woodbridge Fund Entities affiliates.

**39.** Bridge 1's president and chief executive officer is Shapiro and its managing member is WMF.

**40.** In June 2015, Bridge 1 issued a Confidential Offering Memorandum to raise money from investors.  Bridge 1's stated purpose was to offer accredited investors up to $50 million for 500 preferred incentive units for $100,000 each.

**41.** Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of Bridge 1.

**42.** Bridge 1 was to use the proceeds of the offering to originate and finance short-term commercial loans to WMIF Entities on a secured basis to facilitate WMIF's financing of separate third party commercial lending transactions that WMIF has consummated or intends to consummate.

**43.** The investors, referred to as "unit holders", were to be repaid as follows:

a.   6% dividend per annum and 1% accrued incentive after five years; and

b.   After five years, repayment of initial investment.

---

[13] Woodbridge Commercial Bridge Loan Fund 1, LLC Confidential Offering Memorandum.

15



**WMIF 3a** [14]

44.    WMIF 3a is a Delaware limited liability company formed in July 2015 to invest in domestic and foreign first mortgages and other real estate ventures. WMIF 3a's president and chief executive officer is Shapiro and its managing member is WMF.

45.    In October 2015, WMIF 3a issued a Confidential Offering Memorandum to raise money from investors.  WMIF 3a's stated purpose was to offer accredited investors up to $100 million for 1,000 units for $100,000 each.

46.    Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 3a.

47.    WMIF 3a was to use the proceeds of the offering to invest in domestic first mortgages, construction loans, and other real estate acquisitions investments that were to be "secured" and titled in the name of WMIF 3a.

48.    The investors, referred to as "unit holders", were to be repaid as follows:

   a.    10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit;

   b.    After five years, repayment of initial investment; and

   c.    After five years, investors share in 50% of the cumulative profits of the company earmarked for all unit holders.

---

[14] Woodbridge Mortgage Investment Fund 3a, LLC Confidential Offering Memorandum.



### WMIF 4 [15]

49. WMIF 4 is a Delaware limited liability company formed in June 2015 to invest in domestic and foreign first mortgages and other real estate ventures. WMIF 4's president and chief executive officer is Shapiro and its managing member is WMF.

50. In November 2016, WMIF 4 issued a Confidential Offering Memorandum to raise money from investors.  WMIF 4's stated purpose was to offer accredited investors up to $100 million for 1,000 units for $100,000 each.

51. Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of WMIF 4.

52. WMIF 4 was to use the proceeds of the offering to invest in domestic first mortgages, construction loans, and other real estate investments that were to be "secured" and titled in the name of WMIF 4.

53. The investors, referred to as "unit holders" were to be repaid as follows:

    a.    10% annual preferred dividend and 2% additional accrued preferential dividend after five years from the date of purchase of each corresponding unit; and

    b.    After five years, repayment of initial investment.

---

[15] Woodbridge Mortgage Investment Fund 4, LLC Confidential Offering Memorandum.



### Bridge 2 [16]

54. Bridge 2 is a Delaware limited liability company formed in July 2015 to provide senior position loans to WMIF Entities.

55. Bridge 2's president and chief executive officer is Shapiro and its managing member is WMF.

56. In February 2016, Bridge 2 issued a Confidential Offering Memorandum to raise money from investors. Bridge 2's stated purpose was to offer accredited investors up to $100 million for 1,000 preferred incentive units for $100,000 each.

57. Each investor was required to complete a "subscription agreement" among other documents at the time of the investment after which the investor became a "unit holder" of Bridge 2.

58. Bridge 2 was to use the proceeds of the offering to originate and finance short-term commercial loans to WMIF Entities on a secured basis to facilitate WMIF's financing of separate third party commercial lending transactions that WMIF had consummated or intended to consummate.

59. The investors, referred to as "unit holders", were to be repaid as follows:

    a.    6% dividend per annum and 1% accrued incentive after five years;

    b.    After five years, repayment of initial investment; and

    c.    After five years, investors share in the cumulative profits of the company earmarked for all unit holders equal to their respective pro rata share.

---

[16] Woodbridge Commercial Bridge Loan Fund 2, LLC Confidential Offering Memorandum.



### VII.   METHODOLOGY

#### Bank Reconstructions

60.   The Woodbridge Entities maintained their bank accounts with Comerica Bank. A complete list of the accounts is at **_Exhibit D_**. As of September 30, 2017 the combined cash balance in the bank accounts was $9.5 million. The SEC provided me with the bank account record productions it received from Comerica Bank. In my role as forensic accountant to the SEC in this matter, I reviewed, analyzed and reconstructed the entire activity in the bank accounts of the Woodbridge Entities ("Bank Reconstruction").   The Comerica Bank records are the source documents for the Bank Reconstruction.

61.   Shapiro was the authorized signor on each of the Comerica bank accounts and signed the thousands of checks that were issued from the bank accounts during the Relevant Time Period.

62.   The Bank Reconstruction is a database of the details of each transaction (receipts and disbursements) that occurred in the Woodbridge Entities bank accounts. I prepared a separate Bank Reconstruction for each of the Woodbridge Entities' bank accounts.   The Bank Reconstruction includes the following fields of information for each transaction:

a.      Bank account number reference;

b.      Transaction date;

c.      Transaction type;

d.      Transaction amount;



e. Payee/recipient; and

f. Ending balance.

63. To conduct my analysis, I used Actionable Intelligence Technologies Inc.'s Comprehensive Financial Investigative Solution ("CFIS"), which is a computer software company that converts bank statements from financial institutions into searchable databases ("CFIS Databases"). I understand that CFIS is widely employed as a financial investigation tool by U.S. government agencies/organizations including the Internal Revenue Service and the Federal Bureau of Investigation.

64. I used the data from the CFIS Databases to populate the transactions in the Bank Reconstructions in chronological order. I verified that the data from the CFIS Databases matched the transactions listed in the bank statements by reconciling the following items on a monthly basis:

a. Beginning bank account balance;

b. Total credits/receipts;

c. Total debits/disbursements; and

d. Ending bank account balance.

65. Where the CFIS Databases did not include a payee/recipient for each transaction, I populated the payee/recipient information in the bank reconstruction using one of two sources:

a. The bank statement support which included:

i. Canceled checks;

ii. Deposit slips and copies of checks deposited; and



      iii.  Wire transfer support.

  b.     Data from the QuickBooks general ledgers, which was verified on a test basis to the bank statement support further discussed below.

66.    The Woodbridge Entities maintained their accounting general ledgers in QuickBooks accounting software ("QuickBooks").  The SEC provided me with the QuickBooks files listed in ***Exhibit E***.  See ¶73 for a comprehensive discussion regarding the QuickBooks analysis.   The activity in QuickBooks I analyzed was from July 2012 through April 28, 2017.  I extracted the activity for each Woodbridge Entities' bank account from QuickBooks and utilized the data as a source in populating the following additional fields in the bank reconstruction:

  a.     QuickBooks account; and

  b.     In some instances, to complete the process of populating payee/recipient details, I utilized data from the QuickBooks accounting software to populate the payee/recipient information in the Bank Reconstruction.

67.    The SEC provided me with CFIS Databases that had been partially populated with data.  I verified the information on a test basis.

68.    Based on my years of training and experience, I assigned each transaction in the Bank Reconstruction to a category for purposes of analyzing and summarizing the data.  In some instances, I assigned the QuickBooks category that was associated with the transaction.   ***Exhibit F.2*** includes the major categories I utilized in the Bank Reconstruction.

69.    I aggregated the transactions in the Bank Reconstruction by category to prepare summaries of the activity in each Woodbridge Entities' bank account.   ***Exhibit F***



is a combined summary of the Bank Reconstruction and ***Exhibit F.1*** is a combined summary of the Bank Reconstruction presented by entity**.**

**Credit Card Reconstruction**

70.   The SEC provided me with the statements and CFIS Databases for the 16 credit card accounts listed in ***Exhibit D.1***, which were all in the name of Jeri S. Shapiro, the spouse of Shapiro ("Shapiro Credit Card Accounts").

71.   I prepared a reconstruction ("Credit Card Reconstruction") of the activity in the Shapiro Credit Card Accounts.  See ¶106 for a discussion regarding the Credit Card Reconstruction analysis.

72.   During the Relevant Time Period, approximately $24 million was paid towards the Shapiro Credit Cards Accounts, of which 99% of the payments were made from Woodbridge Entities. ***Exhibit G*** is a summary of the Credit Card Reconstruction subtotaled by charge category.  I categorized the credit card transactions by payee and assigned a category. ***Exhibit G.1*** includes the major categories utilized in the Credit Card Reconstruction.

VIII.   **ANALYSIS**

**Accounting Investigation**

73.   I investigated and analyzed the  Woodbridge Entities' QuickBooks and evaluated if the transactions recorded by the Woodbridge Entities were consistent with the Bank Reconstruction.

74.   The following are notable issues of concern and red flags with the Woodbridge Entities' accounting records:



a. The Woodbridge Operating Entities' intercompany QuickBooks accounts did not reconcile with the Woodbridge Fund Entities' intercompany accounts.

b. The Woodbridge Fund Entities' QuickBooks reflect mortgages receivable and some owned real estate assets.[17] The manner in which the Woodbridge Fund Entities recorded these assets primarily comprised of journal entries as a "due to" in an intercompany account. There was no transfer of cash from the Woodbridge Fund Entities in such transaction, effectively creating assets with only book entries and not represented by a cash transaction.

c. A significant amount of the interest income revenue recorded in the Woodbridge Fund Entities' QuickBooks was not cash collected from third parties but instead was recorded as an intercompany receivable transaction with the Woodbridge Operating Entities. Although an intercompany receivable transaction was recorded in the Woodbridge Fund Entities' QuickBooks, in many instances, no corresponding cash receipt was identified in the Woodbridge Operating Entities' bank account nor was a corresponding journal entry reflecting the intercompany transaction recorded in the Woodbridge Fund Entities' QuickBooks.[18]

d. The Woodbridge Fund Entities recorded assets duplicative of the Woodbridge Operating Entities.

---

[17] The real estate assets owned by the WMIF Entities had a book value of approximately $11 million.
[18] In some instances, Structured transferred funds to the Woodbridge Fund Entities but there was no corresponding deposit from a third party noted in Structured's QuickBooks.

23



75.     As discussed in ¶60 of this Declaration, I prepared the Bank Reconstruction.  I then compared the activity in the Bank Reconstruction to the Woodbridge Entities' QuickBooks.  The QuickBooks records covered a period through April 28, 2017 while the Bank Reconstruction covered the period through September 30, 2017.

76.     Given the business model discussed in ¶19, it would be customary for the books and records of the Woodbridge Fund Entities to reflect the following accounting and banking transactional flow:

- Receipt of funds from a WMIF Investor would be recorded as an increase to cash and a corresponding liability due to the WMIF Investor for the same amount.

- The WMIF Investor funds would then be utilized to make loans in the form of mortgages to borrowers.  Accordingly, when the Woodbridge Fund Entities made a loan to a borrower, there would be a decrease in cash and a corresponding asset (Loan Receivable) recorded for the amount of the loan.

- When loan payments were received from the borrower, the Woodbridge Fund Entities would record an increase in cash along with a corresponding entry for interest income or principal reduction, if applicable.

- When the Woodbridge Fund Entities did not receive the monthly interest due from the borrowers, the correct accounting treatment would be to record an interest income receivable.



- WMIF Investors are paid Returns on a monthly basis. Accordingly, when the monthly payments were made there would be a reduction in cash for the amount of the payment made to the WMIF Investor along with a corresponding entry for "interest expense".

- When a WMIF Investor's note matured, the Woodbridge Fund Entities would make a payment to the WMIF Investor for the principal amount of the note which results in a decrease in cash and a reduction of the liability due to the WMIF Investor.

- When a borrower's note became due, the Woodbridge Fund Entities would receive cash from the borrower for the principal amount of the note which results in an increase in cash and reduction of the note receivable asset.

77. The above accounting transactions describe what one would expect to see in the bank accounts and the Woodbridge Fund Entities' QuickBooks.

78. Instead, the account transactional flow reflected in the Woodbridge Fund Entities' accounting and bank records is as follows:

- Receipt of funds from a WMIF Investor are received by one of the respective Woodbridge Fund Entities and were recorded as an increase to cash and a corresponding liability due to the investor for the same amount.

- Rather than using the funds to make loans to borrowers, the respective Woodbridge Fund Entities instead transferred the WMIF Investor funds



to one of the Woodbridge Operating Entities (Structured or Group).[19] When this occurred, the Woodbridge Fund Entities recorded a reduction to cash and an increase in intercompany receivable.

- As a general rule, the Woodbridge Operating Entities utilized the commingled WMIF Investor funds to make large transfers to attorney trust accounts.  The Woodbridge Operating Entities recorded these transfers to the attorney trust accounts as a reduction to cash and an increase to an asset in QuickBooks without identifying any specific asset purchased or money loaned.

- At the same time, the Woodbridge Fund Entities also recorded the outflow of the same funds transferred to an attorney trust account by the Woodbridge Operating Entities as an increase to assets in their respective QuickBooks.  Accordingly, there was a duplication of assets since the entry was recorded in both the Structured or Group's QuickBooks as well as in the individual Woodbridge Fund Entities' QuickBooks. **Table 2** compares the disbursements for Mortgage/Real Estate Investments per the Bank Reconstruction and the Mortgage/Real Estate Investments recorded in QuickBooks during the period from July 11, 2012 to April 28, 2017 (the date of the last QuickBooks data

---

[19] Investor funds for Fund 1, 2, 3 were transferred to Structured. Around approximately January 2016, the investor funds stopped being transferred to Structured and began being transferred to Group. Structured's bank account was closed in March 2016.



available) and illustrates that the Woodbridge Entities assets are potentially overstated by at least $790 million.

**Table 2 - Comparison of Mortgage/Real Estate Investments per QuickBooks and Bank Reconstruction as of April 28, 2017**

*Source: Bank Reconstruction and QuickBooks Files*

| Category | Amount | Percentage |
|----------|--------|------------|
| Mortgage/Real Estate Investments per QuickBooks | $ 1,382,276,592 | 100.0% |
| Mortgage/Real Estate Investments per Bank Reconstruction | 592,174,371 | 42.8% |
| **Variance** | **$  790,102,221** | 57.2% |

- Although one would expect to see a regular flow of mortgage interest payments from the borrowers reflected in the Woodbridge Fund Entities' bank accounts, I determined that there was minimal cash received from borrowers for mortgage interest payments. **Table 3** illustrates the difference between the cash the Woodbridge Entities actually received for mortgage interest income and the mortgage interest income recorded in QuickBooks during the period from July 11, 2012 to April 28, 2017 (the date of the last QuickBooks data available):

**Table 3 - Comparison of Mortgage Interest Income per QuickBooks and Bank Reconstruction as of April 28, 2017**

*Source: Bank Reconstruction and QuickBooks Files*

| Category | Amount | Percentage |
|----------|--------|------------|
| Mortgage Interest Income per QuickBooks | $ 92,909,206 | 100.0% |
| Mortgage Interest Income per Bank Reconstruction | 13,312,415 | 14.3% |
| **Variance** | **$ 79,596,791** | 85.7% |



- Essentially, the Woodbridge Fund Entities recorded the mortgage interest income in QuickBooks as if it had been received but instead of increasing cash, it increased an intercompany receivable account because the entire $92.9 million was not actually received in cash, only $13.3 million was. In other words, there is a potential overstatement of approximately $80 million of book revenue due to the fact that the loans were made to entities that are affiliated with Shapiro ("Affiliated Entities") and they did not make the monthly interest payments.   The manner in which the Woodbridge Fund Entities recorded these transactions was deceptive.   One would expect that any interest not collected would be recorded as an "interest income receivable" asset.   Instead, the Woodbridge Fund Entities masked these transactions by recording them as "intercompany", which makes it difficult for a reader of the financial statements to identify that there were large amounts of interest income which had not been collected.

79.   The manner in which the Woodbridge Entities recorded their transactions was not reflective of the customary accounting entries one would expect.  The Woodbridge Entities' accounting records do not reflect the correct amount of income and assets that is consistent with the cash flow activity reflected in the Woodbridge Entities' bank records, resulting in an artificial representation of the income generated and assets available to pay WMIF Investors.



## Ponzi Scheme - Definitions and Attributes

**80.**   The SEC defines a Ponzi scheme as follows:[20]

> *"A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors.  Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business."*

**81.**   *The Forensic & Valuation Services Practice Forensic Accounting* – Fraud Investigations, published by the American Institute of Certified Public Accountants, defines a Ponzi scheme as follows:

> *"A Ponzi or pyramid scheme is usually a venture wherein earlier investors are repaid principal plus interest with funds provided by later investors.  There may or may not be a legitimate business purpose for the venture, but the need for capital creates and continues the scheme.  Often, unusually high investment returns or other inducements are offered by the promoters to attract investors. "* [21]

**82.**   Each Ponzi scheme typically shares three common characteristics:

- The business activity depends on outside investor money.

- The investor money is not used according to the stated purpose.  Some of the investor money is used to pay the returns promised to earlier investors.

- The business enterprise lacks profits sufficient to provide the promised returns and, therefore, depends on an ever-increasing supply of investor money.

---

[20] http://www.sec.gov/answers/ponzi.htm
[21] Forensic & Valuation Services Practice Aid Forensic Accounting – Fraud Investigations, published by the American Institute of Certified Public Accountants 2014, page 58 – *Ponzi.*



83.    The fuel for a Ponzi scheme is new investor money, in whatever form and label. Out of necessity such a scheme cannot survive in perpetuity and is doomed to collapse. New money is the fuel to perpetuate the life span of a Ponzi scheme. Ponzi schemes manifest in various forms and portray the following characteristics:

a.    Raising funds from investors/lenders. Such sources may include individuals or financial institutions in the form of debt or equity. However, such distinction is of little importance and is irrelevant since accepting the investor money conceives an obligation to return the funds. Furthermore, the profits necessary to provide a return to the investors are nonexistent in a Ponzi scheme.

b.    Ponzi schemes invariably make false promises to investors that they cannot deliver on.

c.    Extensive comingling of funds through multiple entities and layers.

d.    Making of false promises and pitching a business as legitimate while knowing that the money would be used to feed the promises made to prior investors for personal benefits.

e.    There is no supportable business activity generating profits or working capital, thus the only source of funds to fulfill the commitments to the investors is new investor funds.

f.    Ponzi schemes often record transactions in a circular and convoluted manner and maintain accounting records that reflect assets and income are sufficient to fulfill the promises made to investors.



g.    The accounting records are window-dressed to reflect assets and income based on book entries versus actual transactions, thereby giving a false impression that the funds raised from investors were wisely invested and generating profits.

h.    The business model as represented by the schemer to the investors is not consistent with the true activities and manner of conducting transactions.

**Ponzi Analysis**

84.    My analysis and investigation revealed that the Woodbridge Entities conducted transactions in a manner consistent with the attributes of Ponzi scheme.

***Raising Funds from Investors/Lenders***

85.    ***Exhibit F*** is a combined summary of the Bank Reconstruction. During the Relevant Time Period, the Woodbridge Entities received $1.2 billion from 8,400 WMIF Investors and made principal payments to WMIF Investors totaling approximately $265 million, resulting in a net liability due to WMIF Investors of approximately $961 million. Also during this period, Returns payments made to WMIF Investors totaled approximately $103 million. Approximately 700 of the WMIF Investors resided in the Southern District of Florida and invested approximately $114 million.

86.    From July 11, 2012 through September 30, 2017, the Woodbridge Entities generated approximately $47.9 million of income, of which only $13.7 million was interest payments from borrowers. Conversely, they funded more than $103 million of Returns to WMIF Investors labeled as interest and dividend payments. Based on the Bank Reconstruction, other than investor funds, there was no other



meaningful source of operating or other cash flow to the Woodbridge Entities to fund the difference between the WMIF Investor Returns and mortgage interest income.[22]  This mismatch of interest income and Returns was not consistent with the business model represented to WMIF Investors.

87.   As early as the third quarter of 2012 (the first quarter in which there were funds received from WMIF Investors), the Woodbridge Entities did not generate sufficient income to pay investor Returns, operating expenses and insider activity, creating a net operating cash flow deficit. Until the first quarter of 2013, the Woodbridge Entities utilized a cash balance carried over from Structured's activities, funds received from certain other Shapiro related entities, and funds received from other non-WMIF investors to fund the cash flow deficits. Beginning in the second quarter of 2013, the Woodbridge Entities had continuing cash flow deficits (excess of investor Returns and operating expenses over income earned and sources available from other Shapiro related entities and other non-WMIF investors) in each quarter and the only source of funds available to fund the cash flow deficits was WMIF Investor funds.  This cash flow deficit grew to more than $250 million as of September 2017.

88.   The Woodbridge Entities did not generate sufficient cash flow from mortgage receivables, other real estate investments or any other source to fund the payments to investors. Clearly, even with the use of the cash balance carried over

---

[22] Structured received $31 million of income in years 2012 to 2014 which was related to its structured settlement business.  This revenue did not appear to be related to the Woodbridge Fund Entities business.



from Structured's activities the only other source of funds available to the Woodbridge Entities to make the $265 million of principal payments and $103 million in Returns to WMIF Investors were funds from later investors, a classic Ponzi scheme attribute.

### *Commingling of Funds*

89.  Although each of the Woodbridge Entities maintained a separate bank account and QuickBooks file, there were transfers totaling approximately $1.66 billion, exceeding 10,700 transactions, between the Woodbridge Entities resulting in extensive commingling of investor funds.

### *No Supportable Business Activity*

90.  The Woodbridge Fund Entities were supposed to generate revenues from mortgage interest income but the execution of their business model was flawed. A substantial amount of the loans made by the Woodbridge Fund Entities were not arms- length transactions and did not generate cash flow.

91.  I determined that when a borrower's note became due, the Woodbridge Fund Entities generally did not receive the amount due, yet the Woodbridge Fund Entities continued to accrue mortgage interest payments.

92.  The SEC provided me with information regarding the borrowers including copies of promissory notes for certain borrowers and information related to the properties that serve as collateral for the loans. Very pertinently, the documents indicated that many of the borrowers are not third party or unrelated arms-length entities; rather they are Affiliated Entities.



93.  All the Woodbridge Fund Entities loaned funds to both third parties and Affiliated Entities.   However, from July 2012, when WMIF 1 began raising funds from WMIF Investors, the amount of funds loaned to non-Affiliated entities, including loans outstanding and paid off, was approximately 75% and approximately 25% was loaned to Affiliated Entities.   Beginning in December 2013, when WMIF 2 was formed, and subsequently with WMIF 3, WMIF 3a, WMIF 4, the amount of funds loaned to Affiliated Entities, including loans outstanding and paid off, was in excess of 70% (and as high as 98%).[23]

94.  I analyzed the promissory notes the Woodbridge Entities were party to, including the mortgage receivables recorded in QuickBooks. I determined that as of April 28, 2017[24] out of $736 million in loans outstanding[25], $718 million (98%) are due from Affiliated Entities. I determined that these borrowers are not making regular interest payments and the Woodbridge Fund Entities simply recorded interest income for book purposes only.[26]

95.  By way of example, I analyzed the widely publicized purchase of the Owlwood Estate located in California.   One of the Affiliated Entities purchased the Owlwood Estate in September 2016 for $90 million.   The Woodbridge Fund Entities made two loans totaling $90 million at the time of the purchase (effectively a 100%

---

[23] These amounts were determined using known borrowers.
[24] The date of the QuickBooks file.
[25] I was not able to determine if the loan was outstanding if the promissory note was not provided. Additionally, I did not receive the promissory notes for the mezzanine loans, as such I assumed the mezzanine loan had the same maturity date as the regular mortgage.
[26] The Woodbridge Entities received approximately $2.9M from the Affiliated Entities.   In all instances, with one exception, the Woodbridge Entities recorded these receipts as a reduction to an asset labeled as "investment" on the balance sheet.



financing at the time of purchase) and a third loan for development summarized in

**Table 4** as follows:

**Table 4 – Owlwood Estate Loan Summary**
*Source: QuickBooks*

| Entity | Loan Type | Loan Amount |
|--------|-----------|-------------|
| WMIF 3a | Regular Mortgage | $ 63,000,000 |
| WMIF 3a | Mezzanine Loan | 27,000,000 |
| | **Subtotal** | **90,000,000** |
| WMIF 3a | Development Loan | 22,000,000 |
| | **Total** | **$ 112,000,000** |

96.  The Owlwood property was more than 100% financed.  WMIF 3a has recorded more than $9 million in accrued interest income but has not collected any cash flow related to this property.

### *Benefits to Insiders of Ponzi Scheme*

97.  As discussed in ¶104 below, Shapiro, his family members and related entities benefited from the Ponzi scheme and received more than $21.2 million during the Relevant Time Period.

### <u>Woodbridge Fund Entities' Investors</u>

98.   As discussed in ¶21, the WMIF Investors included both FPCM and Fund Investors. Approximately 76% of the WMIF Investors were originally recorded as FPCM Investors or short -term investors.[27]

---

[27] Some investors may have transferred their investment from FPCM to Fund.  The Bank Reconstruction and information presented here is based on the original investor classification and does not consider this transfer.



99.  **Table 5** summarizes the WMIF Investor activity for the Woodbridge Entities.  I classified a WMIF Investor to the Woodbridge Entities based on where the WMIF Investor funds were originally deposited.  I determined if a WMIF Investor was a FPCM or Fund Investor based on the QuickBooks category associated with the transaction.[28]

**Table 5 – Incoming Investor Funds Summary**

*Source: Exhibit F.1*

| Entity | FPCM Investor Funds | Fund Investor Funds | Unknown Type Investors | Total |
|---|---|---|---|---|
| Structured Group | $    4,290,934 1,319,268 | $       469,153 - | $             - - | $    4,760,087 1,319,268 |
| WMIF 1 | 85,850,185 | 9,337,500 | 4,172,382 | 99,360,067 |
| WMIF 2 | 140,075,674 | 22,506,789 | 3,008,841 | 165,591,304 |
| WMIF 3 | 325,096,443 | 44,683,952 | 18,460,042 | 388,240,437 |
| WMIF 3a | 269,705,650 | 61,011,339 | 30,972,583 | 361,689,572 |
| WMIF 4 | 111,258,929 | 23,344,852 | 71,382,717 | 205,986,498 |
| **Total** | **$937,597,083** | **$  161,353,585** | **$  127,996,565** | **$1,226,947,233** |
| **Percentage** | **76.4%** | **13.2%** | **10.4%** | **100.0%** |

100.  Given that the business model of the Woodbridge Fund Entities is to borrow funds from investors and use those funds to make real estate loans to borrowers, since at least 76% of investors were FPCM Investors with a short investment term, the business model would have collapsed because many of the Affiliated Borrowers are not repaying the loans when they become due (see ¶94).  But the scheme

---

[28] For the time period in which the QuickBooks file was not available I categorized WMIF Investor funds using deposit memos and payee names (i.e. if the payee was from a previous investor). I also assumed funds received from individuals in rounded dollar amounts (in even $5,000 increments) or funds from previously identified trust companies. I determined that monthly interest income payments and mortgage principal repayments were commonly for uneven amounts and were mainly from corporations, law firms or escrow/title companies.



continued to survive because FPCM Investors rolled over their investments and kept their money invested in the WMIF Fund Entities and the Woodbridge Entities continued to raise new investor funds.

101. When a WMIF Investors' note matured, the Woodbridge Fund Entities make a payment to the WMIF Investors for the principal amount of the note which results in a decrease in cash and a reduction of the liability due to the investor.   My analysis revealed that in most instances WMIF Investors were not paid when their notes became due and instead their principal investment was retained by the Woodbridge Fund Entities.

102. The Woodbridge Entities received $394 million from IRA custodian accounts from more than 2,600 WMIF Investors. These funds were received by the Woodbridge Entities directly from the various IRA Custodians for the benefit of the WMIF Investors. Over 75% of the total funds from IRA Custodians were received from two IRA Custodians.

**Cease and Desist Orders**

103. Texas, Massachusetts, Arizona and Pennsylvania have issued cease and desist orders. Using addresses from the bank records, I identified WMIF Investors who invested in the Woodbridge Fund Entities after the cease and orders were filed in each state. The cease and desist order applied to FPCM investments.

a.   On May 4, 2015, the Massachusetts cease and desist order was issued.[29] Subsequent to that date through September 30, 2017, 11 WMIF Investors

---

[29] Commonwealth of Massachusetts Office of the Secretary of the Commonwealth Securities Division Order, May 04, 2015, Docket E-2015-0039.



in Massachusetts have invested $3.2 million in the Woodbridge Fund Entities' FPCM investments.[30]

b.    On July 17, 2015, the Texas cease and desist order was issued.[31] Subsequent to that date through September 30, 2017, 25 WMIF Investors in Texas have invested $2.3 million in the Woodbridge Fund Entities' FPCM investments.[32]

c.    On October 04, 2016, the Arizona cease and desist order was issued.[33] Subsequent to that date through September 30, 2017, 13 WMIF Investors in Arizona have invested $900,000 in the Woodbridge Fund Entities' FPCM investments.[34]

d.    On April 24, 2017, the Pennsylvania cease and desist was issued.[35] Subsequent to that date through September 30, 2017, 31 WMIF Investors in Pennsylvania have invested $2.6 million in the Woodbridge Fund Entities' FPCM investments.[36]

---

[30] Additionally, I identified an additional 4 WMIF Investors who invested $635,000, for which the investment type (i.e. FPCM or Fund) is unknown.

[31] Texas State Securities Board, Emergency Cease and Desist Order, July 17, 2015, Order ENF-15-CDO-1740.

[32] Additionally, I identified an additional 4 WMIF Investors who invested $320,000, for which the investment type (i.e. FPCM or Fund) is unknown.

[33] Temporary Order to Cease and Desist and Notice of Opportunity for Hearing, Arizona Corporation Commission, October 04, 2016, Docket No. S-20988A-16-0354.

[34] Additionally, I identified 4 WMIF Investors who invested $200,000, for which the investment type (i.e. FPCM or Fund) is unknown, 2 of these WMIF Investors also invested in FPCM investments during this time period.

[35] Commonwealth of Pennsylvania Department of Banking and Securities Consent Agreement and Order, April 24, 2017, Docket No. 17-0008 (SEC-OSC).

[36] Additionally, I identified 56 WMIF Investors who invested $4.1 million, for which the investment type (i.e. FPCM or Fund) is unknown, 4 of these WMIF Investors also invested in FPCM investments during this time period.



**Payments to or for the Benefit of Shapiro**

104.    During the Relevant Time Period, the Woodbridge Entities made payments totaling $53.2 million to Shapiro or entities or individuals associated with him.  The Woodbridge Entities received $32 million from Shapiro or entities or individuals associated with him for net payments totaling $21.2 million, while the payment of promised Returns to investors was being funded from new investor money. ***Exhibit H*** is a summary of these payments.

105.   Of the $21.2 million in net payments to Shapiro or entities or individuals associated with him, approximately $15.5 million were payments made on behalf of Shapiro and approximately $5.7 million were payments made to entities or individuals associated with him, as follows:

    a.    The composition of the $15.5 million in payments made on behalf of Shapiro is as follows:

        i.    $8.9 million were payments to the Shapiro Credit Card Accounts for personal charges;

        ii.    $3.1 million were for private plane expenses which primarily comprised of payments to charter companies; and

        iii.    $3.5 million were also payments made to third parties for the benefit of Shapiro categorized in the Woodbridge Entities' QuickBooks as "executive salary - Bob" such as:

            1.  Joy Gravenhorst      $1.2 million

            2.  Luxury vehicles      $340,000

            3.  The Falls Country Club    $130,000



b.    The composition of the $5.7 million in net payments made to entities or individuals associated with Shapiro, included the following :

    i.   $1.7 million were payments to Moorpark Boca Funding, LLC

    ii.   $1.3 million were payments to Scott Schwartz and Up and Coming Capital, LLC

    iii.   $1.3 million were payments to Jeri Shapiro

**106.** Of the $8.9 million in payments to the Shapiro Credit Card Accounts for personal charges as described above, the   following are examples of the personal credit card charges[37]:

a.    $1.6 million was spent on travel expenses. Table 6 is a summary of the travel expenses:

---

[37] In total, the Woodbridge Entities paid $24 million to the Shapiro Credit Card Accounts of which $8.9 million were for personal charges.



**Table 6 – Travel Expense**[38]
*Source: Credit Card Reconstruction*

| Payee | Amount |
|-------|-------:|
| Four Seasons Hotels | $    120,073 |
| The London | 83,972 |
| United | 78,297 |
| Ritz Carlton | 72,456 |
| Seagate Hotel And Spa | 67,300 |
| Virgin America | 56,868 |
| American Airlines | 50,445 |
| Hertz Rent-A-Car | 50,322 |
| Mr. C's Hotel | 45,352 |
| Rocky Mountain Limo | 40,382 |
| Delta | 38,158 |
| Ventanas Al Paraiso | 35,587 |
| Hotel Le Bristol | 35,302 |
| Snowmass Ski Area | 32,852 |
| Lax Maria's Limo | 34,180 |
| Other | 749,977 |
| **Total Travel Expense** | **$     1,591,523** |

b.    $1.6 million was spent on retail items that's include furniture, décor and

other home related items. **Table 7** is a summary of these expenses:

---

[38] I included only the significant payees in the table, the remaining payee charges are totaled in "Other" payees that appear to be travel related.



**Table 7 - Furniture, Décor & Home Expense[39]**

*Source: Credit Card Reconstruction*

| Payee | Amount |
|---|---|
| Roaring Fork Furniture | $       143,406 |
| Flooring Liquidators & More | 93,187 |
| Angulo Custom Furnishing | 90,512 |
| Lowes | 75,655 |
| Restoration Hardware | 59,303 |
| Moda Italia Home Furnishing | 70,673 |
| Mitchell Litt Antiques | 69,530 |
| Christie's Ny Auction | 63,125 |
| Aspen Design Room | 49,397 |
| Nest Furnishings & Con | 43,693 |
| Bed Bath & Beyond | 42,030 |
| Custom Blind & Carpet | 40,494 |
| Other | 759,610 |
| **Total Retail - Furniture, Décor & Home Expense** | **$    1,600,615** |

c.    $1.4 million was spent on luxury retail items. **Table 8** is a summary of these

expenses:

**Table 8 – Luxury Retail Purchases[40]**

*Source: Credit Card Reconstruction*

| Payee | Amount |
|---|---|
| XIV Karats Ltd | $       436,627 |
| Bvlgari | 152,439 |
| Louis Vuitton | 130,294 |
| Vhernier | 90,200 |
| Chanel | 58,868 |
| Jimmy Choo | 51,048 |
| Ermenegildo Zegna | 42,845 |
| Dolce & Gabbana | 42,486 |
| FarFetch | 26,876 |
| Fendi | 32,625 |
| Other | 307,211 |
| **Total Luxury Retail Expense** | **$    1,371,518** |

---

[39] I included only the significant payees in the table, the remaining payee charges are totaled in "Other" payees that appear to be related to Furniture, Décor & Home purchases.
[40] I included only the significant payees in the table, the remaining payee charges are totaled in "Other" payees that appear to be luxury retailers.

42



d. **Table 9** summarized charges that I identified as other personal related charges:

**Table 9 – Other Personal Charges**
*Source: Credit Card Reconstruction*

| Payee | Amount |
|---|---|
| US Treasury | $ 1,187,839 |
| Meals & Entertainment Charges | 697,143 |
| Political Donations | 586,538 |
| Clothing, Beauty & Accessories | 514,926 |
| Technology Stores (including Best Buy and Apple) | 429,542 |
| Department Stores(including Amazon) | 340,721 |
| Wine on the Way (an online wine store) | 308,511 |
| Groceries and Pharmacies | 101,628 |
| Medical Charges (including doctors and vets) | 80,864 |
| Spas and Salons | 26,457 |
| Cigar Stores | 14,208 |
| O'Gara Coach Co - Luxury Car Dealer | 11,513 |
| Dirty Devil Customs Auto Body Shop | 10,280 |
| **Total Other Personal Charges** | **$ 4,310,170** |

## Operating Expenses

### Commission Expense

107. The Woodbridge Entities paid commissions totaling approximately $64.5 million during the Relevant Time Period.   Additionally, I determined that over $12 million of the commission expense was paid to 20 different sales agents located in the Southern District of Florida. I used the addresses on the last check paid to each sales agent to determine where the payments were being mailed.



### *Other Operating Expenses*

108.   Operating expenses were paid out of the Woodbridge Operating Entities' bank accounts. The Woodbridge Fund Entities did not make payments for operating expenses other than a minimal amount of bank fees.

109.   Per **Exhibit F**, operating expenses paid during the Relevant Time Period includes $43 million for payroll, $16.6 million for professional fees and $44 million for other operating expenses.

110.   By way of example, other operating expenses of $44 million includes the following items:

a.   $14 million in payments to Chase and $4 million in payments to Citibank where Woodbridge Entities categorized the transaction as an operating expense.[41]

b.   Over $2.4 million in payments to Blue Cross & Blue Shield of Florida for health insurance.

c.   Over $1.8 million in rent payments for the California and Boca offices. This includes $1.2 million in payments to SMP, LLC and $.6 million in payments to Glades First Center, LLC. I determined these transactions were related to the rental of office space based on check memos.

d.   $1.1 million to Viacom Receivables Funding Corp and $1 million to TBS Funding. These transactions were categorized as "TV Commercial/Media" in Structured's QuickBooks.

---

[41] These payments are included in the $24 million discussed in Footnote No. 37.



e.   Over $900,000 to Blanchard & Company Inc., a rare coin and precious metal firm[42]. These transactions were categorized as "Client Gifts" expense in the Woodbridge Operating Entities' QuickBooks.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

111.   As of the filing date of this Declaration, certain bank, accounting and other financial records remain pending.   My analysis and findings are based on the documents referenced herein and information to date.

112.   I reserve the opportunity to revise or supplement this Declaration based on additional information that may become available.

I declare under penalty of perjury that the foregoing is true, correct, and made in good faith.

Dated: December 18, 2017

Soneet R. Kapila, CPA, CIRA, CFF, CFE

---

[42] https://www.blanchardgold.com/about/gold-company/

Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

EXHIBIT A



## Soneet R. Kapila, CPA, CIRA, CFE, CFF

kapila@kapilamukamal.com



Soneet R. Kapila is a founding partner of *KapilaMukamal, LLP* (formerly Kapila & Company). For over 20 years, he has concentrated his efforts in the areas of consulting in insolvency, fiduciary and creditors' right matters. Recognized for his acumen as a "business man", he has been appointed in Federal District Court, Bankruptcy Court and Florida State Court and served in the roles of Chief Restructuring Officer, S.E.C. Corporate Monitor, Examiner, Chapter 11 Trustee of Operating Businesses, Liquidating Trustee and Receiver, among others.

## Professional Experience

Mr. Kapila's practice is focused on restructuring, creditors' rights, bankruptcy, fiduciary matters and financial transactions litigation. He represents other bankruptcy trustees, debtors and both secured and unsecured creditors in and out of bankruptcy court. He also regularly advises clients about insolvency and implications involved in business transactions and the operation of distressed businesses. As a Trustee plaintiff, Mr. Kapila has managed complex litigation in significant cases.

As a fiduciary, he has advised and represented debtors and creditors' committees in formulating, analyzing and negotiating plans of reorganization. Recognized as a expert in fraudulent conveyance, Ponzi schemes and insolvency issues, Mr. Kapila has provided expert testimony and extensive litigation support services to law firms involving complex insolvency issues and commercial damages. He is a sitting trustee on the panel of U.S. Bankruptcy Trustees (Southern District of Florida) and has served in numerous matters in both the Southern and Middle Districts of Florida.

He has conducted numerous forensic and fraud investigations and has worked in conjunction with the Securities and Exchange Commission (SEC), Federal Bureau of Investigation (FBI) and the United States Attorney's Office.

### EDUCATION / QUALIFICATIONS

**Certified Public Accountant (CPA) - Florida**
**Certified Insolvency and Restructuring Advisor (CIRA)**
**Certified Fraud Examiner (CFE)**
**Certified in Financial Forensics (CFF)**
**Certified in Bankruptcy Mediation—Training**
**—St. John's University (2014)**
MBA, Cranfield School of Management Studies,
England (1978)

### ROLES
Bankruptcy Trustee—Chapter 7, 11
Liquidating Trustee / Plan Administrator
Chief Restructuring Officer
Corporate Monitor / Examiner
Receiver / Assignee

### AREAS OF EXPERTISE
Bankruptcy and Insolvency
Creditors Rights
Restructuring
Financial Transactions Litigation
Complex Commercial Litigation

### PROFESSIONAL AFFILIATIONS

American College of Bankruptcy
American Institute of Certified Public Accountants
Florida Institute of Certified Public Accountants
Association of Insolvency & Restructuring Advisors
Association of Certified Fraud Examiners
American Bankruptcy Institute
National Association of Bankruptcy Trustees
National Association of Federal Equity Receivers

### ACCOMPLISHMENTS
* **Fellow, American College of Bankruptcy** – 2013
* **Top CPAs and Litigation Support Professionals**,
  South Florida Legal Guide—multiple years
* **Power Leaders in Law and Accounting** –
  South Florida Business Journal – 2015, 2014
* **Best Trustee** – Daily Business Review's Best of 2012
* **Key Partners Award Honoree** –
  South Florida Business Journal – 2010
* **Bronze Medal Award** – 3rd highest score,
  Examination of the Association of Insolvency
  and Restructuring Advisors – 1996



EXHIBIT A



## Soneet R. Kapila, CPA, CIRA, CFE, CFF

kapila@kapilamukamal.com

### SPEAKING ENGAGEMENTS

American Bankruptcy Institute
New York Law School
St. Thomas University Law School
National Conference of Bankruptcy Judges
National Association of Bankruptcy Trustees
Association of Insolvency & Restructuring Advisors
Bankruptcy Bar Association for the Southern District of Florida
Central Florida Bankruptcy law Association
Florida Bankruptcy Bar
Florida Institute of Certified Public Accountants
National Business Institute
Turnaround Management Association
University of Miami, School of Law
Florida International University, School of Law
Stetson College of Law, Insolvency Symposium – Germany
American Bar Association

### CIVIC, VOLUNTEER AND PHILANTHROPIC

### - Past and Present

**The Kapila Family Foundation -** Director

**American Bankruptcy Institute -**
 Member of Board of Directors - 2016
 Southeast Regional Conference:
  Chairperson of Advisory Board, 2016
  Advisory Board, - 2012-2017 and Co-Chair 2015
 Caribbean Insolvency Symposium -
  Advisory Board—2010-2014 amd Co-Chair 2015

**Association of Insolvency and Restructuring Advisors -**
 Board of Directors
 Past Chairman and Past President

**The Florida Bar**, Member, Grievances Committee

**Hialeah-Miami Springs, NW Dade Chamber of Commerce -**
 Board of Directors (Past)

**The American Group of CPA Firms -** Chairman
 – Litigation Support Services Committee of the
  National Training and Experience Sharing Program

**Florida Institute of Certified Public Accountants -**
 Practice Review Committee

*KapilaMukamal, LLP*
1000 S. Federal Highway, Suite 200
Fort Lauderdale, FL 33316
954-761-1011
www.kapilamukamal.com

### REPRESENTATIVE CLIENTS

**City of Detroit, Michigan**    *Financial Advisors to Fee Examiner*

**SMF Energy Corporation**    *CRO, Liquidating Trustee*

**Fontainebleau Las Vegas, LLC**    *Chapter 7 Trustee*

**Universal Health Care Group, LLC/**
**American Managed Care, Inc.** *Chapter 11 / Liquidating Trustee*

**Simply Fashion Stores, LLC**    *Chief Restructuring Officer*

**Spear & Jackson, Inc**    *Corporate Monitor – SEC Appointment*

**Pan American Hospital**    *Examiner / Plan Administrator*

**Louis J. Pearlman / TransContinental Airlines, et al –**
                    *Chapter 11 Trustee / Liquidating Trustee*

**Levitt & Sons**    *Chief Administrator*

**Planet Hollywood International, Inc**    *Examiner*

**Banco Latino International**    *Financial Consultants to*
                    *Official Committee of Unsecured Creditors*

**Southeast Bank Corp**    *Financial Advisors to Chapter 7 Trustee*

**Innovida Holdings, LLC /Claudio Osorio**    *Chapter 7 Trustee*

**Prime Capital Corporation**    *Chapter 7 Trustee*

**GunnAllen Financial, Inc.**    *Ch 11 Examiner/Liquidating Trustee*

**SEC v. Christopher Freeman Brogdon**    *Corporate Monitor*
                    *- SEC Appointment*

### PUBLICATIONS

"*Best Practices in the Treasury Functions of a Chapter 7 Trustee's Office*" – American Bankruptcy Trustee Journal (NABT) (Fall, 2015)

"*Fraud and Forensics: Piercing Through The Deception In A Commercial Fraud Case*" – American Bankruptcy Institute – 2015

"*Ponzi Schemes: Fiduciaries May Be The Saving Grace*", ABI Journal (2014)

"*A Health Care Fraud and Bankruptcy Primer*", Southern District of Florida Bankruptcy Bar Association Journal (2014)

"*Hidden Resources in a Small Business*"



EXHIBIT B



## *Melissa Davis, CPA, CIRA, CFE*

mdavis@kapilamukamal.com



Melissa Davis is a Partner at *KapilaMukamal, LLP.* She joined the firm in 1998. Her practice concentrates on insolvency and fiduciary matters. Ms. Davis has qualified as an expert in federal court, testified in trials, hearing and depositions. She has served as a court appointed Assignee for the Benefit of Creditors and as Plan Trustee in Chapter 11 bankruptcy matters. She has worked on numerous high profile cases.

### *Professional Experience*

Ms. Davis concentrates on providing bankruptcy, litigation and forensic investigation services to debtors, creditors, receivers, assignees, bankruptcy trustees, examiners and liquidating trusts. Her practice also includes forensic accounting, fraud investigations and litigation support and family law matters.

Ms. Davis has served as a financial advisor to fiduciaries operating distressed companies in a variety of industries including mobile fueling, health insurance, real estate, retail, hospitality, assisted living facilities/nursing homes, metal extrusion, stevedoring and waste management. Her experience includes distressed business operations, management, preservation of collateral and asset divestiture services.

Ms. Davis has investigated fraudulent and preferential transfers, prepared defense, solvency and liquidation analyses. She has worked on asset tracing, tracing of commingled funds, provided litigation support and damage calculation services, including forensic and securities fraud investigations and corporate business conduct analysis. Ms. Davis has extensive experience in fraud and Ponzi-scheme investigations and commingled funds tracing analysis. Her forensic and fraud investigations have involved working in conjunction with the Securities and Exchange Commission (SEC.), the Federal Trade Commission (FTC), the Federal Bureau of Investigation (FBI) and various United States Attorneys Offices.

Ms. Davis has testified in court and depositions and served as Liquidating Trustee and court appointed Assignee for the Benefit of Creditors.

### *EDUCATION / QUALIFICATIONS*

**Certified Public Accountant (CPA) - Florida**
**Certified Insolvency and Restructuring Advisor (CIRA)**
**Certified Fraud Examiner (CFE)**

**Florida Atlantic University, Boca Raton, Florida —**
**Bachelor of Business Administration,**
**Major in Accounting,**

### *AREAS OF EXPERTISE*

**Forensic Accounting**
**Bankruptcy and Insolvency**
**Creditors Rights**
**Restructuring**
**Financial Transactions Litigation**
**Complex Commercial Litigation**

### *PROFESSIONAL AFFILIATIONS*

**American Institute of Certified Public Accountants**
**Florida Institute of Certified Public Accountants**
**Association of Insolvency & Restructuring Advisors**
**Association of Certified Fraud Examiners**
**American Bankruptcy Institute**
**International Women's Insolvency & Restructuring**
  **Confederation**
**Bankruptcy Bar Association, Southern District of Florida**

**National Association of Federal Equity Receivers**



CPAs, Forensic and Insolvency Advisors

EXHIBIT B



*Melissa Davis, CPA, CIRA, CFE*

mdavis@kapilamukamal.com

## SPEAKING ENGAGEMENTS

American Bankruptcy Institute 2017 Annual Spring Meeting— *"Fraudulent Transfers—The Long Claw of The Law"* - April 2017

IWIRC 23rd Annual Fall Conference—*"The Dissection of a Ponzi Scheme"* - October 2016

Florida Institute of Certified Public Accountants – North Dade/South Broward Chapter – *"Tracing Commingled Funds"* - July 2016

Jacksonville Bankruptcy Bar Association 23rd Annual Bankruptcy Seminar – *"E-Discovery in Bankruptcy: Why Should You Care?"* -  August 2015

American Bankruptcy Institute 2015 Southeast Bankruptcy Workshop – *"Time for Trial:  Evidentiary Issues in Bankruptcy Litigation"* -  July 2015

Central Florida Bankruptcy Law Association – *"What Do Boy Bands and Healthcare Have in Common"*, -July 2014

Florida Bar Business Law Section – *"Professional Fiduciaries: Responsibilities and Duties"* - May 2014

Tampa Bay Bankruptcy Bar Association – *"What Do Boy Bands and Healthcare have in Common"* – March 2014

Bankruptcy Bar Association of the Southern District of Florida – *"Valuation Issues in Bankruptcy"* -  May 2013

American Bankruptcy Institute Southeast Regional Conference – *"Ponzi Schemes and Barring Claims Against the Guilty"* - July 2012

Turnaround Management Association – *"Current Issues in Real Estate"* - April 2012

## PUBLICATIONS

*"Fraud and Forensics:  Piercing Through The Deception In A Commercial Fraud Case"* – American Bankruptcy Institute – (2015)

*"Ponzi Schemes:  Fiduciaries May Be The Saving Grace"*, ABI Journal (2014)

*"A Health Care Fraud and Bankruptcy Primer"*, Southern District of Florida Bankruptcy Bar Association Journal (2014)

*"Rising Tide in the Wake of Ponzi,"* ABI Journal (2013)

## ACCOMPLISHMENTS

Top CPAs and Litigation Support Professionals—South Florida Legal Guide, 2015—2017

## CIVIC, VOLUNTEER AND PHILANTHROPIC

## Past and Present

**American Bankruptcy Institute—**

- Advisory Board—ABI Southeast Regional Conference (2017-2018)
- Advisory Board—ABI Caribbean Insolvency Symposium (2016-2018)
- ABI Commercial Fraud Committee (2016-2018)

**Credit Abuse Resistance Education (C.A.R.E.) Volunteer**

 **The Kapila Family Foundation -** Executive Coordinator of the Kapila Family Foundation Endowment Fund for the Broward Center of the Performing Arts

**Summit Questa Montessori School—**PTO Board Member 2013-17

**Leukemia & Lymphoma Society—**Team in Training Participant and Volunteer 2012-2014

**Women in Distress of Broward County —**Annual Back to School and Thanksgiving Drives 2011-2017

*KapilaMukamal, LLP*
1000 S. Federal Highway, Suite 200
Fort Lauderdale, FL  33316
Main   954-761-1011
Direct 954-712-3205
*www.kapilamukamal.com*



CPAs, Forensic and Insolvency Advisors

| | | EXHIBIT C |
|---|---|---|

### SONEET R. KAPILA
**Experience in Matters Involving PONZI / FRAUD including SEC and FTC Matters**

| Case Name | Industry / Type | Role | Description |
|---|---|---|---|
| **SEC Matters** | | | |
| **SEC v. Christopher Freeman Brogdon and Connie Brogdon, Tygh Brogdon, Brogdon Family, LLC, Gordon Jensen Healthcare Association, Inc., JRT Group Properties, LLC, Mobama Nursing, LLC, National Assistance Bureau, Inc., Saint Simons Healthcare, LLC and Winter Haven Homes, Inc.** | Securities Fraud | SEC Corporate Monitor | Securities Fraud |
| **SEC v. Dennis Crowley, Spear & Jackson, et al** | Hedge Funds | Corporate Monitor (SEC Appointment) Forensic Experts | Securities Fraud |
| **SEC v. Amante Corporation, et al** | Securities Fraud | SEC Receiver | Receiver |
| **SEC v. North American Clearing Inc. v. Richard Goble** | Broker Dealer | Corporate Monitor, SEC Retentions, Hedge Funds | Securities fraud - broker-dealer |
| **SEC v. Tel-One, Inc., et al** | Pump & Dump | Claims Administrator / Disbursing Agent - SEC Appointment | Pump and Dump Scheme - Securities Fraud |
| **SEC v. A.B. Financing and Investment, Inc.** | Financing | Forensic Consultants and Expert Witness for the SEC | Quantification of investors losses |
| **SEC v. IDT Group, Inc.** | Securities Fraud | Forensic Accountants | Securities Fraud |
| **SEC v. Aubrey Lee Price; PFG, LLC; PFGBI, LLC; Montgomery Asset Management, LLC f/k/a PFG Asset Management, LLC** | Securities Fraud | Forensic Accountants to the SEC Receiver | Securities Fraud |
| **SEC v. Comcoa, Ltd.** | Wireless communications | Forensic Accountants to the SEC Receiver | Fraud - wireless telecommunications |
| **SEC v. Commodities OnLine, LLC** | Securities Fraud | Forensic Accountants to the SEC Receiver | Securities Fraud |
| **SEC v. Creative Capital Consortium, LLC, et al** | Securities Fraud | Forensic Accountants to the SEC Receiver | Securities Fraud - Haitian-American Community Investment Clubs |
| **SEC v. Edward S. Digges, Jr., Nexstar Communications, LLC, TMT Equipment Company, LLC, TMT Management Group,LC, et al** | Securities Fraud | Expert Witness and Forensic Accountants to the SEC Receiver | Securities Fraud |

Kapila|Mukamal

EXHIBIT C

## SONEET R. KAPILA
### Experience in Matters Involving PONZI / FRAUD including SEC and FTC Matters

| Case Name | Industry / Type | Role | Description |
|---|---|---|---|
| SEC v. Financial Federated Title & Trust, Inc. a/k/a Assets Security Corp., a/k/a Viatical Asset Recovery Corp, a/k/a Quad B Ltd., a/k/a American Benefits Services, Inc. - Various adversaries | Viatical Insurance Settlements | Forensic Accountants to the SEC Receiver | Ponzi Scheme / viatical insurance settlements - Assisted Trustee in adjudication of over 3,000 claims; multiple distributions over a period of years to a creditor body in three related cases totaling 20,000+ distribution checks |
| SEC v. International Capital Management, Inc.. Jose Santiago / MBA | Securities Fraud; Foreign Exchange Currency | Forensic Accountants to the SEC Receiver | Ponzi Scheme - Funds Tracing / co-mingling |
| SEC v. JCS Enterprises, Inc., d/b/a JCS Enterprises, Services, Ind., T.B.T.I., Joseph Signore and Paul L. Schumack, II | ATM Machines | Forensic Accountants to the SEC Receiver | Ponzi Scheme |
| SEC v. Joseph Hilton, f/k/a Joseph Yurkin, Pacific Northwestern Energy, LLC, Rock Castle Drilling Fund, LP, Rock Castle Drilling Fund II LP and New Horizon Publishing, Inc. | Oil Drilling Projects | Forensic Accountants to the SEC Receiver | Ponzi scheme selling unregistered securities in companies purportedly generating profits from oil drilling projects in Kentucky |
| SEC v. Mark David Shiner, Leon Switchkow, Timothy Wetherald and Telecom Advisory Services, Inc., et al - Mile High Telecom | Telecommunications | Forensic Accountants to the SEC Receiver - Expert Witness | Ponzi Scheme - Telecommunications |
| SEC v. Medco, Inc., Mark R. Blacher, Defendants & The Hi Lily Company & National Health Services, Inc., Relief Defendants | Medical Equipment | Forensic Accountants to the SEC Receiver | Medical equipment Ponzi Scheme |
| SEC v. Transamerica Wireless Systems, Inc. and Intercontinental Telecommunications Co. and Danny Sterk | Telecommunications | Forensic Accountants to SEC Receiver | Ponzi Scheme - wireless telecommunications |
| SEC v. WorldCorp FX & Company, Inc. | International Currency | Forensic Accountants to SEC Receiver | Ponzi / Fraud involving trading of international currencies |

Kapila|Mukamal

EXHIBIT C

## SONEET R. KAPILA
### Experience in Matters Involving PONZI / FRAUD including SEC and FTC Matters

| Case  Name | Industry / Type | Role | Description |
|---|---|---|---|
| **FTC Matters** | | | |
| **FTC v. American Precious Metals, LLC** | Precious Metals | Accountants to the FTC Receiver | *Ponzi Scheme* |
| **FTC v. Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., Willoughby Farr, et al** | Telecommunications | Forensic Accounts to the FTC Receiver | *Accountants to FTC Receiver* |
| **FTC v. World Class Limousine** | Limousine | Accountants to the FTC Receiver | *Ponzi Scheme* |
| **FTC vs. Fereidoun "Fred" Khalilian and The Dolce Group Worldwide, LLC** | Extended car warranties | Forensic Accountants to the FTC Receiver | *Ponzi scheme* |
| **FTC vs. Timeshare Mega Media and Marketing Group, Inc., et al** | Condo timeshares | Forensic Accountants to the FTC Receiver | *Ponzi scheme investigation* |
| **Other Ponzi/Fraud Matters** | | | |
| **Associated Record Distributors** | Records | Forensic Accountants to the SEC Receiver | *Ponzi scheme* |
| **ATM Financial Services, LLC** | ATM Machines | Forensic Accountants | *Ponzi - ATM machines* |
| **Lancer Offshore Receivership; Lancer Management Group, LLC; Lancer Management Group II, LLC and Michael Lauer** | Hedge Funds | Accountants to Receiver | *Hedge Fund* |
| **Louis J. Pearlman / TransContinental Airlines** | Securities Fraud | Chapter 11 Trustee | *Classic Ponzi Scheme of approximately $500 million; 100 related entities and over 1,400 victims* |
| **Razorback Funding, LLC et al v. Scott Rothstein, et al** | Hedge Funds | Litigation Consultants and Forensic Experts; Expert Witness | *Hedge Funds/ Banks* |
| **State of Texas v. Edward S. Digges, Jr.** | Securities Fraud | Expert Witness | *Securities Fraud* |
| **U.S. Commodity Futures Trading Commission v. Hunter Wise Commodities, Inc., Inspired Ventures, Inc., Jesse Alper and Victor Alper** | Securities Fraud | Forensic Accountants | *Securities Fraud* |
| **Wealth Pools International, Inc., Robert E. Lane, and Recruit for Wealth, et al** | Securities Fraud | Forensic Accountants - Expert Witness | *Ponzi-Securities Fraud* |

Kapila|Mukamal

Exhibit D

**Woodbridge Entities**

**Bank Record Inventory**

Source: Bank Records and Underlying support

| Entity | Bank | Type | Signer on the Account | Account # | Beginning Date | Ending Date |
|---|---|---|---|---|---|---|
| **Accounts Reconstructed:** | | | | | | |
| Woodbridge Commercial Bridge Loan Fund 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8333 | 09/21/15 | 09/30/17 |
| Woodbridge Commercial Bridge Loan Fund 2 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX1498 | 12/08/16 | 09/30/17 |
| Woodbridge Group of Companies LLC Operating Account | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8192 | 11/25/15 | 09/30/17 |
| Woodbridge Group of Companies LLC Special Holding | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8200 | 11/25/15 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0647 | 07/11/12 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 2 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX3483 | 12/30/13 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 3 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2992 | 10/10/14 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 3a LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX7897 | 11/02/15 | 09/30/17 |
| Woodbridge Mortgage Investment Fund 4 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2703 | 06/26/15 | 09/30/17 |
| Woodbridge Structured Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX7690 | 01/01/10 | 03/24/16 |
| Woodbridge Structured Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2482 | 01/01/10 | 04/11/16 |
| | | | | | | |
| **Other Accounts Considered** | | | | | | |
| Woodbridge Capital Investments LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX9476 | 01/01/10 | 06/30/16 |
| Woodbridge Crowdfunding 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8358 | 07/27/15 | 09/30/17 |
| Woodbridge Lending Fund 1 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX8317 | 09/30/15 | 09/30/17 |
| Woodbridge Luxury Homes of California Inc. | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX3297 | 11/20/14 | 09/30/17 |
| Woodbridge Luxury Homes of California Inc. DBA Mercer Wine | Comerica Bank | Business Money Market | Robert Shapiro | XXXXXXX2653 | 06/17/15 | 09/30/17 |
| Woodbridge Luxury Homes of California Inc. DBA Mercer Wine | Comerica Bank | Business Checking | Robert Shapiro and Adam Jason Rosenfeld | XXXXXXX2661 | 06/17/15 | 09/30/17 |
| Woodbridge Pre-Settlement Funding 2 LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0761 | 02/21/13 | 09/30/17 |
| Woodbridge Pre-Settlement Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX9598 | 05/05/11 | 09/30/17 |
| Woodbridge Pre-Settlement Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0821 | 11/08/11 | 09/30/17 |
| Woodbridge Pre-Settlement Funding LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX9580 | 04/05/11 | 04/13/11 |
| Woodbridge Realty of Colorado LLC | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX2984 | 10/16/14 | 09/30/17 |
| Woodbridge Structured Funding LLC Special Investor Holding | Comerica Bank | Business Checking | Robert Shapiro | XXXXXXX0472 | 09/07/12 | 03/23/16 |
| Woodbridge Structured Settlement Investments LLC | Comerica Bank | Commercial Checking | Robert Shapiro | XXXXXXX9062 | 01/01/10 | 09/30/17 |

**See accompanying Declaration dated December 18, 2017**

Kapila Mukamal
CPAs, Forensic and Insolvency Advisors

Exhibit D.1

| Woodbridge Entities |
| --- |

| Credit Card Statement Record Inventory |
| --- |

Source: Credit Card Statements

| Entity | Bank | Type | Account # | Beginning Date | Ending Date |
| --- | --- | --- | --- | --- | --- |
| *Credit Cards Reconstructed:* | | | | | |
| Chase Hyatt - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-8260 | 12/05/11 | 07/04/13 |
| Chase Hyatt - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-7053 | 11/05/13 | 02/04/17 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-3902 | 12/19/11 | 02/18/14 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-8308 | 02/19/14 | 01/18/15 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-8221 | 01/19/15 | 11/18/15 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2292 | 10/19/15 | 03/18/16 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-4855 | 11/19/15 | 02/18/17 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2092 | 02/19/17 | 03/18/17 |
| Chase Sapphire - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2059 | 03/19/17 | 06/18/17 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-9684 | 03/19/12 | 10/18/12 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-5969 | 10/19/12 | 08/18/13 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-4660 | 08/19/13 | 03/18/14 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-0348 | 03/19/14 | 12/18/14 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-2366 | 03/19/16 | 06/16/16 |
| Chase United - Jeri S Shapiro | JP Morgan | Credit Card | XXXX-XXXX-XXXX-4159 | 06/19/16 | 05/18/17 |
| CitiBank - Jeri Shapiro | CitiBank | Credit Card | 0481 | 07/19/12 | 05/17/17 |

| See accompanying Declaration dated December 18, 2017 |
| --- |

Kapila*Mukamal*

CPAs, Forensic and Insolvency Advisors
Page 1 of 1

**Woodbridge Entities**

**QuickBooks Files Provided**

**Source**: QuickBooks

| Entity | Beginning Date | Ending Date |
|---|---|---|
| Woodbridge Structured Funding LLC | 04/01/11 | 04/11/17 |
| Woodbridge Mortgage Investment Fund 1 LLC | 07/03/12 | 04/28/17 |
| Woodbridge Mortgage Investment Fund 2 LLC | 01/07/14 | 04/28/17 |
| Woodbridge Mortgage Investment Fund 3 LLC | 10/10/14 | 04/28/17 |
| Woodbridge Group of Companies LLC | 06/01/15 | 04/21/17 |
| Woodbridge Mortgage Investment Fund 4 LLC | 07/15/15 | 04/28/17 |
| Woodbridge Commercial Bridge Loan Fund 1 LLC | 09/21/15 | 04/28/17 |
| Woodbridge Mortgage Investment Fund 3a LLC | 12/01/15 | 04/28/17 |
| Woodbridge Commercial Bridge Loan Fund 2 LLC | 12/29/16 | 04/13/17 |

**See accompanying Declaration dated December 18, 2017**

**Woodbridge Entities**

**Consolidated Summary of the Bank Reconstruction (Note 1)**
**Woodbridge Mortgage Funds 1, 2, 3, 3a, 4, Bridge Loan 1, Bridge Loan 2, Structured Funding and Group of Companies**
**July 11, 2012 - September 30, 2017**

Source: Bank Reconstruction; QuickBooks files

| Category | Reference | Inflows | Outflows | Net |
|---|---|---|---|---|
| **Net Investor Activity (Principal)** | | | | |
| Investor - FPCM | | $  937,597,083 | $  259,124,550 | $  678,472,533 |
| Investor - Fund | | 161,353,585 | 6,230,415 | 155,123,170 |
| Investor - Type Unknown | | 127,996,565 | 137,000 | 127,859,565 |
| **Total WMIF Investors** | A | **1,226,947,233** | **265,491,965** | **961,455,268** |
| Investor - Structured Funding | | 79,565,367 | 72,454,136 | 7,111,231 |
| Investor - Held in Escrow | | 46,971,607 | 36,614,913 | 10,356,694 |
| Investor - Group of Companies | | 23,216,500 | 29,845,438 | (6,628,938) |
| Investor - Bridge Loans | | 1,900,147 | 1,142,508 | 757,639 |
| **Total Other Investors** | B | **151,653,621** | **140,056,995** | **11,596,626** |
| **Total Investor Activity** | C = A + B | **1,378,600,854** | **405,548,960** | **973,051,894** |
| **Net Mortgage Lending/Investment Activity (Principal)** | | | | |
| Mortgage Lending | | 112,330,391 | 62,120,367 | 50,210,024 |
| Other - Return of Investment | | 24,298,115 | - | 24,298,115 |
| Other Investments | | 35,312,719 | 784,461,100 | (749,148,380) |
| **Total** | D | **171,941,225** | **846,581,467** | **(674,640,242)** |
| **Potential Investor Liability in excess of Mortgage Lending/Investments Outstanding** | E = C + D | | | **298,411,652** |
| **Income** | | | | |
| Company Income (Structured Settlement Business) | | 30,934,250 | - | 30,934,250 |
| Income - Mortgage Interest Payments | | 13,680,268 | - | 13,680,268 |
| Commission Income | | 2,333,529 | - | 2,333,529 |
| Other Income Earned | | 582,754 | - | 582,754 |
| Gain/Loss on Investments | | 379,126 | | 379,126 |
| **Total Income** | F | **47,909,927** | **-** | **47,909,927** |
| **Expenses** | | | | |
| WMIF Investor - Returns | | - | 103,215,844 | (103,215,844) |
| Commissions to Sales Agents | | - | 64,596,323 | (64,596,323) |
| Other Operating Expenses | | - | 44,147,485 | (44,147,485) |
| Payroll | | - | 42,963,430 | (42,963,430) |
| Professional fees | | - | 16,572,369 | (16,572,369) |
| Other Investor - Interest Expense | | - | 3,631,972 | (3,631,972) |
| **Total Expenses** | G | **-** | **275,127,423** | **(275,127,423)** |
| **Net Income (Loss)** | H = F + G | | | **(227,217,496)** |
| **Other Cash Activity** | | | | |
| Intercompany | | 22,169,080 | 47,028,634 | (24,859,554) |
| Insider Activity **(See Exhibit H)** | | 31,968,699 | 51,211,046 | (19,242,347) |
| Other | | 15,428,285 | 29,037,494 | (13,609,209) |
| Client Funding | | 56,843,327 | 60,194,764 | (3,351,437) |
| Transfers on behalf of other funds | | 10,028,477 | 12,357,994 | (2,329,517) |
| **Total Other Activity** | I | **136,437,868** | **199,829,932** | **(63,392,064)** |
| Intracompany Activity | J | 1,662,377,781 | 1,662,377,781 | - |
| **Net Cumulative Cash Flow Activity** | K = E + H + I + J | **3,397,267,655** | **3,389,465,563** | **7,802,092** |
| **Beginning Balance as of July 11, 2012** | | | | **1,719,417** |
| **Ending Cash Balance as of September 30, 2017** | | | $ | **9,521,509** |

**Note 1)** See **Exhibit F.2** in the accompanying report for a description of the categories in this Exhibit.

**See accompanying Declaration dated December 18, 2017**

Kapila/Mukamal
CPAs, Forensic and Insolvency Advisors

Page 1 of 1

Exhibit F.1

**Woodbridge Entities**

**Summary of Bank Reconstructions**
**Consolidated Category Summary**
**07/11/2012 - 09/30/2017**

Source: Bank Reconstruction and QuickBooks

| Category | 07/11/2012 - 04/06/2016 Structured | 07/11/2012 - 09/30/2017 WMIF 1 | 12/30/2013 - 09/30/2017 WMIF 2 | 10/10/2014 - 09/30/2017 WMIF 3 | 06/26/2015 - 09/30/2017 WMIF 4 | 9/20/2015 - 09/30/2017 Bridge 1 | 11/02/2015 - 09/30/2017 WMIF 3a | 11/25/2015 - 09/30/2017 Group | 12/08/2016 - 09/30/2017 Bridge 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inflows:** | | | | | | | | | | |
| **WMIF Investors:** | | | | | | | | | | |
| Investor - FPCM | $ 4,290,934 | $ 85,850,185 | $ 140,075,674 | $ 325,096,443 | $ 111,258,929 | $ - | $ 269,705,650 | $ 1,319,268 | $ - | $ 937,597,083 |
| Investor - Fund | 469,153 | 9,337,500 | 22,506,789 | 44,683,952 | 23,344,852 | - | 61,011,339 | - | - | 161,353,585 |
| Investor - Type Unknown | - | 4,172,382 | 3,008,841 | 18,460,042 | 71,382,717 | - | 30,972,583 | - | - | 127,996,565 |
| **Total WMIF Investor Inflows** | **4,760,087** | **99,360,067** | **165,591,304** | **388,240,437** | **205,986,498** | **-** | **361,689,572** | **1,319,268** | **-** | **1,226,947,233** |
| | | | | | | | | | | |
| **Other Investors** | | | | | | | | | | |
| Investor - Structured Funding | 23,215,500 | 41,023,500 | 12,815,367 | 2,511,000 | - | - | - | - | - | 79,565,367 |
| Investor - Held in Escrow | 42,577,205 | 218,525 | - | - | - | - | - | 4,175,877 | - | 46,971,607 |
| Investor - Group of Companies | 980,000 | 19,335,000 | - | - | - | - | - | 2,901,500 | - | 23,216,500 |
| Investor - Bridge Loans | - | - | - | - | - | 1,695,747 | - | - | 204,400 | 1,900,147 |
| **Total Other Investor Inflows** | **66,772,705** | **60,577,025** | **12,815,367** | **2,511,000** | **-** | **1,695,747** | **-** | **7,077,377** | **204,400** | **151,653,621** |
| | | | | | | | | | | |
| **Mortgage/Real Estate/Other Investments:** | | | | | | | | | | |
| Mortgage Lending Principal | 7,177,847 | 40,688,012 | 25,153,812 | 35,060,975 | 658,669 | - | 3,428,975 | 162,101 | - | 112,330,391 |
| Other Investments | 7,055,289 | 4,042,729 | - | 3,500,000 | - | - | - | 20,714,701 | - | 35,312,719 |
| Other Return of Investment | - | 3,147,342 | 4,830,778 | 320,016 | 6,259,283 | - | 9,740,696 | - | - | 24,298,115 |
| Mortgage Interest Income | 91,288 | 6,827,370 | 4,096,555 | 2,352,082 | - | - | 318,498 | (5,525) | - | 13,680,268 |
| Other Investment Income Earned | 1,800 | 615,965 | 10,647 | (77,500) | - | - | - | 31,842 | - | 582,754 |
| Gain/Loss on Investments | 532,009 | (1,414,175) | 391,989 | 629,303 | - | - | - | 240,000 | - | 379,126 |
| **Total Inflows from Investing Activity** | **14,858,233** | **53,907,243** | **34,483,781** | **41,784,876** | **6,917,952** | **-** | **13,488,169** | **21,143,119** | **-** | **186,583,373** |
| | | | | | | | | | | |
| **Other Income** | | | | | | | | | | |
| Company Income | 31,041,762 | 94,980 | - | - | - | - | - | (202,492) | - | 30,934,250 |
| Commission Income | 2,268,579 | 64,950 | - | - | - | - | - | - | - | 2,333,529 |
| **Total Other Income** | **33,310,341** | **159,930** | **-** | **-** | **-** | **-** | **-** | **(202,492)** | **-** | **33,267,779** |
| | | | | | | | | | | |
| Client Funding Inflows | 56,577,311 | - | 952,158 | 289,000 | - | - | - | 266,016 | - | 56,843,327 |
| Insiders (See Exhibit H) | 13,072,915 | 500,000 | 952,158 | 289,000 | - | - | 500,000 | 16,654,626 | - | 31,968,699 |
| Intercompany Transfers in | 16,980,938 | 410,000 | - | 550,000 | - | - | - | 4,228,142 | - | 22,169,080 |
| Other Inflows | 624,800 | 249,486 | 396,679 | 1,954,533 | 5,119,241 | - | 6,325,136 | 758,410 | - | 15,428,285 |
| Transfers received on behalf of another fund | 3,830,945 | 3,456,561 | 2,531,965 | (86,263) | - | 100 | 56,960 | 238,209 | - | 10,028,477 |
| **Total Inflows** | **210,788,275** | **218,620,312** | **216,771,254** | **435,243,583** | **218,023,691** | **1,695,847** | **382,059,837** | **51,482,675** | **204,400** | **1,734,889,874** |
| | | | | | | | | | | |
| **Outflows:** | | | | | | | | | | |
| **WMIF Investors:** | | | | | | | | | | |
| Investor - FPCM Repayment | 1,900,000 | 37,581,397 | 57,267,824 | 107,470,902 | 7,208,732 | - | 47,695,695 | - | - | 259,124,550 |
| Investor - Fund Repayment | - | 465,000 | 747,183 | 802,000 | 69,139 | - | 4,147,093 | - | - | 6,230,415 |
| Investor - Type Unknown | - | - | - | - | 89,000 | - | 48,000 | - | - | 137,000 |
| **Total WMIF Principal Repayment** | **1,900,000** | **38,046,397** | **58,015,007** | **108,272,902** | **7,366,871** | **-** | **51,890,788** | **-** | **-** | **265,491,965** |
| | | | | | | | | | | |
| Investor - FPCM Interest Expense | 40,556 | 6,171,427 | 9,293,121 | 20,105,527 | 922,324 | - | 11,013,451 | - | - | 47,546,406 |
| Investor - Unknown Returns | 1,510,576 | 1,188,846 | 5,273,146 | 13,984,092 | 3,714,567 | - | 11,744,662 | - | - | 37,415,889 |
| Investor - Fund Dividend Expense | 10,000 | 3,028,380 | 4,989,106 | 6,127,785 | 520,398 | - | 3,577,880 | - | - | 18,253,549 |
| **Total WMIF Returns** | **1,561,132** | **10,388,653** | **19,555,373** | **40,217,404** | **5,157,289** | **-** | **26,335,993** | **-** | **-** | **103,215,844** |
| | | | | | | | | | | |
| **Total WMIF Investor Outflows** | **3,461,132** | **48,435,050** | **77,570,380** | **148,490,306** | **12,524,160** | **-** | **78,226,781** | **-** | **-** | **368,707,809** |

Exhibit F.1

**Woodbridge Entities**

**Summary of Bank Reconstructions**
**Consolidated Category Summary**
**07/11/2012 - 09/30/2017**

Source: Bank Reconstruction and QuickBooks

| Category | 07/11/2012 - 04/06/2016 Structured | 07/11/2012 - 09/30/2017 WMIF 1 | 12/30/2013 - 09/30/2017 WMIF 2 | 10/10/2014 - 09/30/2017 WMIF 3 | 06/26/2015 - 09/30/2017 WMIF 4 | 9/20/2015 - 09/30/2017 Bridge 1 | 11/02/2015 - 09/30/2017 WMIF 3a | 11/25/2015 - 09/30/2017 Group | 12/08/2016 - 09/30/2017 Bridge 2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Other Investors** | | | | | | | | | | |
| Investor - Structured Funding Repayments | 72,454,136 | - | - | - | - | - | - | - | - | 72,454,136 |
| Investor - Held in Escrow Repayments | 35,409,102 | - | - | - | - | - | - | 1,205,811 | - | 36,614,913 |
| Investor - Group of Companies Repayments | - | - | - | - | - | - | - | 29,845,438 | - | 29,845,438 |
| Investor - Bridge Loans Repayments | - | - | - | - | - | 1,044,508 | - | - | 98,000 | 1,142,508 |
| Other Investors - Interest Expense | 2,263,048 | 9,500 | - | - | - | 93,291 | - | 1,262,131 | 4,002 | 3,631,972 |
| **Total Other Investor Outflows** | **110,126,286** | **9,500** | **-** | **-** | **-** | **1,137,799** | **-** | **32,313,380** | **102,002** | **143,688,967** |
| | | | | | | | | | | |
| **Mortgage/Real Estate/Other Investments:** | | | | | | | | | | |
| Other Investments | 294,068,866 | - | - | - | - | - | - | 490,392,235 | - | 784,461,101 |
| Mortgage Principal | 50,292,367 | 973,000 | - | 10,855,000 | - | - | - | - | - | 62,120,367 |
| **Total Mortgage/Real Estate/Other Investments:** | **344,361,233** | **973,000** | **-** | **10,855,000** | **-** | **-** | **-** | **490,392,235** | **-** | **846,581,468** |
| | | | | | | | | | | |
| Other Expenses | 63,857,858 | 84,276 | 44,358 | 89,190 | 25,695 | 801 | 69,698 | 39,511,240 | 168 | 103,683,284 |
| Commission to Sales Agents | 27,039,040 | - | - | - | - | - | - | 37,557,283 | - | 64,596,323 |
| Client Funding Outflows | 57,018,663 | - | - | - | - | - | - | 3,176,101 | - | 60,194,764 |
| Payments to/for the benefit of Insiders **(See Ex H)** | 29,188,090 | 138,389 | 221,722 | 5,000 | - | - | - | 21,657,845 | - | 51,211,046 |
| Intercompany Transfers Out | 36,748,232 | 544,000 | 1,020,000 | 1,075,000 | - | - | - | 7,641,402 | - | 47,028,634 |
| Other Outflows | 3,715,641 | 476,933 | 919,094 | 3,561,676 | 2,473,807 | 24,460 | 6,147,512 | 11,715,289 | 3,082 | 29,037,494 |
| Amounts paid on behalf of another fund | 10,624,670 | 434,933 | 663,935 | 105,555 | - | - | 1,770 | 527,131 | - | 12,357,994 |
| **Total Outflows** | **686,140,845** | **51,096,081** | **80,439,489** | **164,181,727** | **15,023,662** | **1,163,060** | **84,445,761** | **644,491,906** | **105,252** | **1,727,087,783** |
| | | | | | | | | | | - |
| **Net Activity** | **(475,352,570)** | **167,524,231** | **136,331,765** | **271,061,856** | **203,000,029** | **532,787** | **297,614,076** | **(593,009,231)** | **99,148** | **7,802,091** |
| | | | | | | | | | | |
| Intracompany Inflows | 674,916,707 | 31,276,441 | 49,588,638 | 86,330,067 | 8,802,789 | 4,742,050 | 49,469,172 | 757,153,917 | 98,000 | 1,662,377,781 |
| Intracompany Outflows | 201,283,552 | 198,355,327 | 185,457,528 | 356,414,350 | 208,685,000 | 5,117,000 | 344,944,450 | 161,930,574 | 190,000 | 1,662,377,781 |
| **Net Intracompany Activity** | **473,633,155** | **(167,078,886)** | **(135,868,890)** | **(270,084,283)** | **(199,882,211)** | **(374,950)** | **(295,475,278)** | **595,223,343** | **(92,000)** | **(0)** |
| | | | | | | | | | | |
| **Beginning Balance as of July 11, 2012** | 1,719,417 | - | - | - | - | - | - | - | - | 1,719,417 |
| **Ending Cash Balance as of September 30, 2017** | $ 2 | $ 445,345 | $ 462,875 | $ 977,573 | $ 3,117,818 | $ 157,837 | $ 2,138,798 | $ 2,214,112 | $ 7,148 | $ 9,521,508 |

See accompanying Declaration dated December 18, 2017

Exhibit F.2

| Woodbridge Entities |
|---|

| Bank Reconstruction Categories |
|---|

**Source**: Bank Records and Underlying support

| Inflows | Description |
|---|---|
| **WMIF Investors** | Funds received for investments by the Woodbridge Fund Entities from FPCM Investors, Fund Investors and Unknown Investors. Investors – Type Unknown include those investors in which KM was unable to determine if their investment was for specific properties (indicative of FPCM investors) or for fund Units (indicative of Fund investors). |
| **Other Investors** | Funds received for investments other than the Woodbridge Fund Entities. This includes Bridge 1 and Bridge 2 investors, and investors who invested directly into Structured and Group. |
| **Mortgage/Real Estate/Other Investments:** | Receipts from various mortgage and real estate investing activity. See below for more details: |
| *Mortgage Lending Principal* | Principal payments received from mortgage borrowers. |
| *Mortgage Interest Income* | Monthly interest payments received from mortgage borrowers. |
| *Gain/Loss On Investments* | Monies received in excess or less than the mortgage principal loaned or investment made. |
| *Other Investments* | Monies received from liquidation of real estate owned or other investments. KM determined based on how the items were reported in QuickBooks. |
| *Other Investment Income Earned* | Monies received for rental income or amounts coded in QuickBooks as income including funds sent to investors for profit sharing. |
| *Other Return Of Investment* | Funds received that are a return of principal, but KM is unable to determine what portion is principal, gain/loss, or closing fees. |
| **Other Income** | Funds received which were categorized in QuickBooks as "company income" or "commission income". Based on KM's analysis of the general ledger and the nature of the transactions, "company income" was related to Structured's settlement investing business that was active prior to the Woodbridge Fund Entities being formed and "commission income" was earned by Structured for referring mortgage investments to the WMIF's. |
| **Insiders** | Funds received from Shapiro or individuals or entities associated with Shapiro. |
| **Transfers Received On Behalf Of Another Fund** | Funds categorized in QuickBooks as an intercompany account. |
| **Client Funding Inflows** | Funds categorized in QuickBooks to the Client Funding account. Based on KM's analysis of the general ledger and the nature of the transactions, "client funding" was related to Structured's settlement investing business that was active prior to the Woodbridge Fund Entities. |
| **Other Inflows** | Miscellaneous transactions that are not related to investors or mortgage investing including items requiring further investigation. |
| **Intercompany And Intracompany Transfers In** | Funds received from other Woodbridge Entities that are not included in the Bank Reconstruction. |

**Kapila|Mukamal**
CPAs, Forensic and Insolvency Advisors

Exhibit F.2

**Woodbridge Entities**

**Bank Reconstruction Categories**

**Source**: Bank Records and Underlying support

| Outflows | Description |
|---|---|
| **WMIF Investors** | Funds paid to investors in the Woodbridge Fund Entities for Returns and principal repayment The category is broken down into FPCM Investors, Fund Investors and Unknown Investors. |
| **Other Investors** | Funds paid to investors other than the Woodbridge Fund Entity investors. This includes Bridge 1 and Bridge 2 investors, and investors who invested directly into Structured and Group. |
| **Mortgage/Real Estate/Other Investments** | Includes funds loaned to borrowers for mortgage investments and funds paid for other investments which include investments not categorized as mortgages in QuickBooks and capitalized construction costs. |
| **Commission Expense** | Funds paid to sales agents for commissions earned by referring investors to Woodbridge Entities. |
| **Other Expenses** | Funds for various expenses including payroll, professional fees, and business expenses including marketing, advertising, postage & delivery, office supplies, and rent. |
| **Payments To/For The Benefit Of Insiders** | Funds paid to Shapiro or individuals or entities associated with Shapiro. |
| **Amounts Paid On Behalf Of Another Fund** | Funds categorized in QuickBooks to the intercompany account. |
| **Client Funding Outflows** | Funds categorized in QuickBooks to the Client Funding account. Based on KM's analysis of the general ledger and the nature of the transactions, "client funding outflows" was related to Structured's settlement investing business that was active prior to the Woodbridge Fund Entities. |
| **Other Outflows** | Miscellaneous transactions that are not related to investors or mortgage investing including items in the bank reconstruction requiring further investigation. |
| **Intercompany Transfers Out** | Funds sent to other Woodbridge Entities. |

**See accompanying Declaration dated December 18, 2017**

**Kapila|Mukamal**
CPAs, Forensic and Insolvency Advisors
Page 2 of 2

Exhibit G

**Woodbridge Entities**

**Summary of Credit Card Net Activity**
**06/01/2012 - 06/18/17**
**Summarized by Category**

Source: Credit Card Reconstructions

| Category | Chase 7053 11/05/13 - 02/04/17 | Chase 8221 01/19/15 - 11/18/15 | Chase 4855 11/19/15 - 2/18/17 | Chase 2092 02/19/17 - 03/18/17 | Chase 2059 03/19/17 - 06/18/17 | Chase 2292 10/19/15 - 06/18/17 | Chase 2366 03/19/16 - 06/18/16 | Chase 4159 06/19/16 - 10/18/16 | Chase 9684 06/01/12 - 10/18/15 | Chase 5969 10/19/12 - 08/18/13 | Chase 4660 08/19/13 - 03/18/15 | Chase 0348 03/19/14 - 12/18/14 | Chase 3902 06/01/12 - 05/18/14 | Chase 8308 02/19/14 - 01/18/15 | Chase 8260 06/01/12 - 07/04/13 | Citi 0481 07/19/12 - 05/17/17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Expense | $ - | $ 44,732 | $ 15,052 | $ 177 | $ - | 830,092 | 356,841 | 768,402 | 1,004,771 | 2,908,251 | 1,106,387 | 1,551,623 | 75,449 | - | - | $ 3,370,724 | 12,032,501 |
| Retail - Furniture, Décor & Home | - | 86,936 | 87,062 | 1,408 | 7,715 | 89,954 | 38,556 | 620,377 | 84,691 | 164,558 | 99,699 | 135,333 | 103,619 | 72,612 | - | 8,096 | 1,600,615 |
| Travel | - | 59,515 | 19,700 | - | 202 | 242,954 | 86,163 | 346,814 | 88,919 | 190,973 | 174,056 | 199,446 | 124,616 | 48,902 | 2,304 | 6,959 | 1,591,523 |
| Retail - Luxury | - | 103,484 | 155,966 | 19,755 | 19,816 | 39,754 | 5,573 | 46,107 | 24,974 | 30,445 | 109,810 | 126,344 | 127,086 | 71,747 | - | 442,457 | 1,371,518 |
| US Treasury Payment | - | - | - | - | - | 300,392 | - | 160,000 | 135,000 | 55,000 | 195,169 | 342,278 | - | - | - | - | 1,187,839 |
| Other/FIR | - | 4,613 | 20,319 | 715 | 2,199 | 75,157 | 103,109 | 329,075 | 28,893 | 92,135 | 31,797 | 91,236 | 20,482 | 8,930 | - | - | 808,660 |
| Meals & Entertainment | - | 66,795 | 75,142 | 4,677 | 20,159 | 93,646 | 25,286 | 97,763 | 24,020 | 29,155 | 30,673 | 40,205 | 114,107 | 74,366 | - | 1,149 | 697,143 |
| Political Contribution | - | 800 | - | - | - | 176,900 | 166,065 | 182,698 | 5,500 | - | - | 28,450 | 81 | 1,044 | - | 25,000 | 586,538 |
| Taxes, Fees & Dues | - | - | 855 | - | 938 | 31,337 | 122,892 | 72,666 | 5,129 | 22,920 | 73,553 | 195,263 | - | - | - | - | 525,553 |
| Retail - Clothing, Beauty & Accessories | - | 85,752 | 103,082 | 6,137 | 14,420 | 21,854 | 216 | 28,304 | 4,878 | 13,705 | 2,914 | 5,803 | 132,890 | 91,891 | - | 3,080 | 514,926 |
| Retail - Other | - | 4,452 | 6,195 | 196 | 303 | 41,527 | 29,801 | 175,022 | 9,734 | 58,308 | 41,997 | 55,187 | 38,476 | 9,895 | - | - | 471,093 |
| Retail - Technology | - | 229 | 4,043 | - | - | 14,562 | 47,433 | 121,499 | 17,530 | 122,270 | 37,816 | 63,053 | 655 | 452 | - | - | 429,542 |
| Professional Fees | - | - | - | - | - | 66,732 | - | 202,500 | 4,256 | 2,436 | 195 | 13,637 | - | - | - | 115,482 | 405,238 |
| Retail - Office Furniture & Supplies | - | 145 | - | - | - | 181,482 | 12,768 | 66,049 | 19,941 | 39,175 | 19,485 | 41,093 | 115 | - | - | - | 380,253 |
| Retail - Department Store | - | 23,304 | 38,062 | 785 | 1,134 | 13,920 | 8,960 | 78,937 | 18,082 | 67,153 | 11,418 | 10,870 | 50,314 | 17,782 | - | - | 340,721 |
| Utilities/Telecommunications | - | 39 | 204 | 19 | 38 | 43,806 | 20,256 | 76,092 | 14,202 | 36,981 | 24,479 | 34,205 | 618 | 140 | - | - | 251,079 |
| Real Estate Related | - | 510 | 140 | - | - | 31,413 | 41,342 | 40,486 | 2,730 | 25,308 | 12,524 | 34,730 | 606 | - | - | 500 | 190,289 |
| Storage/Moving/Courier Expense | - | - | 3,216 | - | - | 31,252 | 14,687 | 57,006 | 7,947 | 18,668 | 23,412 | 28,410 | 1,351 | 30 | - | - | 185,979 |
| Grocery/Pharmacy | - | 12,479 | 20,828 | 2,238 | 5,153 | 595 | 214 | 8,021 | 883 | 2,631 | 180 | 52 | 32,017 | 16,221 | - | 116 | 101,628 |
| Medical | - | 5,901 | 15,470 | - | 2,558 | 1,304 | 2,775 | 10,342 | 500 | 1,470 | 9,773 | 1,315 | 12,410 | 9,801 | - | 7,245 | 80,864 |
| Auto | - | 1,557 | 846 | 55 | 345 | 7,501 | 2,300 | 5,587 | 1,086 | 10,533 | 3,255 | 23,725 | 6,909 | 6,707 | - | 62 | 70,468 |
| Insurance | - | - | - | - | - | 18,396 | 2,121 | 95 | 2,338 | 7,745 | 5,858 | 15,904 | 1,865 | - | - | - | 54,322 |
| Bank & Service Fees | 300 | 85 | 85 | - | 85 | 7,032 | 446 | 4,295 | 3,173 | 1,806 | 6,229 | 11,484 | 85 | 85 | 75 | 792 | 36,057 |
| Spa/Salon | - | 2,975 | 6,897 | 155 | 853 | 1,525 | - | 2,987 | - | - | - | - | 8,058 | 2,929 | - | 78 | 26,457 |
| Returned Funds | - | - | 7 | - | - | - | - | - | 150 | - | - | 5 | - | - | - | - | 162 |
| **Total Charges** | 300 | 504,303 | 573,171 | 36,317 | 75,918 | 2,411,287 | 1,087,804 | 3,501,124 | 1,509,176 | 3,901,776 | 2,020,679 | 3,049,651 | 851,809 | 433,534 | 2,379 | 3,981,740 | 23,940,968 |
| Credit Card Payments | 300 | 509,302 | 567,616 | 38,404 | 76,423 | 2,375,390 | 1,122,305 | 3,513,199 | 1,526,084 | 3,890,033 | 2,021,764 | 3,043,775 | 848,339 | 432,511 | 2,379 | 3,981,740 | 23,949,565 |
| Beginning Balance | - | 1,156 | (3,843) | 1,710 | (377) | 3,758 | 39,653 | 5,153 | 78,540 | 61,632 | 73,373 | 72,288 | (3,334) | 134 | - | - | 329,843 |
| **Ending Balance** | $ - | $ (3,843) | $ 1,712 | $ (377) | $ (882) | $ 39,655 | $ 5,152 | $ (6,922) | $ 61,632 | $ 73,375 | $ 72,288 | $ 78,164 | $ 136 | $ 1,157 | $ - | $ - | $ 321,247 |

See accompanying Declaration dated December 18, 2017

Exhibit G.1

**Woodbridge Entities**

**Credit Card Reconstruction Categories**

Source: Bank Records and Underlying support

| Category | Description |
|---|---|
| Auto | Charges for parking, auto repairs, payments to car companies and other automobile expenses |
| Bank & Service Fees | Bank Fees and other service fees including service fees charged to make online payments |
| Business Expense | Charges for business related expenses which mainly includes marketing & advertising expenses |
| Grocery/Pharmacy | Charges at various grocery stores and pharmacies |
| Insurance | Insurance companies |
| Meals & Entertainment | Charges for meals & entertainment, including event tickets, golf courses and tourist attractions |
| Medical | Charges for hospitals, doctors and vets |
| Other/FIR | Miscellaneous transactions including items that required further investigation required |
| Political Contribution | Funds sent to various political campaigns or organizations |
| Professional Fees | Law Firms, Accounting Firms, etc. |
| Real Estate Related | Charges for real estate related services, including locksmiths, home inspections, contractors, real estate agents, etc. |
| Retail - Clothing, Beauty & Accessories | Purchases at retail stores that sell clothing, beauty items (make up, skin care, etc.) and accessories (shoes, handbags, etc.) |
| Retail - Department Store | Purchases at department stores including Amazon, Nordstrom, Target, etc. |
| Retail - Furniture, Décor & Home | Purchases at retail stores that sell furniture, décor & other items for the home. These items could be for personal or business |
| Retail – Luxury | Purchases at luxury retail stores including jewelry stores and high end designers (Louis Vuitton, Chanel, Jimmy Choo, etc.) |
| Retail - Office Furniture & Supplies | Purchases at retail stores that sell office furniture and supplies |
| Retail – Other | Purchases at other retail stores that do not belong in the other retail categories including liquor stores, vitamin stores, cigars, flower stores, etc. |
| Retail – Technology | Purchases at retail stores that sell technology items (Best Buy, Apple, etc.) |
| Returned Funds | Charges for items that have been returned |
| Spa/Salon | Charges at Spas to Salons |
| Storage/Moving/Courier Expense | Charges at storage locations, moving companies and shipping companies (FedEx, USPS, etc.) |
| Taxes, Fees & Dues | Taxes (excluding those to the US Treasury), Fees paid to various courts for record searches, etc. |
| Travel | Charges for Airlines, Hotels, Limos, Taxis, Rental Cars, etc. |
| US Treasury Payment | Payments to the United States Treasury |
| Utilities/Telecommunications | Charges to utility companies and telecommunication companies including internet, telephones, security systems, etc. |

**See accompanying Declaration dated December 18, 2017**

Kapila Mukamal

CPAs, Forensic and Insolvency Advisors

Exhibit H

**Woodbridge Entities**

**Summary of Net Payments to Insiders**
**07/11/2012 - 9/30/2017**

Source: Bank Reconstruction and QuickBooks

| Insider | Structured 07/11/2012 - 04/06/2016 | WMIF 1 07/11/2012 - 09/30/2017 | WMIF 2 12/30/2013 - 09/30/2017 | WMIF 3 10/10/2014 - 09/30/2017 | WMIF 3a 11/02/2015 - 09/30/2017 | Group 11/25/2015 - 09/30/2017 | Total Insider Payments | Additional Credit Card Charges 06/01/2012 - 06/18/2017 | Total Insider Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | |
| Payments made on behalf of Robert Shapiro | $ 56,000 | $ - | $ - | $ - | $ - | $ 4,486 | $ 60,486 | $ - | $ 60,486 |
| Moorpark Boca Funding, LLC | 3,975,000 | - | 640,000 | 250,000 | - | 4,225,000 | 9,090,000 | - | 9,090,000 |
| Scott Schwartz / Up & Coming Capital LLC | - | - | - | - | - | - | - | - | - |
| Jeri Shapiro | - | - | - | 39,000 | - | 340,140 | 379,140 | - | 379,140 |
| Payments made on behalf of 3X a Charm | 3,000 | - | - | - | - | - | 3,000 | - | 3,000 |
| Schwartz Media Buying Company, LLC | 4,372,415 | 500,000 | 280,000 | - | 500,000 | 11,590,000 | 17,242,415 | - | 17,242,415 |
| 3X A Charm | - | - | - | - | - | - | - | - | - |
| Joy Gravenhorst | - | - | - | - | - | - | - | - | - |
| Cash | - | - | - | - | - | 250,000 | 250,000 | - | 250,000 |
| Riverdale Funding, LLC | 4,666,500 | - | 32,158 | - | - | 245,000 | 4,943,658 | - | 4,943,658 |
| **Total Receipts** | **13,072,915** | **500,000** | **952,158** | **289,000** | **500,000** | **16,654,626** | **31,968,699** | **-** | **31,968,699** |
| **Disbursements:** | | | | | | | | | |
| Payments made on behalf of Robert Shapiro | (9,327,731) | - | - | - | - | (4,279,833) | (13,607,564) | (1,964,544) | (15,572,108) |
| Moorpark Boca Funding, LLC | (6,392,500) | - | - | - | - | (4,400,002) | (10,792,502) | - | (10,792,502) |
| Scott Schwartz / Up & Coming Capital LLC | (1,154,400) | - | - | - | - | (164,920) | (1,319,320) | - | (1,319,320) |
| Jeri Shapiro | (1,159,600) | - | - | - | - | (480,718) | (1,640,318) | - | (1,640,318) |
| Payments made on behalf of 3X a Charm | (971,625) | - | - | - | - | - | (971,625) | - | (971,625) |
| Schwartz Media Buying Company, LLC | (5,432,916) | (138,389) | (221,722) | (5,000) | - | (11,990,018) | (17,788,045) | - | (17,788,045) |
| 3X A Charm | (148,800) | - | - | - | - | (166,000) | (314,800) | - | (314,800) |
| Joy Gravenhorst | - | - | - | - | - | (155,000) | (155,000) | - | (155,000) |
| Cash | - | - | - | - | - | (21,354) | (21,354) | - | (21,354) |
| Riverdale Funding, LLC | (4,600,518) | - | - | - | - | - | (4,600,518) | - | (4,600,518) |
| **Total Disbursements** | **(29,188,090)** | **(138,389)** | **(221,722)** | **(5,000)** | **-** | **(21,657,845)** | **(51,211,046)** | **(1,964,544)** | **(53,175,590)** |
| **Net Payments:** | | | | | | | | | |
| Payments made on behalf of Robert Shapiro | (9,271,731) | - | - | - | - | (4,275,347) | (13,547,078) | (1,964,544) | (15,511,622) |
| Moorpark Boca Funding, LLC | (2,417,500) | - | 640,000 | 250,000 | - | (175,002) | (1,702,502) | - | (1,702,502) |
| Scott Schwartz / Up & Coming Capital LLC | (1,154,400) | - | - | - | - | (164,920) | (1,319,320) | - | (1,319,320) |
| Jeri Shapiro | (1,159,600) | - | - | 39,000 | - | (140,578) | (1,261,178) | - | (1,261,178) |
| Payments made on behalf of 3X a Charm | (968,625) | - | - | - | - | - | (968,625) | - | (968,625) |
| Schwartz Media Buying Company, LLC | (1,060,501) | 361,611 | 58,278 | (5,000) | 500,000 | (400,018) | (545,630) | - | (545,630) |
| 3X A Charm | (148,800) | - | - | - | - | (166,000) | (314,800) | - | (314,800) |
| Joy Gravenhorst | - | - | - | - | - | (155,000) | (155,000) | - | (155,000) |
| Cash | - | - | - | - | - | 228,646 | 228,646 | - | 228,646 |
| Riverdale Funding, LLC | 65,982 | - | 32,158 | - | - | 245,000 | 343,140 | - | 343,140 |
| **Total Net Insider Payments** | **$ (16,115,175)** | **$ 361,611** | **$ 730,436** | **$ 284,000** | **$ 500,000** | **$ (5,003,219)** | **$ (19,242,347)** | **$ (1,964,544)** | **$ (21,206,891)** |

See accompanying Declaration dated December 18, 2017