Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     ) File No. FL-04024-A
WOODBRIDGE MORTGAGE INVESTMENT       )
FUND 3, LLC                          )

WITNESS:   Ivan Acevedo
PAGES:     1 through 76
PLACE:     Securities and Exchange Commission
           444 South Flower Street
           Los Angeles, 90071
DATE:      Thursday, October 19, 2017

The above entitled matter came on for hearing pursuant to Notice at 9:50 a.m. PDT, 12:50 p.m. EDT.

Diversified Reporting Services, Inc.
(202) 467-9200

**EXHIBIT 7**

Page 22

1  anyone ever asking for specific information related to
2  the affiliated entity. I think most people that were
3  participating had a relationship with Woodbridge.
4      So I think most people just sort of, I guess,
5  had sufficient information about whose participating to
6  move forward with taking on these loans without having to
7  ask for anything further. Whether or not they asked for
8  anything further once they left my sort of -- my office,
9  I don't know. I'm not really sure how much was obtained
10 down the line.
11     Q  So if I understand right, the lender or the
12 financial planner, they could go on the website to look
13 at the property and on that website there would be some
14 sort of notice that their property was affiliated with
15 Woodbridge?
16     A  Right, yeah. On the actual offering itself
17 there would be in the description, correct.
18     Q  You say on the offering itself. Do you mean on
19 the website or in the documentation to lenders?
20     A  In the offering on the website.
21     Q  Besides just saying that the property was
22 affiliated, did the website describe how that property
23 was affiliated?
24     A  No.
25     Q  Did you affirmatively tell lenders how that

Page 23

1  property was affiliated?
2      A  There was -- No, it was never really a topic in
3  discussion with specific lenders that I can recall in any
4  specific instance that I ever had.
5      Q  Same question, did you describe how those
6  properties were affiliated to any financial planners?
7      A  No. I mean, I don't recall any specific
8  instances where we had a discussion about the affiliates.
9  I think with financial advisors, I think there may have
10 been a conversation where we had sort of outlined that.
11 Some of these affiliates are affiliated to Woodbridge
12 mortgage fund, one of the Woodbridge companies or one of
13 the Woodbridge partners.
14     So I think maybe we would have touched on that
15 at some point but there were no specific instances I can
16 recall where we actually sat down and really got into
17 detail about the affiliation that was present on any
18 specific deal.
19     Q  I think you said before when your involvement
20 with the first position program started, the loans -- and
21 we're talking about the underlying loans -- were hard
22 money loans to third parties and then at a certain point
23 some went to affiliated companies. Is that correct?
24     A  Affiliated entities of sorts, correct.
25     Q  Fair enough. Over time how did the percentage

Page 24

1  evolve? So it started -- It seems what you're saying is
2  it was mostly hard money loans to third parties and then
3  it started -- some of these loans started going to
4  affiliated entities. When you left Woodbridge, what was
5  the percentage to affiliated entities?
6      A  It's hard to say. The inventory was constantly
7  changing. We didn't really run any metrics to gauge
8  that. I can't really specifically state a percentage,
9  but they were more prevailing.
10     Q  Would you say that a majority were to
11 affiliated entities when you left?
12     A  I think month to month it changed. I think
13 some months Riverdale was really cranking them out. So I
14 think some months might have been higher than others.
15     Q  You mentioned Riverdale a couple times. Is
16 Riverdale a wholly owned affiliate of Woodbridge?
17     A  I don't know the ownership structure at
18 Riverdale. I don't know, but I do know that we would
19 fund a lot of their loans. I don't know specifically if
20 we were the only funder for Riverdale. I wasn't really
21 privy to that information.
22     Q  What is the or when you were there at least,
23 what was the ownership structure of Woodbridge?
24     A  I don't know the actual ownership structure of
25 Woodbridge. I just know is that Bob was in charge.

Page 25

1      Q  What was Bob's title?
2      A  I believe president, if I recall, something
3  like that.
4      Q  Apart from the items that we've discussed, what
5  other documents, sales materials, disclosures, did you
6  provide to first position lenders?
7      A  So we had a package that would go out of legal.
8  So, I mean, it's -- I mean, it probably had, if I can
9  recall, a lender agreement, whatever disclosures I guess
10 were pertinent to that specific loan, promissory note. I
11 think whatever would be pretty standard. That would not
12 come out of my office. That would come out of legal.
13     Q  So I believe I've seen samples of those
14 documents. Are you talking about the actual
15 documentation for the notes, the loan agreement, the
16 promissory note, collateral assignment?
17     A  Correct.
18     Q  Anything else?
19     A  That I can recall off the top of my head, no.
20 I don't know.
21     Q  What would a lender prior to investing, what
22 would they know about the underlying property?
23     A  They would be offered -- I think we would offer
24 an appraisal and a broker's opinion of value in most
25 cases. Those would be the two items that we would offer

Page 26

1  to give lenders and their representatives what they
2  needed for their own diligence process.
3      Q   Were they provided to all lenders and/or
4  financial planners or only when they asked for those
5  documents?
6      A   I think they were offered and they were
7  presented as requested.
8      Q   When you first became involved in that first
9  position program, you were selling that product to those
10 third-party lenders and financial planners. Was that
11 your role?
12     A   Yes. So my department was in -- We were -- Our
13 responsibility was to introduce clients to the
14 opportunity and then provide them with documentation that
15 would be necessary to have them participate and then to
16 establish the relationship by which we would continue to
17 offer them just whatever products based on whatever needs
18 they had, I guess, through their advisors. Most of it
19 would be through advisors, about 90, 90 to 95 percent.
20     Q   Besides yourself, who else was in that internal
21 group at Woodbridge selling that first position program?
22     A   So when I left, it was Dayne Roseman, David
23 Goldin, Nicole Walker and what's his name. Those were
24 the three that when I left were sort of -- They had a
25 good amount of relationships with advisors.

Page 27

1      There was a few other guys there that I just
2  can't recall their names that were hired right before I
3  left. Donovan Knowles I think was the other guy I was
4  trying to think of that was there for a little while
5  while I was there, but that's it. There was only six or
6  seven people including the two new guys. I can't recall
7  their names.
8      Q   Who was in charge of that group?
9      A   I'm sorry.
10     Q   So during your time at Woodbridge and if it
11 changed, let me know, who was in charge of that group?
12     A   I managed the team while I was there.
13     Q   The entire time you were there?
14     A   I managed that team, that specific team, the
15 entire time I was there, yes, that's correct.
16         MR. KOONIN: Did you have any prior managerial
17 experience?
18         THE WITNESS: I did.
19         MR. KOONIN: Doing what?
20         THE WITNESS: So when I -- I've ran other --
21 For my father's contracting company since I was young, I
22 managed employees. When I was in the currency trading, I
23 was managing a group of traders. You know, I've been
24 involved in sales capacities throughout the years and
25 I've always ended up with some kind of

Page 28

1  supervisory/managerial type of position. So managing
2  people wasn't something that I was new to.
3          MR. LOWRY: Q When you managed that, what was
4  your title? I know you said account executive.
5      A   I was the -- I guess you would call me the
6  investments manager, sales manager.
7      Q   In that position who did you report to?
8      A   To Bob.
9      Q   What was Bob's role in the first position
10 program?
11     A   I think Bob was -- He would bring the deals,
12 the properties. I think his primary role was to
13 facilitate the growth of our deal flow.
14     Q   Bob would bring your group either the
15 affiliated property or the third-party properties
16 underlying the loans?
17     A   I think Bob was ultimately approving the deals
18 through Riverdale and whatever third party or affiliated
19 or not loans that we would have. I think Bob was
20 ultimately the one that was choosing and not which ones
21 we would do.
22     Q   Did Jeri have a role in the first position
23 program?
24     A   No, not that I can think of. I mean, I don't
25 know. I don't think so. Not with me.

Page 29

1      Q   Okay. How did you know what financial planners
2  to contact?
3      A   I think by then we had a pretty good amount of
4  relationships just from having been with the settlement
5  space and introduced advisors to that, that we sort of
6  plugged in a lot of the first position offerings through
7  our network. So we really had an easy time because
8  people would usually call us and ask for opportunities.
9  We would not necessarily ever have to cold call or call
10 out.
11     Q   When you say people would call you, do you mean
12 financial advisors?
13     A   Financial advisor, yes.
14     Q   Did you guys advertise -- I'll call it the
15 first position mortgage. Did Woodbridge advertise the
16 FPCM program?
17     A   When we there, we had a lot of struggles with
18 marketing while we were there. Up until I left they
19 never had a really cohesive marketing campaign. I think
20 most of our marketing sort of revolved around the
21 structured settlements. Towards the later years right
22 before I left, I think we may have created some kind of
23 web banner type of stuff.
24     So I think, if I remember correctly, we may
25 have begun to advertise the first position product, but I

Page 66

1  lender.
2      Q   Apart from that structured settlement business,
3  would the FPCM or PPM revenues form the collateral for
4  any bridge loans?
5      A   I don't know specifically. I'm not sure.
6      Q   None of the bridge loans that you're aware of
7  used PPM or FPCM revenues as collateral?
8      A   Not revenues, no. No, not to my knowledge.
9      Q   So apart from the structured settlement
10 revenues, I'm asking the question in a different way to
11 make sure --
12     A   It's not revenues that would be acting as
13 collateral. It would be actual contracts that Woodbridge
14 had taken possession of in the process of obtaining the
15 rights to a settlement. So it would be a basket or one
16 or two different settlement payment rights, the actual
17 rights, not the cash flows themselves.
18         I guess we're talking apples to apples. I
19 guess they would be cash flows but they wouldn't
20 necessarily be against a receivable without some kind of
21 ownership present. So in the time I saw --
22     Q   What I'm asking in a bad way is, I guess, apart
23 from the structured settlement business, were the FPCM or
24 PPM, that business, did that provide a collateral for any
25 bridge loan?

Page 67

1      A   Possibly.
2      Q   You said there were a handful of bridge loan
3  investors. Who were they?
4      A   To my knowledge, ▮▮▮ was one of the
5  only ones I knew that was an ongoing bridge loan investor
6  or lender. We didn't market those. It was something
7  that we would offer to people that were already sort of
8  in that small group.
9      Q   Small group in terms of they were friends of
10 Bob Shapiro?
11     A   Correct, yeah. I know ▮▮▮ because
12 mainly he was one of the guys I worked with before Bob
13 became friends with him. So I kind of stopped working
14 with him.
15     Q   Then these bridge loans, who would offer these
16 to the handful of folks?
17     A   Not my team. Bob maybe.
18         MR. KOONIN: Is that what you meant, you were
19 working with Halbert but then that trailed off, it
20 started to be more of a relationship with Mr. Shapiro?
21         THE WITNESS: Correct.
22         MR. LOWRY: Q   What would be the impetus for
23 Woodbridge seeking a bridge loan?
24     A   I don't know, besides covering a gap in funding
25 for something.

Page 68

1          MR. KOONIN: So that would be a potential
2  reason, covering a gap in funding?
3          THE WITNESS: On the settlements, we could have
4  had a settlement go to court that's worth a half million
5  dollars and then a buyer might have fallen off and so
6  Woodbridge would need to then resell the deal but still
7  cover the funding to the annuitant, and I remember
8  Woodbridge had a policy of not penalizing investors that
9  would decide not to buy a settlement.
10         So they would let them get off the hook. So in
11 those cases, I think there would be a gap between
12 Woodbridge actually taking possession and then reselling
13 it to a new investor. So those types of gaps would
14 happen periodically in the settlement space.
15         MR. LOWRY: Q   Besides ▮▮▮, who were the other
16 bridge loan investors?
17     A   Those were personal contacts that Bob would not
18 ever really give me access to. They were people that I
19 didn't talk to myself that I knew were taking bridge
20 loans from ▮▮▮. So I knew that at some point there
21 might have been more than just one.
22     Q   Are you familiar with ▮▮▮▮▮▮?
23     A   Yes, I'm familiar with ▮▮▮▮▮▮.
24     Q   Did you reach out to him during your time at
25 Woodbridge?

Page 69

1      A   Actually now that you just reminded me of a
2  name from the past, yes, ▮▮▮▮▮ was a
3  client and I remember that being funny because Bob is a
4  staunch Republican and ▮▮▮▮ was a liberal and
5  we used to joke about that. Yes, he was somebody that
6  became a client of Woodbridge throughout the years I was
7  there.
8          MR. KOONIN: How did that come about?
9          THE WITNESS: I think we sent him a letter and
10 he responded, was interested in what we were doing and he
11 became a client, and then he became a friend of Bob's. I
12 never dealt with Bob directly after the initial contact.
13         MR. KOONIN: You mean ▮▮▮
14         THE WITNESS: I'm sorry, with ▮▮▮
15         MR. KOONIN: You said you sent a letter. Was
16 that a targeted letter to him or just a mass mailing?
17         THE WITNESS: No, just a mass mailer. I still
18 remember the day after I had the call and how we left it.
19 It was just a random occurrence.
20         MR. KOONIN: So did you have any contact with
21 him other than that initial call from him?
22         THE WITNESS: Just initial calls. Initially,
23 he might have called and asked a question about something
24 but yeah, I didn't deal with George Stephanopoulos much.
25         MR. KOONIN: So when he was calling, obviously

Page 70

1  he's a well known guy. Did you notify Mr. Shapiro that
2  you were speaking to him?
3      THE WITNESS: Yeah. That's why we had a laugh,
4  had a laugh about it.
5      MR. KOONIN: What knowledge do you have of
6  Stephanopoulos' involvement in Woodbridge products or
7  bridge loans? How much do you know?
8      THE WITNESS: Very little. I don't know – I
9  just know he became a client and I think he might have
10 become a unit holder in one of the mortgage funds, but I
11 didn't deal with him directly after Bob sort of initiated
12 contact with him and then established a relationship
13 directly with George. I don't know specifically the
14 scope of his involvement with products at Woodbridge or
15 not.
16     MR. LOWRY: Q Did Juan Williams also become a
17 client of Woodbridge while you were there?
18   A  That would be news to me. I don't know.
19   Q  What about Janine Shapiro?
20   A  I don't know.
21     MR. KOONIN: When was it that you stopped
22 working for Woodbridge?
23     THE WITNESS: December 2014.
24     MR. KOONIN: What were the circumstances there?
25 I know we talked about it a little earlier if you could

Page 71

1  kind of go into that.
2      THE WITNESS: I was ready to do my -- I was
3  looking at other things that I wanted to do. I wanted to
4  get back into the settlement space. My business partner
5  at the time, the timing for both of us was right. So I
6  think just everything pointed towards me going out and
7  taking on new challenges, I guess. It was time for me to
8  go.
9      MR. KOONIN: Who did you tell at Woodbridge?
10     THE WITNESS: I had been talking to Bob about
11 it for a few months before I left.
12     MR. KOONIN: What was his reaction to your
13 inclination to want to leave?
14     THE WITNESS: I think he was always saying to
15 me that if I thought I could do better somewhere else, he
16 would be more than happy to see me go.
17     MR. KOONIN: Did any of your team members come
18 with you?
19     THE WITNESS: I didn't take anybody from there,
20 no. My intention was not to create any problems with
21 Woodbridge. So when I left Woodbridge, I did it in a
22 very supportive fashion and I did not attempt to steal
23 any employees or anything that would create a problem for
24 myself.
25     MR. KOONIN: Do you have any ill will toward

Page 72

1  Mr. Shapiro or anyone at Woodbridge today?
2      THE WITNESS: I have no ill will towards
3  anybody anywhere.
4      MR. NELSON: That's a big statement.
5      MR. KOONIN: Let me just reverse that question.
6  To the best of your knowledge and understanding, do you
7  think that Mr. Shapiro or anyone at Woodbridge has any
8  ill will toward you?
9      THE WITNESS: I would hope not.
10     MR. KOONIN: Do you have any reason to think
11 they do?
12     THE WITNESS: No.
13     MR. LOWRY: Q That is all we have for you
14 today. Again, we thank you for taking the time to come
15 and talk to us. I know we talked a few times now. Is
16 there anything you want to clarify or add to what you've
17 said today?
18   A  No. I think I've come prepared to answer all
19 of your questions to the best of my ability. So if there
20 is nothing else I can answer for you guys, I think I'm
21 good.
22     MR. LOWRY: Does counsel have any questions?
23     MR. NELSON: I do.
24
25              EXAMINATION

Page 73

1  BY MR. NELSON:
2   Q  Ivan, you said you left Woodbridge in December
3  2014.
4   A  Correct.
5   Q  Is it fair to say that all your testimony today
6  relates to knowledge and information about Woodbridge to
7  the year 2014 and earlier?
8   A  Correct.
9   Q  Is it also correct in your testimony today that
10 you have no knowledge or information about Woodbridge for
11 the years 2015, 2016, 2017?
12  A  Yeah, I don't have any knowledge of inner
13 workings of the company any longer.
14  Q  Since you left Woodbridge in December of 2014,
15 you haven't had any involvement in the day-to-day
16 operations of Woodbridge. Is that correct?
17  A  I have not.
18  Q  It's also correct you don't have any knowledge
19 about how Woodbridge conducts its business in the years
20 2015, 2016 and 2017. Is that correct?
21  A  Only as far as becoming an investor within that
22 time frame. Above and beyond that, no.
23  Q  It's also a fair statement for the years 2015,
24 2016 and 2017 that you don't have any knowledge with
25 respect to how Woodbridge conducts its business or the

```
 1                    REPORTER'S CERTIFICATE
 2
 3  I, Donald Holcombe, reporter, hereby certify that the
 4  foregoing transcript of 74 pages is a complete, true and
 5  accurate transcript of the testimony indicated, held on
 6  October 19, 2017 at Los Angeles, CA in the matter of:
 7  WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC.
 8
 9  I further certify that this proceeding was recorded by
10  me, and that the foregoing transcript has been prepared
11  under my direction.
12
13
14      Date: 10/31/2017
15      Official Reporter:
16
17
18
19      Diversified Reporting Services, Inc.
20
21
22
23
24
25
```