**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 17-24624-CIV-COOKE/GOODMAN**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **ROBERT H. SHAPIRO, et al.,** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**PLAINTIFF'S RESPONSE TO ROBERT H. SHAPIRO'S MEMORANDUM OF LAW AND MOTION TO DISMISS CAUSES OF ACTION BASED ON FIRST POSITION COMMERCIAL MORTGAGES FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, TO STRIKE ALLEGATIONS RELATING TO FIRST POSITION COMMERCIAL MORTGAGES [DE 104]**

**I.      INTRODUCTION**

Defendant, Robert H. Shapiro's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the alternative, to Strike Allegations Relating to First Position Commercial Mortgages ("Motion"), should be denied it its entirety.[1] For starters, Defendant incorrectly styles his motion as seeking to dismiss the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure ("FRCP"). However, given the nature of Defendant's attack, which challenges an element of the Commission's cause of action, the Court must proceed under Rule 12(b)(6), accepting all of the Commission's allegations as true and construing the allegations in the light most favorable to the Commission. Under this framework, it is abundantly clear that as alleged, the First Position Commercial Mortgages ("FPCMs") at

---

[1] RS Trust has filed a Notice of Joinder to Shapiro's Motion. [DE 115], thus this Response addresses RS Trust's position as well.

issue are indeed securities both as notes and as investment contracts, and therefore the Court has jurisdiction to adjudicate this matter. Similarly, the Court should not strike any of the allegations relating to the FPCMs as immaterial, impertinent, or scandalous.

## II. FACTS THE COURT MUST ACCEPT AS TRUE

Woodbridge Group of Companies, LLC ("Woodbridge") raised in excess of $1.22 billion from over 8,400 nationwide investors. (Compl. [DE 22], ¶41). Its FPCM investment business model was to borrow money from investors and in exchange issue the FPCM Investor a promissory note ("FPCM Note") maturing in twelve (or sometimes up to eighteen) months, bearing an annual interest rate of 5-8%, payable monthly. (Compl. ¶56). The FPCM Note was issued by either Fund 1, Fund 2, Fund 3, Fund 3A, Fund 4, Bridge Loan Fund 1, or Bridge Loan Fund 2, all Delaware LLCs, which are each a defendant in this case (individually "Fund Entity," collectively "Fund Entities"). (Compl. ¶¶19-25, 56).[2] Shapiro was President and CEO of the Fund Entities, which were wholly owned by WMF Management, LLC, also controlled at all times by Shapiro. (Compl. ¶17).

Woodbridge represented that the FPCM Investment was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." (Compl. ¶57). Woodbridge told investors that it was making short-term, high interest rate loans to Third-Party Borrowers, which would be secured by real estate. (*Id.*). These Third-Party Borrowers, Woodbridge claimed, were bona-fide commercial property owners that could not obtain traditional loans and were willing to pay Woodbridge higher interest rates for short-term financing. (Compl. ¶58). Woodbridge provided FPCM Investors three primary documents: (l) a

---

[2] In addition to the FCPM notes, each Fund Entity sold interests ("Fund Offerings") pursuant to a Form D notice of exempt offering of securities filed with the Commission under to Rule 506 of Regulation D of the Securities Act of 1933, seeking to raise anywhere from $10 million to $100 million from investors. (Compl, ¶¶ 19-25,42, 62-73). Shapiro does not dispute that the Fund Offerings constitute securities.

2

promissory note, (2) collateral assignment of note and mortgage, and (3) an inter-creditor agreement. (Compl. ¶59). Each of these documents created the illusion of a legitimate business. (*Id.*).

Woodbridge promised FPCM Investors a pro-rata first position lien interest in the underlying property and told them that their returns would be generated by interest payments made by the Third-Party Borrowers. (Compl. ¶60). Woodbridge represented that the Fund Entity would in turn pool money received from many FPCM Investors and lend those funds to a Third-Party Borrower for one to two years and for up to only 60-70% of the value of the real estate securing the transaction, ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." (Compl. ¶61). Woodbridge did not evaluate whether the FPCM investors were "sophisticated," "accredited" or otherwise had any particular financial acumen. (Compl. ¶89).

Woodbridge represented to investors that the loans to Third-Party Borrowers typically ranged in amounts between $1 million and $90 million, depending on the value of the property. (Compl. ¶65) In fact, investors' funds in reality were used to purchase almost 200 residential and commercial properties primarily in Los Angeles, California and Aspen, Colorado, and titled in the name of a Shapiro-controlled entity. (Compl. ¶84). Woodbridge told investors that it conducted all due diligence including title search and appraisal on the commercial property and borrower. (Compl. ¶66). The investors did not have any role in selecting or analyzing the underlying properties. (Compl. ¶66). Shapiro identified the properties underlying the investments, approved every real estate purchase, and selected the amount and type of investments sold. (Compl. ¶67). In addition, the expected profitability of the investments, as well as the promise to pay returns, were derived solely from the efforts of Shapiro and

Woodbridge. (Compl. ¶68). Once investors provided their funds to Woodbridge, they had no control over how Shapiro and Woodbridge used their money. (Compl. ¶68).

At the end of the one-year term, the Third-Party Borrower was obligated to repay Woodbridge the principal amount of the loan and if it defaulted, Woodbridge could foreclose on the property to recover the amount owed. (Compl. ¶69). The transaction between the Fund Entity and the Third-Party Borrower was documented with a promissory note ("Fund Note") between the Fund Entity and the Third-Party Borrower, as well a mortgage in favor of the Fund Entity. (Compl. ¶70). The Fund Note carried an interest rate equal to usually 11% but sometimes as high as 15% per annum. (*Id.*). Therefore, if the Fund Entity loaned money to a Third-Party Borrower at 11% interest, but borrowed money from the FPCM Investor at 5% interest, then the spread or difference in rate of 6% was income available to the Fund Entity and Woodbridge that they could use to pay expenses including operating expenses and sales commissions. (Compl. ¶71). FPCM investors received 5% to 8% annual interest. (Compl. ¶108).

In numerous marketing materials sent to FPCM Investors, Woodbridge described this investment as "low risk," "simpler," "safe" and "conservative" and that investor returns were generated by the Third-Party Borrowers' interest payments. (Compl. ¶75). For example, Woodbridge wrote in marketing materials that "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents." (Compl. ¶76). This was a lie. (*Id.*). In fact, the "third party" borrowers were actually non-revenue earning, Shapiro-controlled entities that had no ability to pay interest to Woodbridge, which made payments to investors not through earnings, but by the continuous infusion of new investor funds and rollovers. (Compl. ¶78).

Woodbridge had a nationwide network of sales agents, and provided them information that the sales agents gave to FPCM investors. (Compl. ¶100). The external sales agents solicited the general public through marketing materials created, and in many cases, paid for by Woodbridge, which the external sales agents disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters and internet websites. (Compl. ¶101). Woodbridge retained sales commissions for the sale of their investment products (5% - 8% of the total amount raised) and paid their largely unregistered sales agent employees transaction-based commissions. (Compl. ¶98).

Woodbridge went on to represent to investors that having a "first-position" means "you have priority over any other liens or claims on a property if the property owner defaults." (Compl. ¶77). Woodbridge further reassured investors, telling them not to worry about the borrower not making their loans payments because Woodbridge would continue to pay the investor their interest payments. (Compl. ¶78). However, because of the absence of bona-fide revenue, Woodbridge had no ability to pay investors except by raising new funds and convincing existing investors to rollover their notes. (Compl. ¶¶9, 49, 78).

Woodbridge and Shapiro pooled FPCM Investors' and Fund Investors' investment funds into Fund Entity bank accounts and then further commingled them into a single Woodbridge or Woodbridge Structured Funding, LLC ("WSF") operating account under Shapiro's control. (Compl. ¶82). The commingling was extensive and resulted in more than 10,700 intra-company transfers totaling approximately $1.66 billion. (*Id.*). WMF also participated in the scheme by managing the various Fund offerings, including commingling all investor proceeds into one operating account and paying returns to investors using investor proceeds. (Compl. ¶83). An investment into Woodbridge was a Ponzi scheme, as Woodbridge generated virtually no income,

and thus investors' interest payments from Woodbridge were derived entirely from those of new investors. (Compl. ¶¶1, 4, 5, 47, 78-94, 111-112). On December 4, 2017, Woodbridge and its affiliates filed for Chapter 11 bankruptcy. (Compl. ¶37).

### III.   ARGUMENT

#### A.   Defendant's Motion is Akin to Motion to Dismiss Under FRCP 12(b)(6)

Although Shapiro styles his Motion as challenging subject matter jurisdiction pursuant to FRCP 12(b)(1), in fact it is an attack on an element of the Commission's causes of action, and therefore the Court must proceed under FRPC 12(b)(6). This Court analyzed a similar situation in *U.S. CFTC v. Aliaga,* 2011 WL 941373 (S.D. Fla. Feb. 28, 2011). In *Aliaga,* the CFTC brought an action alleging fraud in the solicitation of funds from retail investors for the purpose of trading certain commodities, and alleged that the defendants operated a Ponzi scheme. *See id.* at *1-2. The defendants moved to dismiss for lack of subject matter jurisdiction. *See id.* at *1.

In denying the motion, this Court differentiated between a "factual" and a "facial" attack upon jurisdiction. A "factual attack" challenges the existence of subject matter jurisdiction, irrespective of the pleadings, and the court is permitted to examine and weigh evidence relating to the court's subject matter jurisdiction and giving no presumptiveness of truth to the plaintiff's allegations. *See id.* (internal citations and quotations omitted). By contrast, in a facial attack, the court looks to the complaint to determine whether the plaintiff has alleged subject matter jurisdiction, and similar to a motion under Rule 12(b)(6), the court must consider the allegations to be true.

An attack on subject matter jurisdiction that "also implicates an element of the cause of action" is treated like a facial attack. *Id.* at 2. The court must "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (quoting *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)). This Court then

noted that a court must find that the question of jurisdiction and the merits of an action are intertwined where a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief. *See id.* In this scenario, the court must proceed under Rule 12(b)(6) and "accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff." *Id.*

Like Shapiro, the defendants in *Aliaga* moved to dismiss for lack of subject matter jurisdiction, arguing that the transactions at issue were not transactions in commodities governed by the Commodity Exchange Act. *See id.* Much like Shapiro's Motion, the defendants in *Aliaga* urged this Court to examine documents outside of the four corners of the complaint. *See id.* at 3. This Court rejected such advances. *See id.*

Recognizing that the issue turned on whether there was a "contract for the sale of a commodity for future delivery" under the relevant sections of the Commodity Exchange Act, this Court, relying on precedent such as *Garcia*, proceeded to analyze defendant's attack under the framework of Rule 12(b)(6). *See id*. at 4.[3] This Court thus reviewed the allegations contained within the complaint. *See id.* It found that the plaintiff's complaint made sufficient allegations that the defendants solicited and accepted funds from retail investors for the purposes of making transactions in foreign currency, thus concluding the plaintiff had sufficiently alleged the contracts at issue were contracts for the sale of a commodity for future delivery, and that the plaintiff had articulated enough facts to state a claim to relief that was plausible on its face. *See id.* at *4 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Defendant's motion was denied. *See id.*

---

[3] This Court noted one exception if the plaintiff's claim was "immaterial or insubstantial." *Id.* at *4. This is clearly not the case in the instant matter, and Shapiro makes no such argument to that effect.

### B. Standards by Which to Adjudicate Shapiro's Motion

Precisely as in *Aliaga,* Shapiro's attack implicates the merits of the Commission's causes of action, because if the FPCMs are not securities, the Commission would not have an action, as it pertains to the FPCMs,[4] under Section 5 of the Securities Act of 1933 ("Securities Act") (Count I), which requires the offending action to be "with respect to securities issued"; Section 17(a) of the Securities Act (Counts II-IV), which require the offending action to be "in the offer or sale of securities"; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), (Counts V-VII) which require the offending action to be "in connection with the purchase or sale of securities"; and aiding and abetting Section 15(a) of the Exchange Act (Count X), which requires "effecting transactions in securities or inducing or attempting to induce the purchase or sale of securities."[5]  Therefore, just as in *Aliaga*, this Court must analyze Shapiro's Motion under Rule 12(b)(6).

As this Court is familiar, under Rule 12(b)(6), the Court must accept as true all facts alleged in the Complaint in the light most favorable to the Commission.  *American United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007).  All reasonable inferences in the Complaint must be drawn in the Commission's favor.  *Ventrassist Pty. Ltd. v. Heartware, Inc.,* 377 F. Supp. 2d 1278, 1285 (S.D. Fla. 2005) (citing *Jackson v. Birmingham Bd. of Ed.*, 309 F.3d 1333, 1335 (11th Cir. 2002)).

Moreover, under the liberal notice pleading standards of Rule 8(a), all the Commission must do is set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2).  The Court's inquiry at the motion to dismiss stage still focuses on

---

[4] As noted above, Shapiro does not dispute that the Fund Offerings are securities.

[5] Section 20(a), Count VIII, Control Person Liability, is, as alleged, tied to an underlying violation of Section 10(b) of the Exchange Act.

whether the challenged pleadings "give the defendant fair notice of what the . . . claim is and the grounds on which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "The proper test is whether the complaint 'contains either direct or inferential allegations respecting all material elements necessary to sustain a recovery under some viable legal theory.'" *Financial Sec. Assur. Inc., v. Stephens Inc.,* 500 F.3d 1276, 1282 (11th Cir. 2007). The threshold for withstanding a motion to dismiss based on a claim of inadequate pleading is "exceedingly low." *In the Matter of Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995).

Because the Court can and need only consider the pleadings contained within the four corners of the Complaint, Shapiro's attempt to incorporate investor declarations and other extraneous matters must be rejected and ignored. *See Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is limited to the four corners of the complaint"). Moreover, the Court's determination of whether the FPCMs are securities is based on the reality of the transaction, not false statements made to solicit investors. *See SEC v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) (rejecting argument that collateralized notes were not securities when "the so-called collateralization appears to be a fiction").

### C. **The Well Pleaded Facts Clearly Indicate that FPCMs are Securities Under *Reves***

A "note" is presumed to be a security under *Reves v. Ernst & Young*, 494 U.S. 56 (1990); *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007).[6] This presumption can be rebutted if the note is an instrument the Court specifically said was not a security. *Reves,* 494 U.S. at 65; *SEC v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125 (9th Cir. 1991); *SEC v. Levin,* 2014 WL 11878357, *9 (S.D. Fla. Oct. 6, 2014). According to the Court, Congress'

---

[6] Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), define "security" to include "any note."

9

purpose "was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Reves*, 494 U.S. at 61 (emphasis in original); *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 742 (11th Cir. 2005). A note that is not among the list identified in *Reves* is a security unless it bears a "strong family resemblance" to the non-security notes identified in the opinion. *Reves*, 494 U.S. at 64-65; *Levin,* 2014 WL 11878357 at *9.

*Reves* established a four-factor family resemblance test to determine whether a note is a security: (1) the motivations of the buyer and seller; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the existence of an alternate regulatory regime. *See id*. at 66-67. Failure to satisfy one of the *Reves* factors is not dispositive, as the test is considered as a whole. *See, e.g., McNabb v. SEC*, 298 F.3d 1126, 1132-33 (9th Cir. 2002). If a note fails the family resemblance test, it is deemed a security and subject to federal securities regulation.

The first *Reves* factor examines the transaction "to assess the motivations that would prompt a reasonable seller and buyer to enter into it." *Reves*, 494 U.S. at 56. The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security). *See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994) (holding that mortgage participations were securities under *Reves*). The FPCM investors were unquestionably motivated by the high rate of return--5% to 8% annual interest--which Woodbridge offered. (Compl. ¶108). Woodbridge represented that the FPCM Investment was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." (Compl. ¶57). The *Reves* Court recognized that if the buyer is primarily interested in the profit the note is expected to generate, it is likely to be a security. *See Reves*, 494 U.S. at 66.

In addition, the raising of money "for the general use of a business enterprise or to finance substantial investments" is indicative of an investment motivation. *See Reves*, 494 U.S. at 66; *Pollack*, 27 F.3d at 812-13. Woodbridge used the funds raised to pay operating expenses and sales commissions (Compl. ¶¶71, 98), and also used the funds raised to provide loans to the Third-Party Borrowers (the majority of which were Shapiro's LLC entities), ranging from $1 million to $90 million (Compl. ¶65), which, in reality, were used to purchase almost 200 residential and commercial properties primarily in Los Angeles, California and Aspen, Colorado. (Compl. ¶84). Thus, the first factor is again satisfied.

The second factor is whether there is "common trading for speculation or investment" which is satisfied when the notes are "offered and sold to a broad segment of the public." *Reves*, 494 U.S. at 68; *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1287 (11th Cir. 2007). The FPCM notes here were sold to thousands of investors nationwide who invested hundreds of millions of dollars. (Compl. ¶41). Woodbridge had a nationwide network of sales agents, and provided them information that the sales agents gave to FPCM investors. (Compl. ¶100). The external sales agents solicited the general public through marketing materials created, and in many cases, paid for by Woodbridge, which the external sales agents disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters and internet websites. (Compl. ¶101). Such a widespread distribution to an extremely large number of holders is more typical of a securities offering than of a borrower/lender relationship. *See Wallenbrock*, 313 F.3d at 539 (notes sold to over 1,000 investors in at least 25 states constituted broad segment of public); *Wright v. Downs*, 1992 WL 168104, *3 (6th Cir. July 17, 1992) (notes sold to 200 investors constituted broad segment); *see also Deal v. Asset Mgmt. Grp.* 1992 WL 212482, *4 (N.D. Ill. Aug. 28, 1992) (holding that just six unrelated investors constituted broad

11

segment). Woodbridge also placed no limitations on who could purchase the notes, offering them to any member of the public with the money to buy them. (Compl. ¶¶1, 41, 89). *See SEC v. Thompson*, 732 F.3d 1151, 1165 (10th Cir. 2013) (noting that seller "sought to expand its distribution to anyone interested who had $100,000 to invest . . . and made its instruments available to anyone willing to pay.").

The next factor to analyze is the "reasonable expectations of the investing public" and whether there is a valuable return on an investment, as well as the length and characteristics of the note. *See*, *e.g., Stoiber v. SEC*, 161 F.3d 745, 751 (D.C. Cir. 1998) ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments."). This analysis is quite similar to that required by the first *Reves* factor—the FPCMs were held by thousands of individual investors and carried a promised high rate of return. (Compl. ¶¶60-61, 70-71). Woodbridge repeatedly advertised them as "safe," "secure," and "conservative." (Compl. ¶¶57, 75). These facts would lead a reasonable investor to believe that the FPCMs were investments and, in fact, investors viewed these as passive investments generating safe returns.

The final factor is whether there are any risk-reducing factors indicating that the notes are not in fact securities. *Reves*, 494 U.S. at 69. An alternative regulatory regime would need to be quite comprehensive, such as FDIC or ERISA regulations, to keep the notes from "escap[ing] federal regulation entirely." *Id*. Here, Shapiro cannot possibly allege there are risk-reducing factors. Shapiro did not use investors' funds as promised. (Compl. ¶¶41, 47, 80, 84, 85, 87). Instead of funding loans to Third-Party Borrowers, Shapiro and his web of LLCs used newer investor funds to make interest payments to other investors, in classic Ponzi scheme fashion. (Compl. ¶¶41, 47, 80, 84, 85, 87). It is quite clear that there are wholly inadequate risk-reducing

factors and any recuperation of investor assets will be based on the ability of the Commission to seek redress of investor harm in this action and/or in the parallel bankruptcy action. *See Pollack*, 27 F.3d 808 (holding state mortgage regulations inadequate); *McNabb*, 298 F.3d 1126 (holding that state property laws are "not the type of regulatory schemes contemplated by the [*Reves*] test").

Importantly, the FPCMs do not involve one-on-one transactions, but, as demonstrated, are comprised of large pools of unrelated, private investors who do not know one another. (Compl. ¶¶60-61). They differ substantially from sophisticated institutions, such as banks, engaged in the business of providing mortgages or consumer lending. While the FPCM investors must rely on limited or no information about their investment, a commercial bank deals "face-to-face with the promissor," putting the bank in a position to make an informed decision and protect itself against loss. *Great Western Bank and Trust v. Kotz*, 532 F.2d 1252, 1262 (9th Cir. 1976).

No matter whether the FPCM promissory notes are weighed against the four *Reves* factors individually or collectively, Shapiro cannot satisfy his burden of establishing that the notes are not securities and subject to federal securities regulation. The FPCM promissory notes do not fall into any category of non-security notes recognized in *Reves*, and application of the family resemblance test confirms that they are securities. As such, the FPCMs offered by Woodbridge are securities within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

### D. In the Alternative, FPCMs are Investment Contracts and Hence Are Securities

Even under an analysis of the FPCMs as investment contracts, they would still meet the definition of a security. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the

Exchange Act define "security" to include, among other things, "investment contracts." In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

The Eleventh Circuit employs a "broad vertical commonality test," which only requires a showing that the investors are dependent upon the expertise or efforts of the investment promotor for their returns. *SEC v. ETS Payphone, Inc.,* 300 F.3d 1281, 1284 (11th Cir. 2004), *re-aff'd by SEC v. ETS Payphones, Inc.* 408 F.3d 727, 732 (11th Cir. 2005). The investment contract analysis is "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Indeed, Courts have classified as investment contracts a kaleidoscope of investment opportunities that satisfy *Howey*'s three criteria. *See, e.g., id*. (holding that sale of citrus groves, in conjunction with a service contract, is an investment contract); *Bamert v Pulte Home Corp.*, 2011 WL 5105925 (11th Cir., Oct. 26, 2011) (real estate purchases with two-year management agreements for rentals); *Teague v. Bakker*, 35 F.3d 978, 981, 990 (4th Cir. 1994) (same regarding purchase of life partnership in evangelical community); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 132 (5th Cir. 1989) (same regarding cattle-feeding and consulting agreement).

Here, in analyzing the *Howey* test, FPCM investors clearly made an "investment of money." (Compl. ¶¶ 41, 56). Thousands of people invested hundreds of millions of dollars in promissory notes based on the supposed payment of interest from hundreds of commercial property Borrowers. (Compl. ¶¶1-3, 56-58). The FPCM investors had no role in selecting or analyzing the underlying commercial properties. (Compl. ¶¶66-68). Here, the expected

profitability of the investments, as well as the promise to pay returns, were derived solely from the efforts of Woodbridge. (*Id.*). Woodbridge further reassured investors, telling them not to worry about the borrower not making their loans payments because Woodbridge would continue to pay the investor their interest payments. (Compl. ¶78). Once investors purchased the FPCM notes, they had no control over how Woodbridge used their money. (*Id.*). Moreover, investors' funds were combined in a pool with funds of other investors, (Compl. ¶61), as Woodbridge and Shapiro pooled FPCM Investors' and Fund Investors' investment funds into Fund Entity bank accounts and then further commingled them into a single Woodbridge or WSF operating account under Shapiro's control. (Compl. ¶82). The commingling was extensive and resulted in transfers totaling approximately $1.66 billion and exceeded 10,700 transactions. (*Id.*). WMF also participated in the scheme by managing the various Fund offerings, including commingling all investor proceeds into one operating account and paying returns to investors using investor proceeds. (Compl. ¶83). These characteristics clearly demonstrate the vertical commonality of the FPCM investment. *See e.g. SEC v. Chemical Trust,* 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000) (pooled investment indicates vertical commonality). And of course, Woodbridge was a Ponzi scheme, where the interest payments to old investors were contingent on the influx of new investor money. (Compl. ¶¶1, 4, 5, 47, 79-94, 111-112). *See e.g. ETS Payphones, Inc.,* 408 F.3d at 732 (finding common enterprise where 99% of investors leased back phones to company operated by promoter and were reliant on promoter to attract new investors to pay earlier ones); *Hays v. Adam,* 512 F. Supp. 2d 1330, 1337 (N.D. Ga. 2007) (By virtue of Ponzi scheme nature of the investment, the fortunes of investors were interwoven with and dependent upon the efforts and success of the defendants).

## E. Shapiro's Motion to Strike the Allegations Relating to the Shapiro Counts as Immaterial, Impertinent, or Scandalous is Unwarranted

Shapiro's argument has no merit in seeking this Court to strike the Commission's charges relating to the FPCM Notes as immaterial, impertinent, and scandalous. A motion to strike is governed by Rule 12(f) that provides in relevant part that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FRCP 12(f). However, motions to strike are generally disfavored by courts and are considered a "drastic remedy to be resorted to only when required for the purposes of justice." *Augustus v. Board of Public Instruction,* 306 F.2d 862, 868 (5th Cir. 1962). Motions to strike "will usually be denied [by the court] unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Id.; Jackson v. Grupo Industrial Hotelero, S.A.,* 2008 WL 4648999 (S.D. Fla. Oct. 20, 2008). Here, Shapiro's sole argument in support of his motion to strike is that the FPCMs are not securities. Because, as demonstrated above, the FPCMs are indeed securities, and withstand scrutiny under Rule 12(b)(6), Shapiro's justification for striking the allegations necessarily fails.

## IV. CONCLUSION

Shapiro's Motion to Dismiss for Lack of Subject Matter Jurisdiction is neither supported by law or fact. His motion should be denied in its entirety.

Respectfully submitted,

Dated: March 6, 2018    By:    */s/ Russell Koonin & Christine Nestor*
Russell Koonin & Christine Nestor
Senior Trial Counsel
kooninr@sec.gov; nestorc@sec.gov
FL Bar No.: 474479; FL Bar No. 597211
Telephone: (305) 982-6385; (305) 982-6367

>Attorneys for Plaintiff
>**SECURITIES AND EXCHANGE COMMISSION**
>801 Brickell Ave., Suite 1800
>Miami, Florida 33131
>Telephone: (305) 982-6300
>Facsimile: (305) 536-4154

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM-ECF on all counsel or parties of record on the Service List below.

>/s/ *Russell Koonin*
>Russell Koonin, Esq.

## SERVICE LIST

Adam L. Schwartz, Esq.
aschwartz@homerbonner.com
Kevin P. Jacobs, Esq.
kjacobs@homerbonner.com
Homer Bonner Jacobs
1200 Four Seasons Tower, 1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5116

Ryan Dwight O'Quinn, Esq.
Ryan.OQuinn@dlapiper.com
Elan Gershoni
Elan.gershoni@dlapiper.com
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: 305.423.8500

Jeffrey E. Marcus, Esq.
jmarcus@mnrlawfirm.com
Michael A. Pineiro, Esq.
mpineiro@mnrlawfirm.com
Allison M. Green, Esq.
agreen@mnrlawfirm.com
Marcus Neiman & Rashbaum LLP
2 South Biscayne Boulevard, Suite 1750
Miami, Florida 33131
Telephone:  305.400.4262

Armando Rosquete, Esq.
Armando.rosquete@gmail.com
Armando Rosquete, P.A.
66 West Flagler Street, Suite 1000
Miami, Florida 33130
Telephone: 305.470.2060

Robert P. Charbonneau, Esq.
rpc@agentislaw.com
Matthew Petrie, Esq.
map@agentislaw.com
Agentis PLLC
501 Brickell Key Drive, Suite 300
Miami, Florida 33131
Telephone: 305.722.2002

{Response to Motion to Dismiss DE 104}