**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-24624-CIV-COOKE**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

ROBERT H. SHAPIRO,
WOODBRIDGE GROUP OF COMPANIES, LLC
d/b/a WOODBRIDGE WEALTH,
RS PROTECTION TRUST, WMF MANAGEMENT, LLC,
WOODBRIDGE STRUCTURED FUNDING, LLC,
WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC,
WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC,
WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC,
WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC,
WOODBRIDGE MORTGAGE INVESTMENT FUND 4, LLC,
WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 1, LLC,
WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 2, LLC,
144 WOODBRIDGE-AFFILIATED PROPERTY
LIMITED LIABILITY COMPANIES,
131 WOODBRIDGE-AFFILIATED HOLDING
LIMITED LIABILITY COMPANIES,

Defendants, and

JERI SHAPIRO,
WOODBRIDGE REALTY OF COLORADO, LLC d/b/a
WOODBRIDGE REALTY UNLIMITED,
WOODBRIDGE LUXURY HOMES OF CALIFORNIA, INC.
d/b/a MERCER VINE, INC.,
RIVERDALE FUNDING, LLC,
SCHWARTZ MEDIA BUYING COMPANY, LLC,
WFS HOLDING CO., LLC,

Relief Defendants.
_______________________________________________/

**RELIEF DEFENDANTS' MOTION TO DISMISS AND, IN THE ALTERNATIVE, MOTION FOR MORE DEFINITE STATEMENT AND MOTION TO STRIKE**

Woodbridge Realty of Colorado, LLC, Woodbridge Luxury Homes of California, Inc., Riverdale Funding, LLC, and WFS Holding Co., LLC (hereinafter "Relief Defendants") hereby move to dismiss the SEC's December 20, 2017 Complaint under Rules 9(b) and 12(b) of the Federal Rules of Civil Procedure and, alternatively, move for a more definite statement under Rule 12(e) and move to strike the SEC's prayer for disgorgement under Rule 12(f).

## SUMMARY OF THE COMPLAINT'S ALLEGATIONS RELEVANT TO THE RELIEF DEFENDANTS

The SEC alleges that from July 2012 through December 4, 2017, Robert H. Shapiro and Defendant Woodbridge (Compl., ¶15) engaged in a real-estate based "Ponzi scheme" using 275 Limited Liability Companies. It alleges that Woodbridge sold investors a twelve-to-eighteen-month First Position Commercial Mortgage Notes ("FPCM Notes") bearing 5%-8% interest as well as private-placement fund offerings with five-year terms. Compl., ¶42. "The purported revenue source enabling Woodbridge to make the payments to [investors] was the interest [that] a Woodbridge affiliate would be receiving from mainly one-year loans to supposed third-party commercial property owners ('Third-Party Borrowers')." *Id*., ¶43. The Complaint alleges that Woodbridge told investors that these Third-Party Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing and that Woodbridge also "purchase[d] properties to develop and sell for a profit." *Id.*, ¶44.

The SEC alleges that instead of issuing loans to unaffiliated Third-Party Borrowers, Woodbridge and Mr. Shapiro used investors' funds to purchase approximately 200 residential and commercial properties and place title to those properties in the name of one of 144 Limited Liability Companies. *Id*., ¶84. According to the SEC, these 144 Limited Liability Companies, collectively defined as the "Shapiro Property LLCs" along with 131 Limited Liability Companies

defined as the "Shapiro Holding LLCs" were "essential to Shapiro's [alleged] fraudulent business operation." *Id.*, ¶¶4, 26; Appendix "A" (listing the "Shapiro Property LLCs").

As part of the alleged scheme the SEC alleges that these Relief Defendants "[w]ithout a legitimate basis, . . . received investors' proceeds emanating from the Defendants' [alleged] fraud." *Id.*, ¶¶ 29-31, 33; *see also id.*, ¶11 ("[Relief Defendants] all received proceeds of the fraud without any legitimate entitlement to the funds."). Relief Defendant Woodbridge Realty of Colorado, LLC is alleged to have been "formed on August 20, 2014" and described as "a real estate brokerage firm responsible for purchasing and selling Colorado real property owned by several of the Shapiro Property LLC." *Id.*, ¶29. Relief Defendant Woodbridge Luxury Homes of California, Inc.[1] is alleged to have been "formed on August 6, 2014" and described as a "real estate brokerage firm responsible for purchasing, developing, and selling California real property owned by several of the Shapiro Property LLCs." *Id.*, ¶30. Both Woodbridge Realty and Woodbridge Luxury Homes are alleged to have "received sales commissions as a result of real estate transactions," but the Complaint does not identify the real-estate transactions in question or details regarding the sales commissions such as their amount or when they were received. *Id.*, ¶¶ 119-20. Relief Defendant Riverdale Funding LLC is alleged to have been "formed in 2012" and described as being "engaged in the business of providing hard-money loans to third-party clients and servicing those loans." *Id.*, ¶31. Finally, WFS Holding Co. is alleged to have been "formed in September 2017" and to have been the entity through which Mr. Shapiro was retained and paid "as a consultant" in connection with Woodbridge's December 1, 2017, bankruptcy filing. *Id.*, ¶33.

---

[1] The Complaint refers to Woodbridge Luxury Homes of California, Inc. as "Mercer Vine." Compl., ¶11 ("Woodbridge Luxury Homes of California, Inc. d/b/a Mercer Vine, Inc.")

In light of the legal analysis underlying disgorgement against a relief-defendant, it is worth noting that at various points, the SEC's Complaint stops short of casting Woodbridge's operations as completely fraudulent. For example, the SEC alleges that the "*vast majority* of the purported Third-Party Borrowers" were LLCs that Mr. Shapiro owned and controlled, and he and Woodbridge supported their business operations "*nearly entirely*" by raising and using new investor funds. *Id*., ¶47 (emphasis added). Similarly, it states that "*virtually* no Third-Party Borrowers would be making payments to Woodbridge . . ." and indicates that, at one unspecified point after 2013, 30% of Woodbridge's overall loan portfolio was comprised of funds loaned to entities *not* affiliated with Mr. Shapiro or a Shapiro Property LLC. *See id.*, ¶78; ¶86 ("Beginning in 2013 . . . the amount of funds loaned to entities affiliated with Shapiro was in excess of 70%--and as high as 98%--of Woodbridge's overall loan portfolio.").

In so far as the SEC does not allege that Woodbridge operated improperly from its inception or in every instance, these allegations help contextualize the ambiguous allegations made against the Relief Defendants. In light of the allegations highlighted above, this Court should require the SEC, either by way of dismissal or more definite statement, to provide sufficient notice and greater clarity about the details surrounding the Relief Defendants' allegedly improper receipt of investor proceeds. Further, at the heart of SEC's allegations against the Relief Defendants is a prayer for disgorgement relief that this Court should strike under Rule 12(f) pursuant to *Kokesh v. S.E.C.,* 137 S.Ct. 1635 (2017).

# ARGUMENT

## I. RELEVANT LEGAL STANDARDS

### A. Standard Under Fed. R. Civ. 12(b)(6)

While Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," "it does demand 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Sinaltrainal v. Coca-Cola Co*., 578 F.3d 1252, 1261 (11th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "[O]nly a claim that states a plausible claim for relief survives a motion to dismiss." *Sinaltrainal*, 578 F.3d at 1260. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Though a court makes reasonable inferences in the plaintiff's favor, it is "not required to draw plaintiff's inference." *Sinaltrainal*, 578 F.3d at 1261. Similarly, "[a]lthough it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions." *Id.* at 1260. (citing *Iqbal*, 556 U.S. at 678).

### B. Standard for Pleading Fraud Under Fed. R. Civ. P. 9(b)

For allegations of fraud or mistake, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply. *See Brightstar Corp. v. WSA Distrib.*, No. 09-20795, 2010 U.S. Dist. LEXIS 25759, *5-6 (S.D. Fla. Mar. 17, 2010). Rule 9(b) provides that "[i]n alleging fraud

or mistake, a party must state with particularity the circumstances constituting fraud or mistake" Fed. R. Civ. P. 9(b). The purpose of the Rule is to "alert defendants to the precise misconduct with which they are charged and protect defendants against spurious charges of immoral and fraudulent behavior." *See BB In Tech. Co. v. JAF, LLC*, 242 F.R.D. 632, 639 (S.D. Fla. 2007) (internal citations and quotations omitted). Rule 9(b)'s particularity requirement in fraud cases is not met unless a complaint sets forth "(1) precisely what documents or oral representations were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation omitted). In other words, the rule requires that claims of fraud be accompanied by the "who, what when, where, and how" of the conduct at issue. *Begualg Inv. Management Inc. v. Four Seasons Hotel Ltd.*, No. 10–22153–CIV, 2011 WL 4434891, * 2 (S.D. Fla. Sept. 23, 2011).

**C. Standard for More Definite Statement Under Fed. R. Civ. P. 12(e)**

Rule 12(e) provides that a party "may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "If a pleading fails to specify the allegations in a manner that provides sufficient notice or does not contain enough information to allow a responsive pleading to be framed," a motion for more definite statement under Rule 12(e) is appropriate. *O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1369 (S.D. Fla. 2016) (internal citations and quotations omitted). "[A] pleading is insufficient [under Rule 12(e)] if a defendant does not know the basic facts that constitute the claim for relief against it. Such detail should not be left to discovery, for the purpose of discovery is to find out additional facts about a well-pleaded claim,

not to find out whether such a claim exists." *Clearwater Consulting Concepts, LLP v. Imperial Premium Fin., LLC*, No. 09-CV-81042, 2010 WL 916392, at *1 (S.D. Fla. Mar. 11, 2010) (internal citations omitted).

**D. Standard for Motion to Strike Under Fed. R. Civ. P. 12(f)**

Pursuant to Rule 12(f) the Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Among the matters that a Court can strike are "prayer[s] for relief seeking damages that are not recoverable as a matter of law." *Ariste v. Broward College*, No. 15-CV-61788, 2015 WL 13310399, *1 (S.D. Fla. Oct. 21, 2015); *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*, 2009 WL 3460218, at *6 (N.D. Ill. Oct. 20, 2009) (striking prayer for disgorgement that plaintiff was not entitled to).

**II. DISMISSAL IS APPROPRIATE BECAUSE THE SEC'S ALLEGATIONS AS TO THE RELIEF DEFENDANTS FAIL TO MEET NECESSARY PLEADING REQUIREMENTS AND, AT A MINIMUM, WARRANT A MORE DEFINITE STATEMENT UNDER RULE 12(E).**

The SEC's Complaint falls short of Rule 12(b) and Rule 9(b). The SEC's allegations against the Relief Defendants fail under Rule 12 because they do not provide sufficient factual detail to plead an entitlement to the relief the SEC seeks. The SEC also fails to allege with particularity as required by Rule 9(b) that the Relief Defendants received tainted assets and have no legitimate claim to them for purposes of disgorgement relief. The important details necessary under Rules 12 and 9(b) are absent even though the SEC has been investigating Woodbridge since September 2016. More specifically, the SEC's Complaint fails to adequately allege: (i) who transferred the assets in question; (ii) what the nature of the assets transferred were; (iii) when the assets received by each Relief Defendant were transferred; (4) how the assets were transferred; and (iv) how any specific transfers fit into the larger scheme of allegedly unlawful conduct. *Cf. FTC v. Johnson,* No. 10-CV-02203, 2013 WL 2460359, at *8 (D. Nev. June 6, 2013) (concluding

that FTC's Complaint against relief defendants satisfied Rule 9(b) precisely because FTC had alleged the nature of the assets, the timing of the transfers, who was involved in the transfers, and how the transfer fit into the scheme).

The SEC's allegations that the Relief Defendants "[w]ithout any legitimate basis . . . received investors' proceeds emanating from the Defendants' securities fraud" is conclusory and insufficient under Rule 9(b). *See id.* at *8 (rejecting relief defendants' argument that the FTC had failed to allege with particularity that they have no legitimate claim to assets because "[i]n addition to stating the elements required for an equitable disgorgement, *the FTC provide[d] specific, factual examples of gratuitous transfers made to Relief Defendants that demonstrate[d] that they [were] in possession of ill-gotten assets without any legitimate claim to them*"). *SEC v. McKelvey*, No. 15-CV-80496, 2015 WL 1254728 (S.D. Fla. Nov. 9, 2015) (Marra, J.) is instructive on the issue of Rule 9(b)'s applicability to relief defendants in SEC enforcement actions. In *McKelvey*, the main defendants and the relief defendants moved for dismissal under Rule 12(b)(6) and Rule 9(b) and, alternatively, sought a more definite statement under Rule 12(e). The Court required that the SEC re-plead to meet the requirements in Rule 9(b), reasoning that:

> While the Complaint alleges that Defendants filed numerous false and forged certifications, forms and agreements, the Complaint does not provide adequate detail with respect to the dates of these filings. Moreover, given the sheer number of companies at issue, the Complaint fails to identify the relationship between the false statements and the particular company at issue. Instead, the Complaint simply alleges a broad-based scheme that lasted the period of January 2007 through December 2013. In fact, the Complaint is devoid of specific dates connecting the conduct and misrepresentations of [Defendants] to a specific date and time. While the Court agrees with Plaintiff that there are other means to satisfy the specificity rule besides listing the date and time of the fraud, given the sheer volume of forged and falsified documents alleged, it is necessary to provide a workable framework to identify the specific alleged false statements to a particular date, defendant and company.

*Id.* at *5.

Here, like in *McKelvey*, the SEC's Complaint fails to specify at any point in its 47 pages which of the **144** Shapiro Property LLCs or **131** Shapiro Holding LLCs may have transferred assets to any of the Relief Defendants—this generalized and sweeping pleading falls short of what is required under Rule 9(b). For example, the SEC alleges broadly and without more details that Relief Defendants Woodbridge Realty of Colorado and Woodbridge Luxury Homes of California received or handled assets "owned by several of the Shapiro Property LLC." These unadorned allegations do not even identify which of the 144 Shapiro Property LLCs transferred assets to either of these entities let alone when or how these entities might have "received investors' proceeds emanating from the Defendants' alleged securities fraud." Compl., ¶¶29-30.

Similarly, as in *McKelvey*, the allegations are insufficient because they do not set forth any kind of "workable framework," *McKelvey*, 2015 WL 1254728, at *5, that provides the Relief Defendants with sufficient notice of the claims under Rule 9(b) or Rule 12(e). For example, as to Relief Defendant Riverdale the SEC states only that it was "engaged in the business of providing hard-money loans to third-party clients and service those loans" and simply alleges it "received millions of dollars from Woodbridge . . . without a legitimate basis"—no substantive details whatsoever are provided regarding the alleged "millions of dollars" in tainted assets. Compl., ¶31. Considering the "sheer number of companies at issue," and the complexities of the case, these allegations fall far short of meeting minimal pleading requirements.

As to WFS Holding, the Complaint alleges only that "on the eve of its bankruptcy filing, Woodbridge retained Shapiro as a consultant to the company" and that "Shapiro, through WFS Holding, has been paid at least $175,000 thus far." Compl., ¶121. Wholly absent from the SEC's allegations are the crucial details required for WFS Holding to craft a response, including: (i) the

source of the $175,000 payment; (ii) how those funds are tainted; (iii) that Mr. Shapiro failed to render services as a consultant; or (iv) why the consultant arrangement is otherwise improper. Instead, the SEC relies on the cryptic allegation that "without any legitimate basis, WFS Holding received investors' proceeds emanating from the Defendants' securities fraud." Compl., ¶121. The SEC, however, does not expressly allege that the $175,000 paid to Mr. Shapiro came from these "investor proceeds." The SEC's attempt to shoe-horn the Relief Defendants into this action with its bare-bones, ambiguous allegations should not be countenanced—it has not demonstrated that it has enough facts to establish the elements necessary for the relief it seeks.

## III. Dismissal for Lack of Subject-Matter Jurisdiction is Also Appropriate Because the FPCM Notes Do Not Constitute "Securities" Within the Meaning of The Securities Act or The Exchange Act.

The Relief Defendants adopt and incorporate by reference Mr. Shapiro's "Motion to Dismiss Causes of Action Based on First Position Commercial Mortgage for Lack of Subject Matter Jurisdiction, or in the Alternative, to Strike Allegations Relating to First Position Commercial Mortgages," (DE 104). The SEC's demanded relief against the Relief Defendants is contingent upon the First Position Commercial Notes ("FPCM Notes") constituting "securities" and if this Court determines that they are not, then dismissal on subject-matter jurisdiction grounds would be appropriate against the Relief Defendants as well.

The SEC asserts that the FPCM Notes are "securities" and, thus, that this Court has subject matter jurisdiction over the claims against Mr. Shapiro relating to the FPCM Notes pursuant to the Securities Act of 1933 (the "Securities Act") and Securities Exchange Act of 1934 (the "Exchange Act"). In truth, however, the notes are not "securities" within the meaning assigned by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56 (1990). Pursuant to the Supreme Court's *Reves* test, the FPCM Notes are not "securities" because: (i) the FPCM Notes' proceeds were not used to fund

Woodbridge's general operations, rather, they were used to fund specific loans; (ii) the FPCM Notes were not transferrable or assignable; (iii) the FPCM Lenders could only reasonably believe that the notes entitled them to interest payments, not a portion of Woodbridge's profits; and (iv) the FPCM Lenders' loans were secured by a first position security interest on collateral. Since the FPCM Notes are not "securities," the notes are not governed by the Securities Act or the Exchange Act, which only regulate "securities." Therefore, the Court lacks subject matter jurisdiction to determine claims of wrongful conduct relating to the FPCM Notes.

## IV. THE COURT SHOULD "STRIKE" THE SEC'S REQUEST FOR DISGORGEMENT UNDER RULE 12(F).

The Relief Defendants also ask that this Court strike the SEC's request for disgorgement pursuant to *Kokesh v. S.E.C.,* 137 S.Ct. 1635 (2017) and adopt and incorporate by reference Mr. Shapiro's "Motion to Strike Prayer for Disgorgement in Complaint," (DE 103). In *Kokesh*, the Court limited the SEC's enforcement powers with respect to the SEC's disgorgement efforts. In that opinion, the Court held that disgorgement is a "penalty." *Id.* at 1645 ("Disgorgement as it is applied in SEC enforcement proceedings, operates as a penalty under §2462."); *id.* at 1644 ("SEC disgorgement thus bears all the hallmarks of a penalty . . ."); *cf. S.E.C. v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) (affirming district court's opinion that "the disgorgement of all ill-gotten gains realized from the alleged violations of the securities laws . . . can truly be regarded as nothing other than a forfeiture (both pecuniary and otherwise), which remedy is expressly covered by [28 U.S.C § 2462"]).

In *Kokesh*, the Supreme Court rejected arguments that disgorgement is remedial. Specifically, it disagreed with the SEC's contention that disgorgement is a remedy that seeks to "restore the status quo," observing that SEC disgorgement sometimes goes merely remedying unjust enrichment and exceeds the alleged profits obtained through a securities violation. *Id.* at

1645. The Court also highlighted how SEC disgorgement is often ordered without considering the defendants' expenses which reduce his or her "ill-gotten gains." Defendants have been required to disgorge "gross proceeds" regardless of the amount of actual gains received. *Id.* at 1644-45. Under those circumstances, disgorgement does not restore the status quo, it leaves the defendant in a worse position and, therefore, is not "remedial.". *Id*.

And even though SEC disgorgement might serve compensatory goals in some cases, "sanctions frequently serve more than one purpose." *Id.* at 1645. Despite those dual purposes, the Supreme Court stated that any civil sanction that serves both remedial and penal purposes should be considered a "penalty"—its compensatory function does not render it an equitable remedy. It is a penalty and should be treated as such. *Id.* Accordingly, the Supreme Court's determination that SEC disgorgement "bears all the hallmarks of a penalty," is problematic in so far as a "relief defendant" is traditionally understood as a "nominal" party who "is not a real party in interest" and "is not accused of wrongdoing." *See, e.g., S.E.C. v. Founding Partners Capital Mgmt*., 639 F. Supp. 2d 1291, 1293 (M.D. Fla. 2009) (internal citations and quotations omitted); *S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) (stating that a relief defendant "is not a real party in interest").

The caselaw interpreting *Kokesh* is sparse given its recent vintage.[2] But while courts have generally continued to assume the power to order disgorgement, they have also "*recognize[ed] that some amount of uncertainty has been introduced into the legal landscape*." *SEC v. Jammin Java Corp*., No. No. 2:15–cv–08921 SVW, 2017 WL 4286180, at *3 (C.D. Cal. Sept. 14, 2017)

[2] The SEC in response to Mr. Shapiro's Motion to Strike (DE 103) cites to various cases where courts have declined to extend the opinion. *See* DE 119 at 6-7 ("SEC Response to Robert H. Shapiro's Motion to Strike Prayer for Disgorgement in Complaint"). But the SEC's portrayal of the current state of precedent regarding *Kokesh* merits more nuance and ignores judicial acknowledgment that *Kokesh* has injected some degree of uncertainty into the doctrine of disgorgement in SEC actions. This point is borne out in the multiple cases referenced herein.

(emphasis added). Another Court noted that it had relied on precedents "that *might subsequently have been abrogated by the Supreme Court in Kokesh*. . ." *SEC v. Amerindo Inv. Advisors Inc.*, 2017 WL 3017504, at *8 (S.D.N.Y. July 14, 2017) (Sullivan, J.) (emphasis added). Further, one court observed in its restitution analysis that "the SEC's prayer for disgorgement, *to the degree that such a remedy is available in a civil enforcement action*, would be duplicative at best and potentially disruptive" and supported that observation by declaring that "[i]t bears noting that the Supreme Court earlier this month expressly reserved the question 'whether courts possess authority to order disgorgement in SEC enforcement proceedings.'" *United States v. Latorella*, No. CR 10–10388–DPW, 2017 WL 2785413, at *4 n.4 (D. Mass. June 27, 2017) (Woodlock, J.) (emphasis added). Similarly, the court in *S.E.C. v. Premier Links, Inc.*, No. 14-CV-7375, 2017 WL 7792702, at *9 (E.D.N.Y. Sept. 14, 2017), discussed the implications of *Kokesh*, cited to *Kokesh*'s oral-argument transcripts where some of the Justices called into question the SEC's statutory authority to pursue disgorgement, and stated:

> *The Supreme Court indicated that it may be willing to revisit the viability of the disgorgement remedy*, noting: "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context[.] The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." *Kokesh*,, 137 S.Ct. at 1642 n.3; *see also* Tr. of Oral Argument at 31:16-21, *Kokesh v. S.E.C.,* 137 S.Ct. 1635 (2017) (No. 16-529) (CHIEF JUSTICE ROBERTS: "One reason we have this problem is that the SEC devised this remedy or relied on this remedy without any support from Congress."); *id.* at 7:20-8:2 (JUSTICE KENNEDY: "Is it clear that the district court has statutory authority to do this? ... Is—is there specific statutory authority that makes it clear that the district court can entertain this remedy?").

*S.E.C. v. Premier Links, Inc.*, No. 14-CV-7375, 2017 WL 7792702, at *9 (E.D.N.Y. Sept. 14, 2017), report and recommendation adopted by 2018 WL 1064575 (E.D.N.Y. Feb. 23, 2018). Judge Merritt in his dissent in *Osborn v. Griffin*, 865 F.3d 417 (6th Cir. 2017) also expressed the

sentiment that equitable disgorgement might be living on borrowed time in the SEC context, stating:

> The idea of "equitable disgorgement" is a doctrine of a very recent vintage used in SEC fraud cases, primarily in the Second Circuit. *See SEC v. Cavanagh*, 445 F.3d 105, 116–20 (2d Cir. 2006). The doctrine is used to remove unlawful gains from insider traders because such cases do not cause damages to any discrete plaintiffs. The theory is not applicable to cases of this kind in which there are identifiable victims with a right to recover damages. *Indeed, the theory may not even be applicable in SEC contexts for much longer in light of the Supreme Court's recent opinion on the matter. See. Kokesh v. SEC,* 137 S.Ct. 1635, 1642 n.3 (2017) ("Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context.").

*Id.* at 471, n.1 (emphasis added).

The SEC's efforts to limit *Kokesh* to 28 U.S.C. §2462 also overlooks *Saad v. SEC*, 873 F.3d 297 (2017), where the D.C. Circuit asked the SEC to assess whether a FINRA expulsion was "remedial" or "punitive" under *Kokesh*. *Saad* did not involve a statute-of-imitations issue or disgorgement. As a matter of agency deference, the D.C. Circuit nevertheless asked the SEC "to address . . . the relevance—if any—of the Supreme Court's decision in [*Kokesh*]" on whether a FINRA lifetime ban is "impermissibly punitive." *Saad v. SEC*, 873 F.3d 297, 304 (2017). As part of that opinion, Judge Cavanaugh concurred and posited that *Kokesh* might have more far reaching implications than the SEC envisions, reasoning that:

> Our precedents say that the SEC may approve expulsion or suspension of a securities broker as a remedy, but not as a penalty. . . . Our use of the term "remedial" to describe expulsions or suspensions finds its roots in a single, unexplained sentence in a 77-year-old Second Circuit case. *See Wright v. SEC*, 112 F.2d 89, 94 (2d Cir. 1940). . . .
>
> My fundamental problem with this line of cases is that the term "remedial" makes little sense when describing the expulsion or suspension of a securities broker. . . .
>
> [H]ere, the Supreme Court's recent decision in [*Kokesh*], means that we can no longer characterize an expulsion or suspension as remedial. After the Supreme

> Court's decision in *Kokesh*, in other words, our precedents characterizing expulsions or suspensions as remedial are no longer good law.
>
> In *Kokesh*, the Supreme Court ruled that disgorgement paid to the Government is a "penalty" subject to the five-year statute of limitations in 28 U.S.C. § 2462. 137 S.Ct. at 1643–45. . . . Notably, the Supreme Court's decision in *Kokesh* overturned a line of cases from this Court that had concluded that disgorgement was remedial and not punitive. *See, e.g., Zacharias v. SEC*, 569 F.3d 458, 471–72 (D.C. Cir. 2009). ***As I see it, the Kokesh analysis matters here. The Supreme Court's reasoning in Kokesh was not limited to the specific statute at issue there. . . .***
>
> Our pre-*Kokesh* cases in turn say that the SEC may uphold FINRA sanctions as not being excessive or oppressive if the sanctions are remedial, not punitive. *See Siegel v. SEC,* 592 F.3d 147 (D.C. Cir. 2010); Paz, 566 F.3d at 1175–76. And our pre-*Kokesh* cases further say that an expulsion or suspension can be considered remedial, not punitive.
>
> My sole point here is to cast doubt on our pre-*Kokesh* cases' characterization of an expulsion or suspension as remedial rather than punitive. . . . .
>
> If FINRA and the SEC must justify expulsions or suspensions as punitive (as I believe they must after *Kokesh*), they will have to explain why such penalties are appropriate under the facts of each case. FINRA and the SEC will no longer be able to simply wave the "remedial card" and thereby evade meaningful judicial review of harsh sanctions they impose on specific defendants. . . .

*Id.* at 304–06 (emphasis added).

The SEC's view of post-*Kokesh* jurisprudence is optimistically monolithic. As *Saad* and the other cases herein demonstrate, the SEC's position that courts uniformly view *Kokesh*'s holding as hermetically sealed and immune from further expansion[3] is overstated. Relief

[3] As to Relief Defendant Riverdale Funding, LLC, *Kokesh*'s conclusion that the five-year statute of limitations applies to the SEC's disgorgement efforts is potentially implicated. With respect to Riverdale the SEC's Complaint fails to allege when the assets it seeks to disgorge from Riverdale were transferred to it, but the Complaint does allege that Riverdale was formed "in 2012." Compl., ¶31. The SEC's Complaint was filed on December 20, 2017 meaning that it cannot seek disgorge any assets that Riverdale obtained prior to December 20, 2012. The Complaint alleges that the scheme ran from "June 2012 through December 4, 2017." Compl., ¶1. The SEC has not alleged the dates (or even a range) during which Riverdale received the allegedly tainted assets the SEC seeks to disgorge.

Defendants respectfully submit that the Court should strike the SEC's prayer for disgorgement relief.

**CONCLUSION**

The Court should dismiss the SEC's Complaint against the Relief Defendants because its allegations do not satisfy the pleading standards under Rule 12(b) and Rule 9(b) and because the FPCM Notes do not constitute "securities," which would deprive this Court of subject-matter jurisdiction. In the event that this Court does not dismiss the Relief Defendants, they request that the Court require a more definite statement from the SEC under Rule 12(e) and that the Court strike the SEC's prayer for disgorgement under Rule 12(f) in light of *Kokesh.*

**WHEREFORE**, Relief Defendants respectfully submit that the Court should enter an Order dismissing the SEC's Complaint pursuant to Fed. R. Civ. P. 12(b) and Fed. R. Civ. P. 9(b)—or, alternatively, requiring a more definite statement from the SEC under Fed. R. Civ. P. 12(e)—and striking the SEC's prayer for disgorgement under Fed. R. Civ. P. 12(f).

Respectfully submitted,

ARMANDO ROSQUETE, P.A.
66 W. Flagler Street, Suite 1000
Miami, Florida 33130
Telephone: (305) 470-2060
Facsimile: (866) 747-9299
armando.rosquete@gmail.com

By: /s/ Armando Rosquete
Armando Rosquete, Esq.
Florida Bar No. 648434
*Counsel for Woodbridge Realty of Colorado, LLC, Woodbridge Luxury Homes of California, Inc., Riverdale Funding, LLC, and WFS Holding Co., LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of March 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on all counsel or parties of record on the Service List.

By: /s/Armando Rosquete
Armando Rosquete, Esq.